U.S. _____ ___

★ OCT 2 0 2009 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

                  Plaintiff,

    -against-

IDEAL MORTGAGE BANKERS, LTD.
d/b/a LEND AMERICA, and
MICHAEL HOWARD ASHLEY,

                  Defendants.
--------------------------------------------------------X

COMPLAINT

Civil Action No.

CV - 09 4484

BIANCO, J.

WALL, M.J.

    Plaintiff, the UNITED STATES OF AMERICA, by its attorney, BENTON J.

CAMPBELL, United States Attorney for the Eastern District of New York, and Kevan Cleary,

James H. Knapp, Edward K. Newman and John Vagelatos, Assistant U.S. Attorneys, alleges for

its Complaint as follows:

## I.  INTRODUCTION

    1.      This is a civil action brought by the United States pursuant to 18 U.S.C. § 1345

for a temporary restraining order, and preliminary and permanent injunctive relief, to enjoin

Defendant IDEAL MORTGAGE BANKERS, LTD. d/b/a LEND AMERICA ("LEND

AMERICA") and its Executive Vice President, Defendant MICHAEL HOWARD ASHLEY

("ASHLEY"), from engaging in ongoing schemes to defraud the United States with respect to

the origination of government-insured mortgage loans to unqualified borrowers.

    2.      LEND AMERICA is a mortgage lender that participates in a federal program

sponsored by the United States Department of Housing and Urban Development ("HUD") called

the "Direct Endorsement Program."  Subject to the requirements of the program, LEND

AMERICA is authorized to "originate" – i.e., make – and to underwrite mortgage loans to first-

time and low-income home buyers and to low-income home owners refinancing mortgages, that are insured by the Federal Housing Administration ("FHA"). In exchange for having the authority to originate and underwrite FHA-insured loans, LEND AMERICA is obligated to determine whether prospective borrowers meet minimal credit-worthiness criteria and to certify to HUD that borrowers who receive loans have met the criteria. In the event that an FHA-insured loan originated by LEND AMERICA goes into default, the FHA guarantees payment of the outstanding portion of the mortgage principal, accrued interest, and costs owed by the borrower.

3.      Through its abuse of the Direct Endorsement Program, LEND AMERICA is engaging in four categories of ongoing schemes to defraud the United States, any one of which provides a basis for the relief sought by the United States:

      a.      LEND AMERICA is misrepresenting and making materially false certifications to HUD that LEND AMERICA is complying with its obligations as a Direct Endorser, when in fact it is intentionally disregarding its obligations.

      b.      LEND AMERICA is intentionally manipulating the loan applications and documentation supporting endorsement for FHA insurance for unqualified borrowers so that it appears that the borrowers qualify for FHA-insured mortgage loans.

      c.      Each of the loans described herein constitutes an individual scheme to defraud. In each case, LEND AMERICA has not only (i) actively misrepresented and omitted material facts, but *also* (ii) made materially false certifications concerning the loans that it has originated and which have been endorsed for FHA insurance.

      d.      LEND AMERICA is intentionally concealing each of the foregoing schemes from detection by HUD.

4.      ASHLEY, together with others, has devised the schemes by which LEND AMERICA defrauded the United States.

5.      By these ongoing schemes to defraud, LEND AMERICA and ASHLEY

2

(collectively "Defendants") are inducing the FHA to guarantee non-qualifying mortgage loans.

6.     LEND AMERICA is deriving benefits from its participation in the Direct Endorsement Program, and by its fraudulent schemes, in the form of fees and other payments that it receives through the origination of FHA-insured loans.

7.     LEND AMERICA derives additional benefits from the sale of the mortgages into the secondary market, and from the servicing fees it receives from processing the monthly payments on the mortgages.

8.     ASHLEY derives benefits from the fraudulent schemes in the form of compensation for every FHA-insured loan originated by LEND AMERICA.

9.     As a result of Defendants' fraudulent schemes, many of LEND AMERICA's borrowers have missed mortgage payments and defaulted on their mortgage loans.  Many of these homeowners have lost or are in the process of losing their homes to foreclosure.

10.     The imprimatur of federal mortgage insurance puts the full faith and credit of the United States behind the payment of a mortgage and makes mortgages highly marketable.  The tainted mortgages in this case now serve as collateral for securities whose performance is guaranteed by the Government National Mortgage Association ("Ginnie Mae"), a government-owned corporation within HUD.  Thus, Defendants' fraudulent conduct has serious ramifications beyond its impact on the Direct Endorsement Program and the FHA insurance fund.

11.     For the reasons stated herein, the United States requests injunctive relief pursuant to 18 U.S.C. § 1345 to enjoin Defendants' schemes to defraud the United States using the mails and wires in violation of 18 U.S.C. § 1341 and § 1343.

## II. PARTIES

12.     Plaintiff United States of America is the sovereign and body politic.

3

13.     Defendant LEND AMERICA is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. HUD has approved LEND AMERICA as a Non-Supervised Mortgagee in the Direct Endorsement Program. LEND AMERICA has offices in New York and is approved by HUD to do business in 48 states and the District of Columbia. LEND AMERICA's principal place of business is, and was at all times relevant to this action, located in the Eastern District of New York. LEND AMERICA also does business as Consumer First and Lending Key.

14.     Defendant ASHLEY is, and was at all times relevant to this action, a key officer of LEND AMERICA whose responsibilities include oversight of the company. LEND AMERICA and ASHLEY have characterized his role in a number of different ways over time, ranging from Vice President to Executive Vice President to Chief Business Strategist. ASHLEY resides in the Eastern District of New York.

### III.  JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1345.

16.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2).

### IV.  FHA MORTGAGE INSURANCE AND THE DIRECT ENDORSEMENT PROGRAM

17.     The National Housing Act of 1934 authorizes the FHA to insure home mortgages for first-time and low-income home buyers. 12 U.S.C. § 1709. The FHA only insures mortgage loans issued by approved mortgage lenders or "mortgagees" to qualified borrowers.

18.     FHA approves mortgage lenders and other mortgagees for participation in the Direct Endorsement Program, in the following five categories:

        a.      Supervised Mortgagee: Financial institutions that are members of the

4

Federal Reserve System and whose accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), or the National Credit Union Administration (i.e., banks, savings associations and credit unions).

b.      Non-Supervised Mortgagee:  Non-depository financial entities that principally lend or invest funds in real estate mortgages (i.e., lenders).

c.      Non-Supervised Loan Correspondent:  Non-depository financial entities that principally originate FHA-insured mortgages for sale or transfer to sponsors who underwrite the mortgages (i.e., mortgage brokers).

d.      Supervised Loan Correspondent:  A mortgagee qualifying as a Supervised Mortgagee which has sponsors who underwrite the mortgages.

e.      Investing Mortgagee:  An organization, not approved as one of the above institutions, that invests funds under its own control, and which may purchase, hold and sell – but not originate – FHA-insured mortgages.

19.     Under the Direct Endorsement Program, approved mortgage lenders (" Direct Endorsers"), determine whether loan applicants are eligible for FHA mortgage insurance.  See 24 C.F.R. § 203.5(a).  A Direct Endorser must submit a mortgage insurance application for each borrower to HUD, with documentation of the borrower's assets and credit-worthiness, and of the Direct Endorser's review and analysis of the loan.  There are over 750 Direct Endorsers.  In the twelve month period ending August 31, 2009, HUD insured over 1.9 million loans.

20.     HUD authorizes some Direct Endorsers to endorse mortgage loans for FHA mortgage insurance on an expedited basis, after the company's own pre-endorsement review of the file.  This endorsement occurs without a pre-endorsement review of the mortgage insurance application file by HUD.  This is known as the Lender Insurance program.  Under this program, Direct Endorsers are still required to comply with all HUD regulations concerning the origination of FHA-insured mortgages.  Additionally, there is no reduction in the documents required and the mortgage lender is required to retain all loan origination documents.  Further, Direct Endorsers are still required to submit the full mortgage loan file to HUD upon HUD's request.  LEND AMERICA participates in the Lender Insurance program.

21.     LEND AMERICA originates mortgages nationally through its direct lending branch.  Direct lending branches of FHA-approved mortgage lenders contact consumers and originate mortgages through the internet, or through a call center.  LEND AMERICA's call center and internet-based origination operations are located in Melville, Long Island, in the Eastern District of New York.

22.     Many of LEND AMERICA's underwriters are located in Melville, Long Island, in the Eastern District of New York, and underwrite FHA-loan files for the all 48 of the states in which HUD approves LEND AMERICA to transact business.

**A.  Underwriting and Eligibility Requirements for FHA Mortgage Insurance**

23.     In determining whether a loan applicant qualifies for an FHA-insured mortgage loan, a Direct Endorser must comply with HUD underwriting requirements which establish the minimum standard of due diligence in underwriting mortgage loans.  24 C.F.R. § 203.5(c).  Among other things, a Direct Endorser is required by law to "exercise the same level of care it would exercise in obtaining and verifying information for a loan in which the [Direct Endorser] would be entirely dependent on the property as security to protect its investment."  Id.

24.     Specifically, a Direct Endorser is responsible for evaluating a borrower's credit characteristics, including past credit history and demonstrated willingness to pay debts.  Additionally, a Direct Endorser must assess the adequacy of a borrower's income, including the adequacy and stability of income to meet periodic mortgage payments and the adequacy of a borrower's available assets.  24 C.F.R. § 203.5(d).

25.     For each FHA-insured loan, a Direct Endorser must establish that the borrower has the ability and willingness to repay the loan.  A Direct Endorser's determination must be predicated on sound underwriting principles consistent with HUD's requirements and must be

6

supported by requisite documentation.  See HUD Handbook 4155.1Rev-5, Mortgage Credit

Analysis for Mortgage Insurance, One to Four Family Properties, October 20, 2003 ("Credit

Analysis Handbook"), ¶ 2-1.  A Direct Endorser must therefore pay specific attention to a

borrower's rent or mortgage payment history, and any collection actions, judgments, foreclosures

or bankruptcies.  Id.

      26.     If a borrower has gone through a bankruptcy, the Direct Endorser must document

that the borrower's current situation indicates that the events that led to the bankruptcy are not

likely to recur.  Further there must be documentation that  the borrower has the ability to

responsibly manage his or her financial affairs.  See  Credit Analysis Handbook , ¶2-3E.  HUD

regulations further require that a Direct Endorser calculate a borrower's verifiable income and

determine the likelihood that the income will continue through at least the first three years of the

mortgage.  Credit Analysis Handbook, ¶2-7.  In particular, a Direct Endorser must review:

        a.    salaries, wages, and other regular payments such as social security or
            retirement benefits;

        b.    alimony, child support or maintenance income; and

        c.    net rental income from property owned by the borrower.

A Direct Endorser may include rental income from properties owned by borrowers in its

analysis, if the lender can document that the rental income is stable through a lease, an agreement

to lease, or a rental over the past twenty-four months free of unexplained gaps.

      27.     A Direct Endorser must further verify and document a borrower's cash

investment in the property by obtaining a Verification of Deposit form from the borrower's bank

to verify their current bank deposits, along with the most recent bank statement.  Credit Analysis

Handbook, ¶2-10B.

      28.     A Direct Endorser must also list a borrower's recurring obligations, including

installment loans, charge accounts, and real estate loans, and consider their impact on the borrower's ability to pay the mortgage.  Credit Analysis Handbook, ¶2-11A; ¶3-1B.

29.    Additionally, a Direct Endorser must compute two "Qualifying Ratios" to determine whether the borrower can reasonably be expected to meet the expenses involved in home ownership, and otherwise provide for the borrower's family:

a.    Mortgage Payment to Effective Income Total: the mortgage payment, including payments into an escrow account for taxes, insurance and any other assessments, should not exceed 31% of a borrower's effective income.  Credit Analysis Handbook, ¶2-12A; Mortgagee-Letter 2005-16, April 13, 2005.

b.    Total Fixed Payment to Effective Income: the borrower's mortgage payments and all other payments on recurring obligations should not exceed 43% of effective income.  Credit Analysis Handbook, ¶2-12B; Mortgagee-Letter 2005-16, April 13, 2005.

30.    Where a borrower exceeds either Qualifying Ratio, a Direct Endorser must determine whether there are "Compensating Factors" that justify the making of the loan.  Credit Analysis Handbook, Chapter 2, Section 5, ¶2-13.  Compensating Factors include whether a borrower has:

a.    successfully demonstrated the ability to pay housing expenses equal to or greater than the proposed monthly housing expense for the new mortgage over the past 12-24 months.

b.    demonstrated an ability to accumulate savings and a conservative attitude toward the use of credit.

c.    only a minimal increase in the housing expense.

d.    at least three months' documented cash reserves after closing (and funds from gifts from any source are not to be included as cash reserves).

31.    HUD further requires that a Direct Endorser judge the overall merit of a borrower's loan application.  Simply establishing that a loan transaction meets minimal standards does not necessarily constitute prudent underwriting.  Credit Analysis Handbook, Chapter 2,

8

Section 5.  A Direct Endorser must therefore analyze the probability that a borrower will repay the mortgage obligation.  Credit Analysis Handbook, Chapter 2, Section 5.

32.    A Direct Endorser must document each loan submitted for mortgage insurance. Credit Analysis Handbook, Chapter 3.  A Direct Endorser must ask questions that will elicit a complete picture of the borrower's financial situation.

33.    When a borrower's credit history reveals delinquent accounts, the Direct Endorser must document their analysis of whether the late payments were based on a disregard for, or inability to pay or manage debts.  Credit Analysis Handbook, ¶2-3.

34.    A Direct Endorser is required to have the property appraised according to specified standards and requirements laid out by the Secretary of HUD.  24 C.F.R. § 203.5(e)(1). See HUD Handbook 4150.2, Chg-1,Valuation Analysis for One-to-Four-Unit Dwelling, July 1, 1999 ("Appraisal Handbook").  The appraiser must provide an analysis of sales of comparable properties that occurred within one year of the appraisal.  HUD Mortgagee Letter 2005-02, January 4, 2005.

35.    Appraisals must be in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP").  12 U.S.C. § 202(e); Appraisal Handbook ¶4-0.

36.    Appraisers must verify that all sales comparable information used in the appraisal is accurate and meaningful.  Verification must ensure that only information that accurately reflects current market trends and conditions is presented.

37.    Appraisers must have an understanding for the motivations behind the sale of a comparable, in order to determine that the sale was at arm's length and not distressed.  Sale information must be verified by a party to the sale or their representative.

38.    Only if the sale cannot be verified by someone with first hand information, may

9

public records be relied upon.  However, sales information that was not verified with an involved party or one of their representatives should not be heavily relied upon by appraisers, because of the prevalence of sales concessions in the real estate market, Appraisal Handbook, Section 8, Confirmation of Sales and Transaction Information.  A Direct Endorser may receive Verification of Employment forms from a borrower's employer by fax, if the borrower's employer is clearly identified as the source of the fax.  The lender is accountable for ascertaining the authenticity of employment verification documents, by examining information its header and footer.  Credit Analysis Handbook, ¶3-1.

39.     Mortgage lenders may not accept or use documents relating to the employment, income or credit of borrowers that are handled or transmitted from or through interested third parties, including real estate agents, or by using their equipment.  Credit Analysis Handbook, ¶3-1.

## B. Direct Endorser Certifications To HUD

40.     As a condition for maintaining its participation in the Direct Endorsement Program, a Direct Endorser, by its President or Vice-President, must certify to HUD annually that the Direct Endorser conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval.  See Title II Yearly Verification Report, Home Office.  The officer must further certify that the Direct Endorser is responsible for all its employees' actions.  Id.

41.     For each mortgage loan insured by FHA under the Direct Endorsement Program, a Direct Endorser and its Underwriter must make a number of certifications required by HUD. See Direct Endorsement Approval for a HUD/FHA Insured Mortgage form; HUD Handbook 4000.4 Rev-1, Single Family Direct Endorsement Program, 9/2/88 ("Direct Endorsement Handbook"), ¶2-1.

42.     Specifically, a Direct Endorser must make a series of certifications in the HUD 1003 Addendum, also known as the HUD/VA Addendum to Uniform Residential Loan

Application and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, including:

    a.    The loan terms furnished in the Uniform Residential Loan Application and the Addendum are true, accurate and complete.

    b.    The information contained in the Uniform Residential Loan Application and the Addendum was obtained directly from the borrower by an employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief.

    c.    The verification of employment was requested and received by the lender without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.

    d.    The verification of deposit was requested and received by the lender without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.

    e.    The proposed loan to the borrower meets the income and credit requirements of the governing law in the lender's judgment.

    f.    That the Direct Endorsement Underwriter has personally reviewed any appraisal report, credit application, and all associated documents.

    g.    That the Direct Endorsement Underwriter has used due diligence in underwriting the mortgage.

    h.    That the statements made in its application for insurance are true and correct.

    i.    That the statements made in the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

    j.    That complete disbursement of the loan has been made to the borrower, or to his/her creditors for his/her account and with his/her consent.

    k.    No charge has been made to or paid by the borrower except as permitted under HUD regulations.

    l.    The Lender has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with the transaction except as permitted under HUD regulations and administrative instructions.

    m.    The Lender's officer has personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents.

n.    The Lender's officer has made all certifications required for the mortgage by Direct Endorsement Handbook.

o.    That the Direct Endorsement Underwriter makes all certifications required by Direct Endorsement Handbook, which include:

i.    The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

ii.   The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

iii.  The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

43.    A Direct Endorser's Underwriter must represent, in the Underwriter's Analysis of Appraisal Report, that the mortgage property was appraised using acceptable comparable properties to determine the its value. The Direct Endorser is responsible for the quality of the appraisal, and for ensuring that the appraisal and related documentation satisfy FHA appraisal requirements. 24 C.F.R. § 203.5(e)(3).

## C. Submission To HUD

44.    A Direct Endorser must submit a mortgage insurance application for each borrower to HUD, together with documentation of the borrower's assets and credit-worthiness, and documentation of the Direct Endorser's review and analysis of the loan, including:

a.    The Uniform Residential Loan Application and Addendum signed and dated by all borrowers and the Direct Endorser. Credit Analysis Handbook, ¶3-1;

b.    Mortgage Credit Analysis Worksheet ("MCAW") where the Direct Endorser must truthfully and accurately break out and review the borrower's available assets and income, versus the expected costs of both the mortgage and other fixed payments owed by the borrower. The Direct Endorser further must truthfully apply HUD-mandated ratios and ratings of the borrower's credit as well as their current and future ability to pay their debts;

c.    Credit Report for all borrowers;

12

d. Verification of employment;

e. Verification of available funds from borrower's bank, and the borrower's most recent bank statements;

f. Verification of Rent or Payment History of Present/Previous Mortgages; and

g. Settlement Statement (also known as the "HUD-1").

HUD does not accept personal delivery of insurance applications.

45. Direct Endorsers also electronically submit information for mortgage insurance applications to HUD, including the borrower's name and social security number, the property address, the appraiser's name, and the borrower's Qualifying Ratios.

46. After HUD receives a Direct Endorser's mortgage insurance application, HUD will issue a mortgage insurance certificate for the mortgage if several criteria are met, including that the application contains all the required documentation and that the Direct Endorser and its Underwriter have made their certifications. 24 C.F.R. § 203.255(c)(1)-(7).

47. HUD monitors Direct Endorsers' compliance with HUD regulations. HUD tracks the delinquency and default rates (delinquencies of greater than ninety days) of borrowers from each approved branch office of a Direct Endorsement mortgage lender for the first two years of each loan, to detect whether the mortgage lenders may be violating HUD standards in originating insured mortgage loans.

48. HUD's primary means to monitor compliance with its underwriting regulations is through the Neighborhood Watch system ("Neighborhood Watch"). Neighborhood Watch is a tool which identifies lenders, loan types, and locations by zip code that have a high incidence of single family insured mortgages going into default (90 days delinquent) within the first two years after loan origination. The system is designed to highlight exceptions, so that potential problems are readily identifiable. Neighborhood Watch is designed as an Early Warning System and is

13

intended *inter alia* to aid HUD/FHA staff in monitoring lenders and our programs.

## V. FACTS

### A. Prior Mortgage Fraud Violations

49.     The fraudulent schemes alleged herein are the latest iteration of a pattern of conduct over two decades in the making.

50.     Throughout his career in the mortgage industry, ASHLEY has violated governing regulations, laws and industry bans. Each company he has worked at has in turn come under scrutiny, causing him to repeatedly move from company to company.

51.     In 1984, ASHLEY began working for Liberty Mortgage Banking Ltd. ("Liberty Mortgage"), which was owned by his father, Kenneth Ashley.

52.     After working six to eight months at Liberty Mortgage, ASHLEY left Liberty Mortgage to work for Chase Capital d/b/a Shares Capital Company ("Shares Capital"), a mortgage brokerage set up by his father and others. Although ASHLEY owned a portion of Shares Capital, it was controlled by his father.

53.     In 1987, ASHLEY was working as a mortgage broker for Shares Capital. ASHLEY's father was the owner and president of Liberty Mortgage. ASHLEY's mother, Janet Ashley, also worked as an in-house title closer for Liberty Mortgage. In 1987, ASHLEY was referring roughly 95% of the loans that Shares Capital originated to Liberty Mortgage.

54.     In September 1987, due to a downturn in the real estate industry, ASHLEY ceased the operations of Shares Capital and put 60-70% of the Shares employees to work downstairs at Liberty Mortgage on the second floor. At that time, ASHLEY began working for Liberty Mortgage as a sales manager, where he was "responsible for sales."

55.     In January 1988, ASHLEY had a falling-out with his father and began operating

Shares Capital again as a mortgage broker.  Even though ASHLEY had left Liberty Mortgage,

once he restarted Shares Capital, he continued to primarily bring mortgage applications to

Liberty Mortgage.

56.     ASHLEY was the President of Shares Capital, and "oversaw all aspects of the

company's mortgage brokerage business operation, from origination to closing."

57.     At some time prior to 1989, by his own admission, ASHLEY began engaging in

mortgage fraud.

58.     By that time, ASHLEY was – in his own words – "very familiar" with the

guidelines of the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Freddie Mac was

a private corporation created by Congress to develop a secondary mortgage market for

conventional residential loans.  As such, Freddie Mac purchased conventional loans from

approved mortgage sellers.

59.     During the time of the frauds, ASHLEY was working as a mortgage broker taking

loan applications and knew the secondary market's loan qualification requirements.

60.     ASHLEY "basically falsif[ied] documentation on mortgages" so that they would

meet guidelines for the secondary market, Fannie Mae, Freddie Mac and other secondary market

investors.  ASHLEY admitted that he falsified borrowers' assets and credit in "all different

ways", falsifying deposit verifications, gift verifications, income, assets, and owner occupancy.

61.     ASHLEY explained that "Mortgage companies sell their loans off into the

secondary market and there's a set of guidelines you have to go by in order to get these loans

approved.  I made sure the loans that were in my interest, that they met the guidelines.  If

somebody didn't have the income, I made it up myself, although they didn't have the income."

62.     For example, in order to meet Freddie Mac's income requirements for purchasing

a loan, ASHLEY would fraudulently increase non-qualifying borrower's income by either falsifying verifications of income ("VOI") himself, asking the borrower to falsify a VOI, or directing his employees to falsify a VOI.

63.    By his own admission, ASHLEY engaged in more than ten instances of mortgage fraud, in connection with which he confessed to forging documents.

64.    As a mortgage broker, ASHLEY "helped fill out the application for the mortgage." In doing so, he participated with others in "actually filling out loan applications, misrepresenting income and assets in order to qualify" for Fannie Mae mortgages. ASHLEY would also participate in misrepresenting "the value of the property that would be financed in order to qualify for the mortgage, in order to get the mortgage."

65.    As a result of the fraudulent statements of ASHLEY and his co-conspirators, the lending bank provided, and Freddie Mac purchased, the mortgage, and were defrauded in the amount of the mortgage.

66.    As part of those frauds, ASHLEY transmitted and caused to be transmitted fraudulent statements in interstate commerce by means of wire communication.

67.    Mortgage brokers provide a service for prospective borrowers. For a fee, they locate the best available mortgage rates for a borrower. While ASHLEY was working for Shares Capital, the mortgage brokerage was not allowed to issue any government loans. Nonetheless, in order to circumvent that limitation, ASHLEY directed two of his salespeople to work for a mortgage lender that was allowed to originate government loans. Based on the loans that ASHLEY funneled through his salespeople for origination, the mortgage lender would surreptitiously compensate ASHLEY by paying ASHLEY's wife.

16

**B.  Closing of Liberty Mortgage and Opening of Able Mortgage**

68.     In March 1991, Liberty Mortgage Banking Ltd. surrendered its New York license to engage in business as a mortgage banker.  In June 1991, Liberty Mortgage Banking Ltd. also gave up its HUD approval.  Also in 1991, ASHLEY gave up his New York state mortgage broker license.

69.     In 1991, Liberty Mortgage gave up its FHA approval.  At that time, ASHLEY owned a part of Liberty Mortgage.

70.     In or around 1990, ASHLEY began a new company, Able Mortgage, a registered mortgage broker.  ASHLEY acted as Able's Sales Manager, recruiting, hiring and managing a sales staff to originate loan applications in the Long Island, New York area.

71.     At some time in 1991 or later, ASHLEY was employed by Consumer Home Mortgage.

**C.  Indictment and Conviction**

72.     On June 14, 1993, the United States of America filed indictment No. 93-CR-00662 (JM) against Liberty Mortgage, ASHLEY, Janet Ashley, and others.  The indictment charged the defendants with conspiring to commit wire fraud in violation of 18 U.S.C. § 371 and 3551 et seq.

73.     On October 22, 1993, the United States of America filed information No. 93-CR-01188 (JM) against ASHLEY alone.  The information alleged two counts of fraud and conspiracy to commit fraud in violation of 18 U.S.C. § 371 to defraud lender Loan America and secondary purchaser Freddie Mac.  ASHLEY later waived indictment.

74.     On October 28, 1993, ASHLEY pled guilty to Count One of Indictment No. 93-CR-662 (JM) and both counts of information No. 93-CR-01188 (JM).  In sum, ASHLEY plead

guilty to three counts of conspiracy to commit wire fraud in connection with multiple instances of mortgage fraud.

75.     Liberty Mortgage Banking, Ltd. plead not guilty.  After a jury trial, Liberty Mortgage Banking Ltd. was found guilty of two counts of wire fraud under indictment No. 93-CR-00662 (JM) on June 21, 1994.

76.     On November 29, 1994, the Honorable Jacob Mishler sentenced Liberty Mortgage to a fine of $1 million.

77.     On October 25, 1996, the Honorable Jacob Mishler sentenced ASHLEY to five years probation, including two months of home confinement.  Judge Mishler also sentenced ASHLEY to pay restitution to Freddie Mac.  Finally, Judge Mishler ordered that – if the total restitution was paid on or before November 1, 1997, that the probationary term would end on November 1, 1997.

### D. **Mortgage Industry Ban**

78.     As a result of ASHLEY's October 1993 guilty plea, the New York State Banking Department informed Consumer Home Mortgage that if it continued to employ ASHLEY, the Department would terminate Consumer Home Mortgage's New York State mortgage banking license pursuant to sections 592(2) and 595(1) of the New York Banking Law.  Accordingly, Consumer Home Mortgage terminated ASHLEY's employment in December 1993.

79.     ASHLEY commenced litigation against the New York State Banking Department alleging, inter alia, the unconstitutionality of sections 592(2) and 595(1) of the New York Banking Law.  Pursuant to an August 1, 1997 settlement of that lawsuit with the Banking Department, ASHLEY paid $30,000 to the Freddie Mac Fraud Unit and $6,300 to two complainants.  He also consented to being "barred from engaging in any capacity in the

residential mortgage brokerage and mortgage banking industry in New York State" until August

1, 1997. ASHLEY further agreed that from August 1, 1997 through January 1, 1999, he could

engage in the residential mortgage brokerage and banking industry only as an employee of either

a licensed mortgage banker, a registered mortgage broker or an exempt organization, but not in a

managerial or processing position. ASHLEY also stipulated that he would not be an owner,

principal officer, director or control party of a mortgage banker, a mortgage broker or an exempt

organization until at least January 1, 2000.

      80.      Despite the New York State Banking Department's employment ban, ASHLEY

formed another company, Diversified Marketing, Ltd., located at 115 Broadhollow Road, Suite

350, Melville, New York. Contrary to the New York State Banking Department's employment

bar which precluded ASHLEY from "engaging in any capacity in the residential mortgage

brokerage and mortgage banking industry," ASHLEY continued to perform Consumer Home

Mortgage's marketing as a consultant through Diversified Marketing. In that capacity, he

"provided marketing and consulting services to the mortgage industry." He also "conducted

training for loan officers and real estate offices including the development of seminars and

marketing plans."

      81.      On May 21, 1997, HUD suspended and debarred ASHLEY from participating in

transactions as either a participant, principal or contractor with HUD and throughout the

Executive Branch of the Federal Government, based upon his conviction. ASHLEY appealed

his suspension and disbarment. Pursuant to a March 11, 1998 Settlement Agreement, ASHLEY

was debarred from participating in primary covered transactions and lower-tier covered

transactions, including procurement contracts, as a participant, principal, or contractor at HUD

and throughout the Executive Branch of the Federal Government for one year, ending May 20,

1998.  In addition, ASHLEY agreed to "fully comply with all rules, regulations and other requirements of HUD."

### E.  <u>Consumer Home Mortgage</u>

82.     In 1997, ASHLEY rejoined Consumer Home Mortgage ("Consumer") of Melville, New York to build the sales team.  His employment has been characterized at various times as a Sales Manager, Vice President of Marketing, President and Chief Financial Officer. As Sales Manager, ASHLEY "created a unique marketing plan to originate loan applications from real estate offices primarily located in the 5 boroughs of New York City."  ASHLEY was "responsible for recruiting, training and hiring loan officers."

83.     From 1996 to 2001, ASHLEY had increased loan volume 525% from $80 million in loans to $500 million loans.

84.     From July 1992 through March 2002, Dawn O'Halloran worked as an underwriter at Consumer.

85.     From December 1996 to February 2002, Lisa Burns worked as an underwriter at Consumer.

86.     From January 2001 to Febuary 2002, Erika Etzel worked as an underwriter at Consumer.

87.     From January 1997 to January 2002, Michael Primeau was a Senior Vice President of Consumer.

88.     From July 1999 to December 2001, Helene DeCillis was a Vice President of Consumer.

89.     In 2001, Consumer shut down its 10 branches and voluntarily relinquished its New York State mortgage license.

90.     In 2002, Consumer defaulted on its lease at its headquarters at 115 Broad Hollow Road in Melville, New York.

## F.  U.S. Mortgage

91.     In 2001, U.S. Mortgage of Pine Brook, New Jersey acquired Consumer. ASHLEY became an employee of U.S. Mortgage on February 4, 2002.  U.S. Mortgage's New York residential lending division operated under the name of "LEND AMERICA."

92.     ASHLEY brought approximately 40 to 50 of Consumer's employees with him to U.S. Mortgage.  Consumer's President, Robert Standfast, said in an interview that after ASHLEY left Consumer, business plummeted.

93.     ASHLEY stated that in an interview that U.S. Mortgage paid him "like I was an owner [of a mortgage bank] to join."  ASHLEY characterized his main function at LEND AMERICA is to generate loans.

94.     From July 2002 to April 2003, Dawn O'Halloran was an underwriter at U.S. Mortgage.

95.     From February 2002 to September 2003, Lisa Burns worked as an underwriter at U.S. Mortgage.

96.     From February 2002 to September 2003, Erika Etzel worked as an underwriter at U.S. Mortgage.

97.     From January 2002 to May 2003, Michael Primeau was a senior Vice President of U.S. Mortgage.  Helene DeCillis was his supervisor.

98.     From January 2002 to September 2003, DeCillis was a Vice President of U.S. Mortgage.

99.     In September 2002, HUD performed a quality assurance review of U.S. Mortgage

and found numerous instances of fraud, including but not limited to, as at Liberty, falsified documents, improperly documented funds, improperly documented income, insufficient credit analysis, excessive ratios and insufficient compensating factors.

100.   ASHLEY, who was an Executive Vice President at U.S. Mortgage, left the company on November 9, 2002, as part of a "mutual termination."

101.   HUD's Mortgagee Review Board later provided U.S. Mortgage with a Notice of Violation dated October 23, 2003, containing 14 findings.

102.   On December 29, 2003, U.S. Mortgage responded, in its response to the notice, noted:

> "[A]ll but a handful of the loans cited in the Notice were originated by employees who worked at LEND AMERICA, a former division of [U.S. Mortgage] managed by Michael Ashley. Significantly, [U.S. Mortgage] recently terminated its relationship with LEND AMERICA and Mr. Ashley, thereby closing 13 offices in New York. LEND AMERICA employees who no longer work for the Company originated, processed, underwrote, and closed the majority of the loans referenced in the Notice. . . [U.S. Mortgage] believes that the termination of its relationship with LEND AMERICA and Michael Ashley, coupled with its hiring of new Quality Assurance and compliance personnel, has improved and will continue to improve the Company's business operations."

### G. Ideal Mortgage Bankers, Ltd.

103.   After leaving U.S. Mortgage in 2003, ASHLEY and Michael Primeau brought their New York residential lending group, operating under the name "LEND AMERICA," to Ideal Mortgage Bankers, Ltd., also located 201 Old Country Road, Melville, New York.

104.   Primeau joined Ideal Mortgage Bankers, Ltd. as the Chief Operating Officer ("COO") in April 2003. Primeau became President, CEO and Loan Originator for LEND AMERICA in May 2003.

105.   Dawn O'Halloran became an underwriter with LEND AMERICA in June 2003.

106.   Lisa Burns became an underwriter with LEND AMERICA in October 2003.

22

107.    Erika Etzel became an underwriter with LEND AMERICA in September 2003.

108.    In September 2003, Helene DeCillis also left U.S. Mortgage and joined ASHLEY and Primeau at LEND AMERICA as a Vice President and corporate Secretary.  As a Vice President at LEND AMERICA, DeCillis was Manager of Secondary Marketing, Warehousing & Funding Departments.  Her responsibilities included supervising and tracking delivery and funding of all loans to investors.

109.    In September 2003, Ideal Mortgage Bankers, Ltd. acquired certain assets and liabilities of the mortgage operations of Ashley's New York residential lending group, "LEND AMERICA."  The "LEND AMERICA" branches were formerly part of U.S. Mortgage.  The stockholders of Ideal Mortgage Bankers, Ltd. facilitated this acquisition of certain assets and liabilities by contributing capital of approximately $4.9 million.  Included in the acquired assets were cash of $2.5 million, mortgage loans held for sale of $30.1 million and warehouse lines of credit of $27.3 million.

110.    In November 2003, Michael Primeau became the majority stockholder of LEND AMERICA.

### H. **ASHLEY'S Role at LEND AMERICA**

111.    LEND AMERICA and ASHLEY have characterized ASHLEY's role at LEND AMERICA in various ways, including Vice President of Sales, Executive Vice President for Sales and Marketing, and Chief Business Strategist.  In its 2008 New York State Banking Department Licensed Mortgage Banker Volume, LEND AMERICA listed ASHLEY as its Business Strategist, whose job responsibilities are "Marketing."

112.    LEND AMERICA and ASHLEY have fraudulently concealed ASHLEY's employment and criminal history from state regulators.

113.   By his own characterization, ASHLEY's role includes "oversight of the 'LEND AMERICA' division of Ideal Mortgage Bankers Ltd." ASHLEY "created, designed and implemented, under the supervision and with the approval of management, a complete retail loan origination model, including a . . . loan officer recruiting and training program. . ." "In addition to being the company's spokesperson on its website and TV shows, [ASHLEY has] meaningfully assisted in the achievement of Ideal's growth in all areas of the mortgage business, from operations through secondary marketing." ASHLEY "participated with the management team to create the company's vision, policies and procedures for everything from sales through the development and management of investor relationships."

114.   ASHLEY hired personnel to serve as FHA Audit Managers. The primary duty of FHA Audit Managers is ensuring that, in response to HUD requests for the loan origination file, that LEND AMERICA's files contain all required information and documentation. Moreover, should HUD have additional inquiries concerning information or inconsistencies within the LEND AMERICA files, FHA Audit Managers investigate and verify the accuracy of borrower information used in originating and endorsing FHA-insured loans.

115.   At ASHLEY's direction, and under his direct supervision, LEND AMERICA redirected its marketing efforts from subprime mortgages to FHA-insured mortgages. ASHLEY further directed and trained his sales force at LEND AMERICA to focus on originating mortgages to be insured by the FHA.

116.   Under the terms of ASHLEY's employment contract, ASHLEY's pay is directly tied to the value of the of the mortgage loans originated by LEND AMERICA. ASHLEY's contract requires that he receive one half a percentage point of every mortgage loan originated by LEND AMERICA. Thus, as stated in the employment agreement, if LEND AMERICA

originates $41 million in one month, ASHLEY is to receive $205,000 in compensation for that month.

117.    LEND AMERICA originated $1.075 billion in loans in the financial year ending September 30, 2008. Accordingly, ASHLEY was entitled to $5.375 million in associated compensation.

118.    Since at least early 2006, ASHLEY has personally conducted weekly sales meetings with his sales staff.

119.    From early 2006 forward, ASHLEY has urged LEND AMERICA employees to originate as many FHA-insured mortgages as possible. Employees were urged to "aggressively market FHA" loans, and to use "relentless pounding" to originate FHA loans. ASHLEY directed LEND AMERICA to make FHA loans its niche market.

120.    ASHLEY further informed his staff that FHA-insured loans were generally loans to borrowers in such bad financial shape that the borrowers could not otherwise obtain mortgages. ASHLEY informed his sales staff that there were "no minimum credit score requirements" for FHA-insured loans, and that it was okay for the borrower to have made late payments on previous mortgages. ASHLEY informed his sales force that FHA insured borrowers had the worst credit scores of any of the borrowers they provided mortgages to, but produced the largest commissions for each loan originated.

121.    ASHLEY further informed his sales staff that LEND AMERICA had "total control" over FHA-insured loans, and that "everything is done in house." In particular, "in house underwriting" meant that loans could be originated and closed faster.

122.    ASHLEY informed his sales staff that FHA-insured mortgages were preferable, because they required less documentation of the borrower's wages than other types of loans.

ASHLEY stated that LEND AMERICA had the "most control over the deal" with FHA-insured loans, as opposed to other types of loans.

123.    ASHLEY informed his sales force that salesmen received more commissions from FHA-insured loans than from any other type of mortgage.  Salesmen could make almost ten times the commissions they made for standard mortgages, and almost four times the commission they would make for subprime mortgages.

124.    ASHLEY informed his sales staff that they would receive their commissions for each FHA-insured loan they originated the day after the loan was funded.

125.    ASHLEY informed loan officers that loans should not be closed in two weeks or a month, but in eight hours.

126.    ASHLEY further informed his sales staff that FHA-insured loans were "the best for the company."

127.    ASHLEY consistently ranked his sales force, laying out at his sales meetings which sales people were originating the greatest number of mortgages.  Sales people were told that sooner or later they were going to have to "get on the bandwagon" and originate FHA-insured loans.

128.    ASHLEY instituted a computerized "virtual closing calendar" allowing him to continually track who was closing how many FHA-insured loans, and when.

129.    ASHLEY repeatedly stated to his sales force that those who did not originate large numbers of FHA-insured mortgages would be terminated from employment at LEND AMERICA.

130.    Loan officers were told that they should be closing at least two mortgages each week.

131.    ASHLEY fired the lower producing members of his sales staff.

132.    In February 2008, ASHLEY informed his sales staff that the "New LEND AMERICA" was launching "a campaign to eliminate the word 'no' from our team vocabulary." The staff was told to "imagine" a world where loan officers, loan underwriters, loan processors or loan closers "couldn't say no." Sales staff members were told to "change your thought process-ELIMINATE NO!" Saying no was deemed to be "easy" and a "cop-out."

133.    Also in February 2008, ASHLEY told his staff that, faced with a borrower with a credit score below the FHA minimum score of 530, LEND AMERICA would "incubate" the borrowers, so that their credit scores could be "worked" higher.

134.    Later in 2008, ASHLEY informed his staff that there was a minimum requirement for them of one loan origination a week.

135.    In addition, a "points ranking system" was instituted. Employees closing the most loans in a week would receive 200 points. Employees originating the most loans a week would receive 100 points. Employees closing an FHA-insured loan would receive 100 points. However, employees who had "fall out" from a loan that was handed in would lose 35 points, and those who had borrowers pull out of a mortgage would lose 50 points. Those with the most points would qualify for cash bonuses, and increased "guaranteed salaries" for several months. Those with the highest number of points would also have access to the best leads for new mortgages.

136.    In August 2008, ASHLEY announced that the Company's goals were "to provide the best opportunity in the country for every Lend American to earn an outstanding living consistently" and to make LEND AMERICA the "#1 Direct to Consumer FHA lender in the USA."

137.   Employees were told to "Close more-earn more-live more" to close more loans with "less pain, less time" and that loan processing was no longer needed and could be eliminated.  Loans would be approved in 24 hours, and originated within five days of LEND AMERICA's receipt of the property appraisal.

138.   ASHLEY makes underwriting decisions, overriding LEND AMERICA's authorized Direct Endorsement underwriters.  Accordingly, ASHLEY acts as a Direct Endorsement underwriter in violation of multiple federal regulations:

      a.     Direct Endorsement underwriters cannot be paid by commission. Credit Analysis Handbook, ¶3.10B.

      b.     Direct Endorsement underwriters cannot be contract employees.

      c.     Direct Endorsement underwriters must be trained and approved by HUD.

      d.     Only approved Direct Endorsement underwriters may make decisions as to the documentation required to originate and underwrite FHA-loans.

139.   LEND AMERICA has concealed and is concealing ASHLEY's employment and criminal history from multiple state regulators.

140.   LEND AMERICA received a Ginnie Mae stamp of approval in July 2008.

141.   Obtaining Ginnie Mae approval "has enabled LEND AMERICA to have the flexibility to efficiently originate HUD [Department of Housing and Urban Development] loans without the uncertain dependence on those few permanent investors who buy loans for securitization.  The company has eliminated the middleman and today manages the flow of their pipeline into the secondary market."

### I.  LEND AMERICA's Violations

142.   In 2006, LEND AMERICA was using prohibited advertising practices in its marketing and advertising materials.  Specifically,

      a.     LEND AMERICA displayed HUD's logo in its advertising to convey the

28

false impression that the advertisement was from HUD in violation of 18 USC 1017.

b.  LEND AMERICA's advertisement used the wording "Final Notice of Rate Increase" on the advertisement and envelope to mislead the recipient to believe that the notice was from their current mortgage holder when it was from LEND AMERICA.

The Direct Marketing Association notified ASHLEY that LEND AMERICA's advertising was potentially misleading in May 2006. Nonetheless, ASHLEY and LEND AMERICA did not revise the advertising to address the issues until after HUD contacted them in June 2006.

143.  In October 2007, LEND AMERICA was using prohibited advertising practices in its marketing and advertising materials. Specifically, LEND AMERICA's advertisement indicated that the company would charge borrowers a mortgage broker fee in the context of a sponsor program in violation of 24 CFR § 203.27.

144.  In March 2008, LEND AMERICA was using prohibited advertising practices in its marketing and advertising materials. Specifically,

a.  LEND AMERICA used the terms "FHA," "HUD" and the "Federal Housing Administration" in its advertising to convey the false impression that LEND AMERICA's advertising was authorized by the FHA. LEND AMERICA's advertising violated Title 18 USC § 709.

b.  LEND AMERICA's advertisement gave the false and misleading impression that FHA is a sub-prime loan.

c.  LEND AMERICA's advertisement indicated that the company would underwrite for retail brokers who do not have an FHA license in violation of HUD Handbook 4060.1 REV-2, Mortgagee Approval Handbook, ¶ 2-14A, which prohibits Direct Endorsers from allowing an unlicensed broker to originate insured mortgages under the Direct Endorser's FHA number.

145.  In 2008, HUD sent LEND AMERICA a Notice of Violation and Notice of Intent to seek Civil Money Penalty in connection with deceptive advertising practices. Specifically, the Notice stated that LEND AMERICA "improperly advertised on a government-type form designed to simulate an official Federal government document." The Notice further stated that

LEND AMERICA "disseminated correspondence to homeowners giving the false impression that the company has a connection with, or authorization from, HUD/FHA."

146.    In November 2008, the Pennsylvania Department of Banking alleged that LEND AMERICA "engaged in dishonest, fraudulent, illegal, unfair and/or unethical business practices by not funding a closed loan it was required to." LEND AMERICA contended that it did not fund the loan because the borrower failed "to provide documentation regarding the source of the funds necessary for closing as required by applicable guidelines for FHA-insured loans." In spite of the Borrower's failure to provide documentation required for FHA-insured loans, LEND AMERICA allowed the closing to proceed but withheld the mortgage funds. LEND AMERICA denied the Pennsylvania Department of Banking's allegations, but settled the matter by Consent Agreement and Order in 2009.

### J.    Defendants' Current And Continuing Fraudulent Schemes

147.    LEND AMERICA is intentionally disregarding its obligations as a Direct Endorser while Defendants are certifying to HUD that LEND AMERICA is complying with those obligations.

148.    On March 31, 2009, Michael Primeau, as President of LEND AMERICA, made LEND AMERICA's annual certification to HUD of compliance with HUD-FHA regulations for the fiscal year ending December 2008. Specifically, Primeau certified that he knew or was in the position to know whether LEND AMERICA's operations "conform to HUD and FHA regulations, handbooks and policies," and that LEND AMERICA was "fully responsible for all actions of its employees." Critically, Primeau made the further, materially false certification that LEND AMERICA conformed to all HUD-FHA regulations necessary to maintain its HUD-FHA approval as a Direct Endorser.

149.    In 2008, LEND AMERICA made its annual certification to HUD of compliance

30

with HUD-FHA regulations for the fiscal year ending December 2007.

150.    On May 15, 2007, Helene DeCillis, as Vice-President of LEND AMERICA, made LEND AMERICA's annual certification to HUD of compliance with HUD-FHA regulations for the fiscal year ending December 2006.  Specifically, DeCillis certified that she knew or was in the position to know whether LEND AMERICA's operations "conform to HUD and FHA regulations, handbooks and policies," and that LEND AMERICA was "fully responsible for all actions of its employees."  Critically, DeCillis made the further, materially false certification that LEND AMERICA conformed to all HUD-FHA regulations necessary to maintain its HUD-FHA approval as a Direct Endorser.

151.    Beginning in 2004, and every year thereafter, either Michael Primeau or Helene DeCillis made LEND AMERICA's annual certification to HUD of compliance with HUD-FHA regulations for the fiscal year ending December 2004.

152.    In each of the forty mortgage loans set forth below, Defendants have actively misrepresented and omitted material facts, and also made materially false certifications as to the truth, accuracy and sufficiency of the files submitted to HUD.  Collectively, these FHA insurance applications represent nearly $14 million in potential exposure to the FHA insurance program.

153.    Additionally, Defendants are intentionally concealing their fraudulent acts from detection by HUD, which tracks mortgage delinquency and default rates of FHA-approved lenders to detect problems in loan origination.

154.    LEND AMERICA is greatly expanding its FHA-insured loan business.  On October 1, 2009, LEND AMERICA announced that it was entering the wholesale residential mortgage lending business.  This means that LEND AMERICA will now be accepting additional

31

loans for FHA-insurance from mortgage brokers, as well as its current business of retail lending directly to individual borrowers.  LEND AMERICA stated that it expected to accept its first wholesale loan in mid-October 2009.  On October 13, 2009, in an apparent reference to its status as a Ginnie-Mae approved issuer, LEND AMERICA announced that it was starting the "Mini Ginnie Correspondent" program.  Under this program, LEND AMERICA will purchase closed FHA-insured loans from other Direct Endorsers.  LEND AMERICA stated that it expected to purchase its first loans for this program on October 15, 2009.  On Wednesday October 14, 2009, LEND AMERICA initiated an intensive recruiting effort to hire more employees to handle its expanding business, as part of a self-described "media blast."  According to LEND AMERICA, this recruiting effort is to last for six months, and to cover the "entire metro area."

### Borrower 1: Beach 86th Street, Rockaway Beach

155.    LEND AMERICA originated and underwrote a mortgage for $454,862 to Borrower 1, for property on Beach 86th Street, Rockaway Beach, New York, on January 31, 2008.  Pursuant to the terms of the mortgage, Borrower 1 was required to make a monthly mortgage payment of $3,504.84.

156.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on March 1, 2008.  LEND AMERICA also electronically transmitted information to HUD in support of the application on September 12, 2007, December 27, 2007, January 31, 2008, and February 5, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 1's mortgage to HUD, via United States mail or commercial interstate carrier, on or about January 14, 2009.

157.    At the time LEND AMERICA originated the mortgage, Borrower 1 had not been regularly employed for three years.

158.    During his unemployment, Borrower 1's only regular income was a disability

check from the Department of Veterans Affairs ("VA") for $1,503 per month.

159.   Although Borrower 1 informed LEND AMERICA of his lack of regular employment as well as the fact that he was no longer receiving disability payments, LEND AMERICA employee Nel Nirenstein informed Borrower 1 that she would "take care of the employment" for him.  LEND AMERICA thereafter originated the mortgage, and proceeded with the application for FHA mortgage insurance.

160.   LEND AMERICA executed a fraudulent Uniform Residential Loan Application ("URLA") to HUD.  The URLA falsely reported that Borrower 1 was receiving a $1,503 monthly veteran's pension.

161.   LEND AMERICA submitted a fraudulent Verification of Employment form ("VOE") to HUD.  The VOE falsely stated that Borrower 1 had been employed at a business called Adam's Agency Inc. since January 2005, at a weekly salary of $1,419.23.  Borrower 1 never worked for Adam's Agency and was not receiving a weekly salary at this time.

162.   Credit Analysis Handbook, ¶3-1 allows mortgage lenders to receive VOEs by fax, if the borrower's employer is clearly identified as the source of the fax.  LEND AMERICA received the VOE by fax, with no identification of the sender, and a fax legend that states "From: Unknown."  LEND AMERICA removed this fax legend on the copy of the VOE submitted to HUD, to conceal that the VOE had been faxed to LEND AMERICA from an "unknown" sender.

163.   On the VOE, LEND AMERICA falsely certified to HUD that the VOE had been sent directly to the employer by LEND AMERICA, and that it did not pass through the hands of any other interested party.

164.   In the HUD 1003 Addendum, LEND AMERICA Direct Endorsement Underwriter Erika Etzel, on behalf of LEND AMERICA, fraudulently certified that the VOE

33

was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

165.    In addition to the fraudulent VOE, LEND AMERICA submitted a fraudulent letter to HUD, purporting to be from Adam's Agency, itemizing payroll deductions for this non-existent job.

166.    Credit Analysis Handbook, ¶3-1 prohibits mortgage lenders from accepting or using employment documents from or through interested third parties, including real estate agents.  In violation of this provision, LEND AMERICA had received the letter from an interested third party, seller's real estate agent, Parkview Realty.

167.    Prior to submitting the Adam's Agency letter to HUD, LEND AMERICA removed the fax legend on the letter and omitted the fax cover sheet from the realtor, both to conceal that it was faxed to LEND AMERICA, and that it was faxed by an interested third party.

168.    Credit Analysis Handbook, ¶3-1 requires the mortgage lender to obtain and submit the borrower's most recent pay stub, along with the VOE.  LEND AMERICA failed to obtain or submit Borrower 1's most recent pay stub, as required.

169.    HUD required that LEND AMERICA obtain at least the most recent paycheck stub from Borrower 1.  Because Borrower 1 was in fact unemployed, there was no cancelled paycheck or paycheck stub.  Nonetheless, LEND AMERICA misrepresented and falsely certified to HUD, in its application for Borrower 1's FHA mortgage insurance, that the application was supported by "[t]he most recent year-to-date pay stub documenting one full month's earnings."

170.    As part of LEND AMERICA's misrepresentations and false certifications to HUD, in or about December 2007, LEND AMERICA Executive Vice-President and Chief Business Strategist, ASHLEY, personally directed his subordinates, including Loan Officer

Nirenstein, to underwrite, and ultimately originate and endorse for FHA insurance, Borrower 1's mortgage loan without any evidence of genuine employment income.

171. LEND AMERICA included income from the non-existent job at Adam's Agency on the Mortgage Credit Analysis Worksheet ("MCAW") it submitted to HUD. On the MCAW, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that Borrower 1's gross monthly income was $8,673.

172. LEND AMERICA used the inflated income as the basis for its calculation of the Qualifying Ratios on the MCAW. LEND AMERICA fraudulently stated that Borrower 1 had both a mortgage payment-to-income ratio and a total fixed payment-to-income ratio of 40.411%. In reality, Borrower 1's Qualifying Ratios were 233%, well in excess of HUD guidelines that limit the mortgage payment-to-income ratio to 31% and the total fixed payment-to-income ratio to 43%.

173. Despite LEND AMERICA's fraudulent inflation of Borrower 1's income, the Qualifying Ratios still exceeded HUD's permissible guidelines. LEND AMERICA, however, failed to list any Compensating Factors, which are required to be set out by the lender, to justify a loan when the ratio exceeds HUD's guidelines.

174. As part of the FHA mortgage insurance application, LEND AMERICA submitted a fraudulent Verification of Rent form ("VOR") to HUD as documentation for Borrower 1. The VOR falsely stated that Borrower 1 paid $975 per month in rent. Borrower 1's rent was actually $500.

175. On the URLA it submitted to HUD, LEND AMERICA falsely reported Borrower 1's past rental history to exaggerate Borrower 1's ability to make monthly payments.

176. LEND AMERICA submitted a credit report to HUD containing false rental

information.

177.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

178.    Further, Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

179.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 1's employment and income, LEND AMERICA falsely certified to HUD that Borrower 1 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

180.    After no payments were made on the loan whatsoever, the loan defaulted 7 months after closing.  Foreclosure proceedings have been instituted against the property.

**Borrower 2: Colonial Avenue, Freeport**

181.    LEND AMERICA originated and underwrote a mortgage for $356,755 to Borrower 2 for property on Colonial Avenue, in Freeport, New York, on May 4, 2007.  Pursuant to the terms of the mortgage, Borrower 2 was required to make a monthly mortgage payment of $3,125.82.

182.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on May 11, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on April 12, 2007, April 30, 2007, May 4, 2007, May 10, 2007, and May 11, 2007.  LEND AMERICA sent the file supporting its

endorsement of FHA insurance for Borrower 2's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

183.    LEND AMERICA submitted a fraudulent URLA to HUD.  The URLA falsely inflated Borrower 2's monthly income by 60%, by including a non-existent, third job for borrower, at a business called Pyramid Financial.  Borrower 2 never worked for, or received any income from Pyramid Financial.

184.    LEND AMERICA executed a fraudulent MCAW.  LEND AMERICA included the income from the non-existent job at Pyramid Financial, and so inflated Borrower 2's monthly income on the MCAW.  LEND AMERICA further calculated the Qualifying Ratios falsely premised on this figure.  LEND AMERICA falsely stated on the MCAW that Borrower 2 had a mortgage payment-to-income ratio of 40.388%.  In reality, Borrower 2 would have to use an excessive 65% of his monthly income to pay his mortgage.  This ratio violated HUD guidelines.

185.    On the MCAW, LEND AMERICA further fraudulently stated that Borrower 2's total fixed payment-to-income ratio was 45.763%.  The ratio was actually 73%, meaning that Borrower 2 would have to use 73% of his total monthly income to pay all his recurring monthly debts.  Both Qualifying Ratios greatly exceed HUD's guidelines.

186.    LEND AMERICA submitted a fraudulent employment letter to HUD from Pyramid Financial.  The letter falsely stated that Borrower 2 had been an employee at the company from July 2003.  As with other fraudulent employment letters submitted by LEND AMERICA in support of its endorsement of borrower files for FHA mortgage insurance, the letter contained the statement that Borrower 2 "does not receive computer generated pay stubs."  The employer letter included a false bi-weekly gross salary, false tax withholdings and false net pay.  On information and belief, LEND AMERICA arranges for this statement to be included on

37

fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

187.    LEND AMERICA submitted a fraudulent VOE to HUD.  The VOE falsely stated that Borrower 2 earned $31,182 from Pyramid in 2005; earned $32,895 from Pyramid in 2006; and earned $10,816 from Pyramid as of May 2007.  The form was forged by LEND AMERICA.

188.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of LEND AMERICA's knowledge and belief.

189.    LEND AMERICA submitted a forged letter purporting to be from Borrower 2. The letter falsely stated the work hours for Borrower 2 at his three jobs.  Borrower 2 did not write or sign this letter, and was not aware that it had been prepared or submitted to HUD.

190.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the Direct Endorsement file and all of its components.

191.    Further, Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

192.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 2's employment and income, LEND AMERICA falsely certified to HUD that Borrower 2 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

193.    After making two payments, the borrower became delinquent, and then defaulted on the mortgage.  The house was sold in a preforeclosure sale by the mortgage holder.  HUD incurred a loss of $149,991.13 on a claim filed against the FHA mortgage insurance by the mortgage holder.

### Borrowers 3A, 3B and 3C: Burgher Avenue, Staten Island

194.    LEND AMERICA originated and underwrote a mortgage for $320,299 to Borrowers 3A, 3B and 3C for property on Burgher Avenue, Staten Island, New York on July 17, 2006.  Under the terms of the mortgage, the borrowers' monthly mortgage payment was $2,570.90.

195.    LEND AMERICA sent the application for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier on or about July 26, 2006.  LEND AMERICA also electronically transmitted information to HUD in support of the application on July 12, 2006, July 24, 2006, July 25, 2006, and July 27, 2006.

196.    While applying for the mortgage, LEND AMERICA agents and employees told Borrower 3A that his income was insufficient to qualify for the mortgage, and that he would need his parents, Borrowers 3B and 3C, as co-borrowers on the loan.  LEND AMERICA employees told Borrower 3A that the only way the loan would go through would be if it was stated that his parents were moving in with him and his family, and that his parents would be renting out their own two unit home.  The LEND AMERICA employees explained that the purported rental income from the parents home could be used to show how Borrower 3A's own mortgage would be paid.  Borrower 3A told LEND AMERICA that Borrowers 3B and 3C already owned their own home, that his parents would not be living in the property, and that they would not contribute to the monthly mortgage payments.

197.    Nonetheless, LEND AMERICA submitted fraudulent URLAs to HUD.  These URLAs falsely stated that Borrowers 3B and 3C intended to make the Burgher Avenue property their primary residence.  The URLAs also fraudulently included the $1,351 of monthly rental income the parents were purportedly earning, as being available to pay the mortgage.  The URLAs further fraudulently included the parents' social security and disability income as being available to pay the mortgage.

198.    LEND AMERICA submitted a fraudulent Co-Mortgagor Statement, Disclosure Notices form, and Statement of Occupancy to HUD, all of which stated that Borrowers 3B and 3C intended to make the Burgher Avenue property their primary residence.  The Co-Mortgagor Statement further stated that all three co-borrowers would share in all monthly expenses connected with the property, including mortgage payments.

199.    LEND AMERICA fraudulently submitted a MCAW to HUD, which falsely included Borrowers 3B and 3C's monthly income from social security and disability income. The MCAW also falsely stated that $1,351 from the parents' rental of their home was available for payment of the Burgher Avenue mortgage.  LEND AMERICA further fraudulently included both the benefits and non-existent rental income in its calculation of gross monthly income and Qualifying Ratios.  LEND AMERICA fraudulently stated this false income in order to make it appear to HUD that Borrowers 3A, 3B and 3C could meet the expenses involved in home ownership.

200.    In total, LEND AMERICA inflated Borrower 3A's monthly income by $3,775.50 by improperly including Borrowers 3B and 3C's income, real and fictitious, on the MCAW and URLAs.

201.    As a result of this fraudulent inflation, LEND AMERICA made it appear on the

40

MCAW that Borrowers 3A, 3B and 3C's mortgage payment-to-income ratio was just over

HUD's guidelines at 32.356 % and the total fixed payment-to-income ratio was an acceptable

41.354%.  Subtracting Borrowers 3B and 3C's income from the calculations, the actual

Qualifying Ratios are an unacceptable 61% and 75%, respectively.

202.    LEND AMERICA fraudulently submitted two forged leases to HUD.  On

information and belief, LEND AMERICA or its agents prepared these documents, which purport

to document that Borrowers 3B and 3C had rented out their home, and would be collecting

monthly rent payments.

203.    LEND AMERICA fraudulently submitted to HUD a forged, handwritten note,

purportedly written by Borrowers 3A and 3B.  The note falsely stated that Borrowers 3A, 3B and

3C would be moving in together into the Burgher Avenue property, and that the parents were

renting out their own home.  LEND AMERICA fraudulently submitted a forged, typewritten

letter to HUD purportedly written by Borrowers 3A, 3B and 3C.  The letter falsely stated that

changes in the parents' own neighborhood made them want to move in with their son and his

wife at the Burgher Avenue property.  According to the letter, the parents were going to occupy

one of the three bedrooms in the Burgher Avenue property; the second bedroom was for

Borrower 3A and his wife.  The third bedroom was to be for Borrower 3A and his wife's baby,

"when we are ready to have one."

204.    In reality, Borrower 3A and his wife already had four children, and were

expecting a fifth.  On information and belief, LEND AMERICA forged this letter.

205.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

Underwriter Lisa Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

41

sufficiency of the loan application and all of its components.

206.    Further, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified, pursuant to Direct Endorsement Handbook, to the integrity of the data supplied by the lender used to determine the quality of the loan.

207.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 3A, 3B, and 3C's income, LEND AMERICA falsely certified to HUD that Borrowers 3A, 3B, and 3C met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

208.    The borrowers could make only two payments on the loan.  The home was foreclosed upon, and Borrower 3A, his wife and five children were forced to leave the house and seek shelter elsewhere.  HUD incurred a loss of $193,649 on this loan.

### Borrower 4: Park Hill Avenue, Staten Island

209.    LEND AMERICA originated and underwrote a mortgage for $357,178 to Borrower 4 for property on Park Hill Avenue, Staten Island, New York, on May 23, 2007. Pursuant to the terms of the mortgage, Borrower 4 was required to make a monthly mortgage payment of $2,730.44.

210.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on June 9, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on May 8, 2007, May 23, 2007, May 30, 2007, and June 5, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 4's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

211.    Borrower 4 already owned a house on Mosel Avenue, Staten Island, on which she

42

was paying a mortgage. Borrower 4 was trying to rent or sell this property, but was unable to do so at the time she applied for the mortgage with LEND AMERICA. Nor had she rented or sold it by the time the mortgage was originated.

212.    LEND AMERICA submitted a fraudulent URLA to HUD. The URLA falsely stated that Borrower 4 was renting out the Mosel Avenue property for $2,000 per month, yielding a fictional $961 net rental income per month after mortgage payment and other expenses.

213.    LEND AMERICA executed a fraudulent MCAW. The MCAW falsely stated that Borrower 4 was receiving $961 in net rental income per month. Further, by omitting the mortgage payments already owed by the Borrower 4, and including the non-existent rental revenue on the MCAW, LEND AMERICA falsely reduced, and understated the Qualifying Ratios for the borrower. LEND AMERICA falsely stated that the mortgage payment-to-income ratio was 36.073%. In reality, it was 41%. LEND AMERICA falsely stated that the total fixed payment-to-income ratio was 41.728%. In reality, it was 59%, well in excess of HUD guidelines.

214.    LEND AMERICA submitted a fraudulent lease to HUD. The lease falsely purported to rent the Mosel Avenue property for $2,000 per month. Borrower 4 never entered into, or signed such a lease on the Mosel Avenue property. Borrower 4's signature on the lease was forged.

215.    LEND AMERICA obtained a materially deficient, misleading and inaccurate appraisal. The appraised value of the property was inflated by approximately $25,000. The comparable sales in the appraisal were not researched as required by HUD regulations in Appraisal Handbook for information on whether the sales or prior sales were arm's length,

43

distressed sales, or involved seller or financing concessions.  Contrary to valuation protocol described in Appraisal Handbook, the appraiser did not list sources with direct knowledge of the sales, and reported sale or financing concessions as "Unknown None Known."  Further, two of the comparable properties used in LEND AMERICA's appraisal had prior sales that may have been distressed sales, or other than arm's length transactions.  The appraisal submitted by LEND AMERICA to HUD further failed to make an analysis of these previous sales as required by HUD.  Another sales comparable used in the appraisal was inappropriate, because it was a multiple sale of two properties including a vacant lot.  The comparable was also located outside the subject neighborhood.  Yet another sales comparable had an inaccurate price given.  Furthermore, LEND AMERICA's appraisal failed to adjust three brick-constructed sales comparables as compared with the subject's frame construction.

216.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that she personally reviewed the appraisal report.

217.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

218.    Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified, pursuant to Direct Endorsement Handbook, to the integrity of the data supplied by the lender used to determine the quality of the loan.

219.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 4's income and financial history, LEND AMERICA falsely certified to HUD that Borrower 4 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement

Handbook.

220.    After five payments, the borrower became delinquent, then defaulted on the mortgage.  The mortgage has been reinstated by the lender.

### Borrowers 5A and 5B: Hopewell Junction

221.    LEND AMERICA originated and underwrote a refinance mortgage for $281,155 to Borrowers 5A and 5B for property in Hopewell Junction, New York, on May 15, 2007.  Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was $2,559.22.

222.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on May 24, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on February 1, 2007 and February 23, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 5A and 5B 's mortgage to HUD, via United States mail or commercial interstate carrier, in or around, March 6, 2009.

223.    LEND AMERICA employee Larry Denson told Borrower 5B that his income and credit were insufficient to support his obtaining a mortgage.  Denson asked Borrower 5B if he had any other jobs that he could add to his mortgage application for additional income.  Borrower 5B told Denson that he occasionally worked for a second employer.  Borrower 5B further told Denson that the work was performed on an irregular basis, and that the payment was made in cash, without taxes being withheld.

224.    Denson gave a blank VOE to Borrower 5B, and instructed him to give it to his employer, along with Denson's contact number.  Denson then provided the employer with the salary information the employer was to put in the VOE, so as to qualify Borrower 5B for the

loan. Denson further provided the employer with the format and substance of a letter stating Borrower 5B's purported weekly gross salary, tax withholdings, net pay, and the statement, "No computerized pay stubs with ytd earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

225. LEND AMERICA submitted the fraudulent VOE to HUD. The VOE falsely stated that Borrower 5B made $23,400 in 2006, and had made $8,500 year to date, as of April 2007. In reality, Borrower 5B made no more than $1,000 total for 2006, and $1,000 total for 2007, with no withholdings made.

226. On the VOE LEND AMERICA, LEND AMERICA employee Christina Camene, on behalf of LEND AMERICA, falsely certified that the VOE had been sent directly to the employer and had not passed through the hands of the applicant or any other interested party.

227. LEND AMERICA executed a fraudulent URLA to HUD. The URLA falsely stated that Borrower 5B was paid $2,946 per month by his second employer.

228. LEND AMERICA executed a fraudulent MCAW. LEND AMERICA falsely stated on the MCAW that Borrower 5B was paid $2,946 per month by his second employer. LEND AMERICA also fraudulently used this inflated salary to calculate the Qualifying Ratios. LEND AMERICA further falsely stated that the mortgage payment-to-income ratio for the loan was 30.980% and total fixed payment-to-income ratio was 31.404%. In reality, the ratios exceeded HUD guidelines at 46% and 51%.

229. Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA

46

mortgage insurance. Etzel further fraudulently certified that the VOE had been sent to and received directly from Borrower 5B's employer.

230.    Direct Endorsement Underwriter Etzel also fraudulently certified that, pursuant to Direct Endorsement Handbook, she personally reviewed Borrower 5B's mortgage application for FHA mortgage insurance.

231.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 5B's employment and income, LEND AMERICA falsely certified to HUD that Borrower 5B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

232.    Borrowers made only six payments, before they defaulted on the loan. A forbearance agreement has been reached with the mortgage holders.

### Borrower 6: Lake Drive, Wyandanch

233.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for $140,070 to Borrower 6 for property on Lake Drive, Wyandanch, New York on September 20, 2007. Pursuant to the terms of the mortgage, Borrower 6 was required to make a monthly mortgage payment of $1,354.97.

234.    LEND AMERICA sent the application for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier on or about October 12, 2007. LEND AMERICA also electronically transmitted information to HUD in support of the application on August 2, 2007, August 8, 2007, October 11, 2007, and October 16, 2007.

235.    LEND AMERICA loan officer Jean Bernard informed Borrower 6, who had just been paroled after seven years in prison that his lack of credit history, and brief employment record would prevent him from refinancing the property. Bernard offered to obtain fake documentation of a job for Borrower 6, in exchange for $500.

236.    Bernard then contacted the owner of a business called Y M Unisex.  The owner was herself seeking to refinance her mortgage through Bernard and LEND AMERICA.  Bernard presented her with a completed VOE for Borrower 6, as well a letter purporting to state Borrower 6's annual and weekly salary and a breakdown of withholding amounts.  Bernard asked the owner to sign the two documents.  Bernard further offered to pay the owner $300 for every VOE she signed for him.

237.    As part of the FHA mortgage insurance application, LEND AMERICA submitted the fraudulent VOE to HUD.  The VOE falsely stated that Borrower 6 had been employed at Y M Unisex continuously beginning in 2004, and was receiving an annual salary of $42,000.

238.    Borrower 6 never worked for Y M Unisex and never received such an annual salary.  Borrower 6 was incarcerated from 2001 to the spring of 2007 and therefore could not have worked for Y M Unisex during that period.

239.    As part of the FHA mortgage insurance application, LEND AMERICA submitted the fraudulent letter from Y M Unisex to HUD.  The letter falsely stated Borrower 6's dates of employment, salary, and tax withholdings.  As with numerous other LEND AMERICA loan files with fictional employment, the letter states: "[n]o computerized pay stubs with a year to date earnings are issued."

240.    LEND AMERICA submitted a credit report to HUD containing false employment information.

241.    As part of the FHA mortgage insurance application, LEND AMERICA submitted a fraudulent URLA to HUD.  The URLA falsely stated Borrower 6's salary as $3,499.99 per month, from Y M Unisex.  In reality, Borrower 6 earned a monthly salary of $1,169.83, from a job that LEND AMERICA did not report.

242.    As part of the FHA mortgage insurance application, LEND AMERICA further submitted a fraudulent MCAW to HUD.  The MCAW falsely stated Borrower 6's salary, tripling what it actually was.  LEND AMERICA then fraudulently used this salary to calculate Borrower 6's Qualifying Ratios.  LEND AMERICA falsely stated that both the mortgage payment-to-income, and total fixed payment-to-income ratios were 38.714%.  In reality, both ratios were an impossible to maintain 115%.

243.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

244.    Further, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.  Etzel further falsely certified that the VOE was true to the best of the lender's knowledge.

245.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 6's income, LEND AMERICA falsely certified to HUD that Borrower 6 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

246.    After making eight mortgage payments, Borrower 6 defaulted on the mortgage. Foreclosure proceedings have been instituted by the mortgage holder.

### Borrowers 7A and 7B: Bailey Avenue, Bayshore

247.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for $351,951 to Borrowers 7A and 7B for property on Bailey Avenue, Bayshore, New York, on July

30, 2007.  Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was $3,132.

248.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 15, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on July 16, 2007 and July 27, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 7A and 7B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 2, 2008.

249.    LEND AMERICA submitted a fraudulent VOE to HUD.  The VOE falsely stated that Borrower 7A had been employed as a sales person at University Copy & Graphics Inc. since January 2005.

250.    LEND AMERICA fraudulently executed a URLA.  On the URLA, LEND AMERICA employee Nick Neza falsely stated that Borrower 7A was receiving a monthly salary of $2,600 from University Copy & Graphics.

251.    Borrower 7A never worked for University Copy & Graphics and did not receive so large a monthly salary at the time.

252.    Borrower 7A was in fact diagnosed as "totally disabled" and unable to work by his physician at the time of closing.  Borrower 7A provided LEND AMERICA with documentation of his disability and inability to work prior to LEND AMERICA submitting the application for FHA mortgage insurance.

253.    LEND AMERICA fraudulently reported Borrower 7A's worker's compensation and social security disability payments as pension and retirement income.

254.    LEND AMERICA also submitted a fraudulent employment letter, purporting to