be from the president of University Copy and Graphics, confirming Borrower 7A's employment and salary. LEND AMERICA created the VOE as well as the format and substance of a supporting letter from the "employer", including the false annual salary, the breakdown of the bi-weekly payroll withholdings and net pay. The employment letter also states, "[n]o computerized paystubs with year to date earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

255.    On the MCAW, LEND AMERICA fraudulently stated, as a Compensating Factor for Borrower 7A's excessive Qualifying Ratios, that Borrower 7A had "Job Stability." Borrower 7A was not working at the time.

256.    LEND AMERICA submitted a credit report to HUD with false employment and income.

257.    By fraudulently inflating Borrowers 7A and 7B's gross monthly income by $2,600, LEND AMERICA falsely stated that the borrowers' mortgage payment-to-income and total fixed payment-to-income ratios were both 43.995%. In reality, these ratios were a clearly untenable 69%.

258.    LEND AMERICA obtained a materially deficient and misleading appraisal as documentation to support their endorsement of the loan for mortgage insurance. All comparable sales reported in the appraisal were in a different, higher-priced school district. Further, Appraisal Handbook requires that comparable sales be researched for information on whether the sales were arm's length, distressed sales, or involved seller or lender concessions. The comparable sales in the appraisal were not researched, as required. The appraisal submitted by LEND AMERICA failed to note that one of the comparables was a flip sale. It also cited as a

comparable sale a property that could not be found, and that does not exist in the public record.

259.   Contrary to valuation protocol detailed in Appraisal Handbook, the appraiser listed only MLS and similar data sources as verification sources and reported sale or financing concessions as "Unknown."

260.   LEND AMERICA's fraudulent appraisal inflated the appraised value of the house by between $40,000 and $57,000.

261.   In the HUD 1003 Addendum, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that she personally reviewed the appraisal report and found the mortgage eligible for FHA mortgage insurance.

262.   LEND AMERICA failed to analyze Borrowers 7A and 7B's derogatory credit history.  In particular, the borrowers made late payments on a series of prior non-FHA-insured mortgages, and there had been several late payment assessments in the last year of the mortgage that was being refinanced.  Despite this history, LEND AMERICA provided a cash-out refinance mortgage with a monthly payment that was higher than borrowers' previous mortgage.

263.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

264.   Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

265.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

7A and 7B's employment and income, LEND AMERICA falsely certified to HUD that Borrowers 7A and 7B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

266.   After only nine payments were made on the mortgage from its origination, the borrowers defaulted on the mortgage. Foreclosure proceedings against the home have been instituted by the bank holding the mortgage.

### Borrower 8: Carter Avenue, Newburgh

267.   LEND AMERICA originated and underwrote a mortgage for $327,016 to Borrower 8 to purchase a second home, on Carter Avenue, Newburgh, New York, on August 8, 2007. Pursuant to the terms of the mortgage, the borrower's monthly mortgage payment was $2,506.89.

268.   LEND AMERICA sent the application for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier on or about August 28, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on July 20, 2007 and August 13, 2007.

269.   As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent URLA to HUD.  The URLA stated an inflated salary of $6,666 per month for Borrower 8.  Borrower 8 actually earned $2,407 per month in the year before the purchase.

270.   As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent MCAW to HUD.  The MCAW falsely stated the inflated salary for Borrower 8. LEND AMERICA further fraudulently used the inflated salary to calculate the Qualifying Ratios on the MCAW.  LEND AMERICA fraudulently stated that Borrower 8's mortgage payment-to-income ratio was 37.607%.  In reality, it was 104%.  LEND AMERICA stated that Borrower 8's

total fixed payment-to-income ratio was 45.774%. In reality, it was 126%. Both ratios were well in excess of HUD's guidelines, and clearly impossible for borrower to sustain.

271.    As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent VOE to HUD. The VOE had been signed in blank by Borrower 8's employer. LEND AMERICA employees filled in false information on Borrower 8's salary, and sent it to HUD.

272.    As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent letter to HUD purporting to come from Borrower 8's employer. The letter was not written by the employer. LEND AMERICA created the letter on forged letterhead. The letter stated falsely that Borrower 8 made a weekly salary of $1,540, and provided a false breakdown of the weekly payroll withholdings and net pay. The letter also includes the statement, "[w]e do not issue computerized pay stubs with year-to-date earnings." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that the borrower's salary information supplied to HUD by LEND AMERICA is not verifiable.

273.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components. Burns, on behalf of LEND AMERICA further fraudulently certified that the VOE was true to the best of its knowledge.

274.    Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, also fraudulently certified, pursuant to Direct Endorsement Handbook, the integrity of the data supplied by the lender used to determine the quality of the loan.

275.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower

8's employment and income, LEND AMERICA falsely certified to HUD that Borrower 8 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook

276.   The borrower made no payments on the mortgage.  The loan defaulted, and the house was foreclosed on.

### Borrowers 9A and 9B: Addison Road, Fishkill

277.   LEND AMERICA originated and underwrote a mortgage for $250,765 to Borrowers 9A and 9B for property on Addison Road, in Fishkill, New York, on July 24, 2007. Pursuant to the terms of the mortgage, the borrowers' monthly payment was $2,111.56.

278.   LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 15, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on June 11, 2007, July 6, 2007, March 17, 2008, and March 19, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 9A and 9B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

279.   While applying for the mortgage, Borrower 9A was told by LEND AMERICA employee Vincent Vittani that he would need additional income to qualify for the mortgage. Borrower 9A told Vittani that he occasionally had the opportunity to work for Mountainview Painting.

280.   LEND AMERICA obtained a signed VOE from Mountainview Painting on which the signatory declined to provide year-to-date or past years' earnings or an average hours per week worked by Borrower 9A.  LEND AMERICA fraudulently altered the VOE and submitted it to HUD.  The altered VOE falsely stated that Borrower 9A had received regular and increasing income from Mountainview Painting for at least three years.

55

281.   Mountainview Painting also sent a letter to LEND AMERICA stating that Borrower 9A "will have the opportunity to work as a painter with Independent Contractor status… [H]is job assignments would be in the New York metropolitan area.  His potential for earnings in this capacity is approximately $500/month."  LEND AMERICA fraudulently altered this letter and submitted it to HUD.  The altered letter falsely stated that Borrower 9A "does work as a painter for Mountainview Painting Company… [H]is job assignments are in the New York metropolitan area.  The monthly salary is as follows:" followed by a list of gross salary, tax withholding, net salary, and the statement "No computerized paystubs with year to date earnings are issued."

282.   LEND AMERICA submitted a fraudulent URLA to HUD.  The URLA stated the false salary from Mountainview Painting.

283.   LEND AMERICA executed a fraudulent MCAW.  On the MCAW, LEND AMERICA falsely stated the non-existent pay from Mountainview Painting as part of Borrower 9A's regular monthly salary.  LEND AMERICA further fraudulently used the Mountainview pay to calculate Borrowers 9A and 9B's mortgage payment-to-income ratio and total fixed payment-to-income ratio.  LEND AMERICA falsely stated that the mortgage payment-to-income ratio was 33.490%.  It was actually 39%, above HUD's guidelines.  LEND AMERICA also falsely stated the total fixed payment-to-income ratio as 47.098%.  In reality, it was 55%.  In addition, the stated ratios exceeded HUD's guidelines, but LEND AMERICA provide no valid Compensating Factors.

284.   LEND AMERICA failed to analyze Borrowers 9A and 9B's derogatory credit history, in particular that each borrower had filed a separate Chapter 7 bankruptcy, in 2003 and 2004, respectively.  LEND AMERICA also failed to comply with Credit Analysis Handbook,

¶2-3E's requirement that after a bankruptcy, a documented ability by the borrower to responsibly manage his or her financial affairs must be demonstrated. In addition, the lender must document that the borrower's current situation indicates that the events that led to the bankruptcy are not likely to recur.

285. Furthermore, LEND AMERICA failed to disclose the borrowers' bankruptcies on the URLA submitted to HUD. LEND AMERICA submitted a URLA on which the "No" box was checked for each of Borrowers 9A and 9B, in response to the question in the Declarations Section, "Have you been declared bankrupt within the past 7 years?"

286. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

287. Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, also fraudulently certified, pursuant to Direct Endorsement Handbook, to the integrity of the data supplied by the lender used to determine the quality of the loan.

288. Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 9A and 9B's employment and income, LEND AMERICA falsely certified to HUD that Borrowers 9A and 9B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

289. The borrowers made ten payments before they defaulted on the mortgage. After loss mitigation intervention by FHA, the loan has been reinstated.

**Borrower 10: Division Street, Westbury**

290. LEND AMERICA originated and underwrote a mortgage to Borrower 10 for

$359,946 for property on Division Street, Westbury, New York on July 19, 2007. Pursuant to the terms of the mortgage, the borrower's monthly mortgage payment was $3,194.11.

291.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on July 31, 2007. LEND AMERICA also electronically transmitted information to HUD in support of the application on July 12, 2007, July 16, 2007, July 18, 2007, and July 30, 2007. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 10's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

292.    LEND AMERICA Loan Officer Bernard was contacted by the initial owners of the Division Street property to assist them in refinancing their mortgage. Bernard told them that their finances prevented them for qualifying for a refinancing. Bernard then suggested that the owners participate in a mock sale of the property to Borrower 10. Borrower 10 was the brother of one of the then-owners.

293.    Borrower 10 had lived at the Division Street property, with the initial owners for thirteen years, at the time the initial owners applied for the mortgage. After the mock sale, the initial owners continued to live in the house.

294.    In the URLA it submitted to HUD, LEND AMERICA fraudulently concealed that this sale was an identity-of-interest transaction, i.e. a sale between family members, and that Borrower 10 was already living in the property with the sellers prior to the mock sale. LEND AMERICA concealed this by submitting a URLA to HUD with a false address, on Magnolia Avenue, for Borrower 10. The URLA falsely stated that Borrower 10 had lived at the Magnolia Avenue address for five years.

295.    LEND AMERICA further submitted a sales contract to HUD bearing the

58

Magnolia Avenue address as Borrower 10's address.

296.    LEND AMERICA further submitted a fraudulent VOR, which falsely stated that Borrower 10 had been renting an apartment for $1,500 per month, on Magnolia Avenue more than two years prior to the mock sale.

297.    Borrower 10 told Bernard that he made only between $35,000 and $40,000 per year.  Bernard stated that Borrower 10 would need to be able to demonstrate an annual income of $80,000 in order to qualify for the loan.  Bernard then stated that he would "find a way" to resolve the problem.

298.    LEND AMERICA, through Bernard, submitted multiple false documents to HUD documenting a fictitious job for Borrower 10 at Lucky's Store & Lucky's Cash Scrap Gold ("Lucky's").  The fraudulent documentation consisted of a VOE, an employment letter purporting to be from Lucky's owner, and a letter purportedly from Borrower 10.  The documents stated that Borrower 10 had been working for Lucky's for the last five years as a manager and was making an annual salary of $78,965.  LEND AMERICA created these documents.

299.    Borrower 10 never worked at Lucky's and never earned this high a salary. Nonetheless, Bernard had Lucky's owner, who was an acquaintance of Bernard, sign the VOE as well as the supporting letter.

300.    The employment letter included the false annual salary, and the purported breakdown of Borrower 10's weekly payroll withholdings and net pay.  The employer's letter further contained the statement that: "[n]o computerized paystubs with a year to date earnings are issued."  On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not

in fact verifiable.

301.   The VOE was faxed to LEND AMERICA.  However, in violation of HUD regulations, LEND AMERICA failed to provide documented verification of the source of the fax.

302.   On the VOE, LEND AMERICA Loan Processor Shaleea Lynch falsely certified that the form had been sent directly to the employer.  LEND AMERICA further included the false income from Lucky's on the URLA it submitted to HUD.

303.   On the URLA it submitted to HUD, LEND AMERICA fraudulently included inflated monthly income from Borrower 10's actual job.  LEND AMERICA fraudulently included an additional $1,500 of this purported monthly income with no explanation or documentation whatsoever.

304.   LEND AMERICA executed a fraudulent MCAW.  The MCAW contained Borrower 10's fictitious income, which was used to calculate Borrower 10's gross monthly income and Qualifying Ratios on the MCAW.  As a result of fraudulently including this income, LEND AMERICA made it appear that Borrower 10's mortgage payment-to-income ratio was 33.133%, only slightly above HUD's qualifying level of 31%, and his total fixed payment-to-income ratio was 33.599%, below HUD's limit of 43%.

305.   In reality, Borrower 10's Qualifying Ratios were an impossible 204% and 207% respectively.

306.   In the HUD 1003 Addendum, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

307.   LEND AMERICA fraudulently submitted documentation that Borrower 10 was a member of a ten-week savings club, known as a susu, in which members make weekly contributions and take turns receiving the weekly proceeds.  The documentation further stated that Borrower 10 was the last member scheduled to receive a $3,000 disbursement from his savings club in April of 2007.

308.   The susu did not actually exist.  Borrower 10 was not a member of any savings club.  $3,000 in cash was deposited into Borrower 10's checking account from an undocumented source.  Without this deposit, the MCAW would not have shown any cash reserves after closing costs.  The MCAW stated that Borrower 10's "assets available" are exactly $3,000.

309.   LEND AMERICA fraudulently reported on the HUD-1 Settlement Statement that $9,988.91 was disbursed to the seller of the property at the closing.  LEND AMERICA inappropriately kept all but $2,500 of those funds to pay for application and appraisal fees.  The remaining $2,500 was being held by the attorney that represented LEND AMERICA at the closing. Despite repeated requests, the attorney has failed to release the funds to the sellers.

310.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

311.   Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

312.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower

61

10's income, LEND AMERICA falsely certified to HUD that Borrower 10 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

313.   Borrower 10 made only five payments after the origination of the mortgage, before defaulting on the mortgage.  The property is now in foreclosure.

314.   HUD investigated the loan, and issued a demand to LEND AMERICA that it indemnify HUD against any losses incurred from the loan, due to fraud in the file.  Only upon such demand did LEND AMERICA take any steps to indemnify HUD.  Nor did LEND AMERICA notify HUD of any issue of the loan, until HUD itself examined the file.

### Borrowers 11A and 11B: Ferndale Boulevard, Central Islip

315.   LEND AMERICA originated and underwrote a mortgage to Borrowers 11A and 11B for $359,946 for property on Ferndale Boulevard, Central Islip, New York, on August 15, 2007.  Pursuant to the terms of the mortgage, the borrowers' monthly payment was $3,242.29.

316.   LEND AMERICA sent the application for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier on or about September 14, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on July 30, 2007, August 7, 2007, August 8, 2007, September 6, 2007, and September 17, 2007.

317.   As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent VOE to HUD, which certified that Borrower 11A had been employed at Solution Auto Body Collision for three years and was making a salary of $6,357 per month.

318.   Borrower 11A never worked for Solution Auto Body Collision.  Further, Borrower 11A was not receiving a monthly salary of this size at the time the mortgage was originated.

319.   As part of the FHA mortgage insurance application, LEND AMERICA submitted

a fraudulent URLA to HUD.  The URLA falsely included the income from Solution Auto Body Collision as part of Borrower 11A's monthly income.  The URLA further falsely stated that Borrower 11B was a co-borrower on the loan, and included his income as being available for payment towards the monthly mortgage.  Borrower 11B was not going to live in the property or contribute to the mortgage.  Borrower 11B was included on the loan at the suggestion of Bernard, to improve Borrower 11A's ability to obtain the mortgage.

320.   The URLA LEND AMERICA submitted to HUD falsely stated that Borrower 11B paid $1,200 rent per month at his pre-closing residence.  In fact Borrower 11B owned this residence and continued to live there after the closing.

321.   As part of the mortgage insurance application, LEND AMERICA submitted a fraudulent MCAW to HUD.  LEND AMERICA fraudulently included income from Borrower 11B's non-existent job at Solution Auto Body Collision on the MCAW.  LEND AMERICA also falsely included Borrower 11B's income as part of the monthly income available to pay the monthly mortgage.  LEND AMERICA further fraudulently used the two incomes to calculate the Qualifying Ratios.  Despite LEND AMERICA's fraudulent inflation of the monthly income available to pay the mortgage, the mortgage payment-to-income ratio still exceeded HUD's permissible limits at 40.013%.  LEND AMERICA failed to list any Compensating Factors to justify exceeding HUD's permissible limits.

322.   Without Borrower 11B's income, Borrower 11A's mortgage payment-to-income ratio and total fixed payment-to-income ratio were an unworkable 185% and 206%.

323.   LEND AMERICA submitted to HUD fraudulent URLAs, Statement of Occupancy, Borrower's Certification on the HUD/VA Addendum to the URLA, and Disclosure Notices form to HUD, all of which stated that Borrower 11B would use the property as his

principal residence.

324.    LEND AMERICA fraudulently manipulated Borrower 11B's credit report by submitting false information about Borrower 11B's purported monthly rent on the residence he actually owns, to the credit report company.  LEND AMERICA subsequently ran a credit report for Borrower 11B.  The credit report now included the false rent information.  LEND AMERICA then submitted this false credit report to HUD.

325.    LEND AMERICA failed to disclose a monthly $359.15 monthly garnishment on Borrower 11B's salary, as a liability on Borrower 11B's application.

326.    HUD requires documentation of the source of borrower's funds.  LEND AMERICA submitted fraudulent documentation to HUD, which stated that Borrower 11A was a member of a ten-week susu savings club, where members make weekly contributions and take turns receiving the weekly proceeds.  The documentation further stated that Borrower 11A was the last member scheduled to receive a $5,000 disbursement from his savings club on August 14, 2007, the day before the mortgage closing.

327.    The susu did not exist.  Borrower 11A was not a member of any savings club. $5,000 in cash was deposited into Borrower 11A's checking account on the date of closing, from an undocumented source.  Without this deposit, the MCAW would have shown negative cash reserves after closing costs.  Before this deposit, Borrower 11A's checking account balance was $2.09.

328.    Payments totaling $4,160.35 were written at closing from Borrower 11B's checking account.  Despite HUD requirements for documenting the source of borrower's funds, LEND AMERICA submitted no documentation for the origin of the funds from Borrower 11B's checking account.

329.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components. Etzel further fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of LEND AMERICA's knowledge and belief.

330.    Further, Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

331.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 11A and 11B's employment and income, LEND AMERICA falsely certified to HUD that Borrowers 11A and 11B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

332.    After borrowers made only one month's payment toward the mortgage, the loan was placed into default 11 months after closing. Foreclosure proceedings against the home have been instituted by the bank holding the mortgage.

### Borrower 12: 118th Avenue, Jamaica

333.    LEND AMERICA originated and underwrote a mortgage to Borrower 12 for $349,242 for property on 118th Avenue, Jamaica, New York, on March 19, 2007. Pursuant to the terms of the mortgage, the borrower's monthly payment was $2,599.70.

334.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on March 27, 2007. LEND AMERICA also electronically

transmitted information to HUD in support of the application on March 9, 2007, March 15, 2007, and March 17, 2008.  LEND AMERICA sent the documentation supporting its endorsement of the loan for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier, on or about July 10, 2008.

335.    LEND AMERICA submitted a fraudulent VOE to HUD, which falsely certified that Borrower 12 had been employed in a second job as a dispatcher at Daystar Limo since July 2003.

336.    LEND AMERICA submitted a fraudulent URLA that reported that Borrower 12 was receiving a $3,865.16 monthly salary from Daystar Limo.  LEND AMERICA also submitted a fraudulent letter purportedly from Borrower 12's supervisor at Daystar Limo confirming this employment.

337.    Borrower 12 never worked for Daystar Limo, did not have a second job, and was not receiving such a monthly salary at the time.

338.    On the MCAW, Direct Endorsement Underwriter Dawn O'Halloran, on behalf of LEND AMERICA, included income from this non-existent job, fraudulently inflating Borrower 12's gross monthly income by $3,865.16.

339.    By inflating Borrower 12's gross monthly income, LEND AMERICA made it appear as though Borrower 12's mortgage payment-to-income and total fixed payment-to-income ratios fell within permissible HUD limits.  In reality, the mortgage payment-to-income ratio was actually an impermissibly high 73%.  The total fixed payment-to-income ratio was an impermissibly high 110%.

340.    LEND AMERICA submitted to HUD a credit report that falsely stated that Borrower 12 was paying rent of $1,350 per month prior to closing.  Borrower 12's monthly rent

was actually $775. LEND AMERICA falsely reported Borrower 12's past rental history to the credit bureau to exaggerate Borrower 12's ability to make the monthly mortgage payments.

341. LEND AMERICA fraudulently concealed Borrower 12's precarious finances by submitting to HUD a bank statement showing that Borrower 12 had over $4,000 in his checking account at the time of closing. Prior to closing, Borrower 12 went to his bank with his realtor, who deposited $4,000 into Borrower 12's checking account. Borrower 12 printed out a record of his account balance showing the deposit and then repaid all of the money to his realtor.

342. LEND AMERICA fraudulently concealed the provenance of the $4,000 in Borrower 12's bank account by submitting false documentation to HUD certifying that Borrower 12 had been a member of a susu savings club, and had received a $4,000 disbursement prior to closing.

343. Borrower 12 was never a member of a susu savings club and never received a disbursement in that amount. The documentation for the susu was similar in form and substance to that of other fraudulent LEND AMERICA mortgage applications that included false susu documentation, including that Borrower 12 was scheduled to be the last member of the ten week susu to receive a disbursement (in this case $4,000), well-timed to be within two weeks of the closing date of his home purchase.

344. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

345. Underwriter O'Halloran, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the

mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

346.     Further, on the HUD/VA Addendum to the URLA, Underwriter O'Halloran, on behalf of LEND AMERICA, fraudulently certified that the information contained in the mortgage insurance application was received directly from Borrower 12.  In fact, Borrower 12 gave all of the documentation for the application to LEND AMERICA through his realtor.

347.     Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 12's employment and income, LEND AMERICA falsely certified to HUD that Borrower 12 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

348.     After the borrower made only five payments on the loan from its origination, the borrower defaulted on the loan.

349.     After investigation and review of the loan by HUD, HUD demanded that LEND AMERICA indemnify HUD against any losses caused by this loan.  LEND AMERICA resisted indemnifying HUD for eight months.  During these eight months, LEND AMERICA officers and employees offered false or baseless grounds as support for its underwriting of the mortgage. Only after multiple exchanges with, and demands by HUD, did LEND AMERICA indemnify HUD for any losses stemming from the loan.

### Borrowers 13A and 13B: East 137th Street, Bronx

350.     LEND AMERICA originated and underwrote a refinance mortgage to Borrowers 13A and 13B for $461,355 for property on East 137th Street, Bronx, New York, on April 26, 2007. Pursuant to the terms of the mortgage, the borrowers' monthly payment was $3,276.73.

351.     LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on May 10, 2007.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on April 10, 2007, May 8, 2007, and July 9, 2007. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 13A and 13B's mortgage to HUD via United States mail or commercial interstate carrier on or about October 2, 2007.

352.    LEND AMERICA originated an initial primary mortgage and a second mortgage on the subject property to Borrower 13A on March 2, 2007, when Borrower 13A purchased the property. Neither of the mortgages was FHA-insured. Before closing the initial mortgages Borrower 13A informed LEND AMERICA employees that he would not be able to make the mortgage payments of $3,620 per month. LEND AMERICA employees told him that they would lower his monthly mortgage payments in the future.

353.    Prior to when the first payment was owed on the initial mortgage, LEND AMERICA employees approached Borrower 13A with an offer to refinance using FHA mortgage insurance. This would reduce his monthly mortgage payments by $343 per month.

354.    LEND AMERICA obtained a fundamentally deficient and misleading appraisal to support its endorsement of the mortgage for FHA mortgage insurance. The comparable sales in the appraisal were not researched as required by HUD regulations in Appraisal Handbook for information on whether the sales were arm's length, distressed sales, or involved seller or financing concessions. Contrary to valuation protocol described in Appraisal Handbook, the appraiser did not list sources with direct knowledge of the sales and reported sale or financing concessions as "Unknown None Known."

355.    Further, the subject and two of the comparable properties used in LEND AMERICA's appraisal had recent histories of flip sales, distressed sales, or other than arm's length transactions. Moreover, the appraisal submitted by LEND AMERICA to HUD failed to

make an analysis of the previous sales, as required by HUD.

356.    Borrowers 13A and 13B had originally sought a two-family house. The seller was supposed to have finished the basement into an apartment, but at the time of purchase, the property remained in poor shape and this second unit was not finished. Despite these conditions, LEND AMERICA's appraisal appraised the property as a completely renovated, two unit residence with the second unit as a rental property.

357.    Borrowers 13A and 13B informed LEND AMERICA that they did not intend to rent out any of the property for additional income. Nonetheless, LEND AMERICA included $935 for monthly rental income from the property on the MCAW. LEND AMERICA thus fraudulently overstated Borrowers 13A and 13B's monthly income on the MCAW.

358.    LEND AMERICA further violated HUD regulations by failing to document Borrowers 13A and 13B's purported rental revenue with either a lease or a history of rent on the unit, or even a statement of intent to find a paying tenant.

359.    Borrowers 13A and 13B's Qualifying Ratios, even with the non-existent rental income, violated HUD's limits for Qualifying Ratios. LEND AMERICA failed to state or support sufficient Compensating Factors to justify exceeding HUD's Qualifying Ratios, even with the fraudulently understated Qualifying Ratios LEND AMERICA provided.

360.    By overstating Borrowers 13A and 13B's monthly income, LEND AMERICA concealed that Borrowers 13A and 13B's Qualifying Ratios were even higher than LEND AMERICA stated on the MCAW it sent to HUD.

361.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

70

sufficiency of the loan application and all of its components.

362.    Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she had personally reviewed the appraisal, and had used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

363.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 13A and 13B's income and financial history, LEND AMERICA falsely certified to HUD that Borrowers 13A and 13B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

364.    Borrowers 13A and 13B made one mortgage payment after the refinancing.  They were unable to make a second and the loan defaulted.  Foreclosure proceedings against the home have been instituted by the bank holding the mortgage.

### Borrower 14: William Floyd Parkway, Shirley

365.    LEND AMERICA originated and underwrote a cash-out refinance mortgage to Borrower 14 for $366,415 for property on William Floyd Parkway, Shirley, New York, on November 21, 2007.  Pursuant to the terms of the mortgage, the borrower's monthly payment was $3,519.07.

366.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on January 23, 2008.  LEND AMERICA also electronically transmitted information to HUD in support of the application on November 5, 2007, November 20, 2007, and March 19, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 14's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 20, 2008.

367.    Borrower 14 approached LEND AMERICA to refinance his mortgage in order to pay off a large amount of credit card debt and with the hopes of raising money to open his own business.  After reviewing Borrower 14's bank statements and paystubs, LEND AMERICA employee Mohamed Monem informed Borrower 14 that he had insufficient income to qualify for the refinancing.

368.    Monem told Borrower 14 that in order to qualify he would need to find someone willing to falsely confirm that Borrower 14 was an employee and provide LEND AMERICA with fraudulent pay stubs, checks, and other evidence of fictitious employment and salary.

369.    Borrower 14 was able to convince the president of a company called Oz Construction, to provide fraudulent employment information in support of Borrower 14's loan application.  LEND AMERICA provided the VOE form as well as the format and substance of a supporting letter, including the false annual salary, the breakdown of the bi-weekly payroll withholdings and net pay, and the statement, "This company does not issue computerized checks."

370.    LEND AMERICA employee Monem instructed Borrower 14 to obtain, endorse and deposit two company checks for the net pay amount, and then to print out bank images of the deposited checks.  Borrower 14 provided LEND AMERICA with copies of the cancelled checks. After this was done Borrower 14 withdrew the money from his account and returned it to Oz Construction.

371.    Despite knowing that Borrower 14 never worked for Oz Construction and never received any salary from the company, LEND AMERICA submitted to HUD a fraudulent VOE and a letter from Oz Construction purporting to confirm Borrower 14's employment and annual salary of $123,500.

372.    In reality, Borrower 14's annual income from his actual job, which LEND AMERICA did not submit to HUD, was just $22,535.

373.    On the VOE, LEND AMERICA Loan Processor Diana Lau falsely certified that she had sent the form directly to the employer and that it had not passed through the hands of any interested third parties.

374.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and that it was true to the best of LEND AMERICA's knowledge and belief.

375.    LEND AMERICA submitted a credit report to HUD containing false employment information about Borrower 14.

376.    LEND AMERICA fraudulently included Borrower 14's nonexistent income from Oz Construction on the MCAW it executed. As a result of fraudulently including this income, LEND AMERICA made it appear that Borrower 14's mortgage payment-to-income ratio was 34.193% and his total fixed payment-to-income ratio was 46.980%. In reality, LEND AMERICA concealed that Borrower 14's mortgage payment-to-income and total fixed payment-to-income ratios, were 187% and 257% respectively.

377.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

378.    Further, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in

73

underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

379.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 14's income, LEND AMERICA falsely certified to HUD that Borrower 14 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

380.    After the borrower made only five payments from origination, the loan defaulted 5 months after the first payment was due.  Foreclosure proceedings against the home have been instituted by the bank holding the mortgage.

**Borrowers 15A and 15B: Rogers Avenue, Bronx**

381.    LEND AMERICA originated and underwrote a mortgage to Borrowers 15A and 15B for $466,316 for property on Rogers Avenue, Bronx, New York, on August 11, 2006. Pursuant to the terms of the mortgage, the borrowers' monthly payment was $3,671.15.

382.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 24, 2006.  LEND AMERICA also electronically transmitted information to HUD in support of the endorsement for insurance on August 1, 2006. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 15A and 15B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 15, 2008.

383.    LEND AMERICA submitted a fraudulent VOE to HUD which certified that Borrower 15A's monthly salary at Penn Nutrition Corporation was $6,589.  Borrower 15A was only making $1,733 per month at Penn Nutrition.  LEND AMERICA fraudulently inflated Borrower 15A's monthly salary by more than three times its actual size.

384.    LEND AMERICA further submitted fraudulent pay stubs from Penn Nutrition to

74

HUD as verification of Borrower 15A's overstated salary.

385.   LEND AMERICA also included this fraudulently inflated income figure on the MCAW it submitted to HUD, making it appear that Borrowers 15A and 15B's mortgage payment-to-income ratio only slightly exceeded HUD's recommended guideline at 35.528%. Further, including the false income allowed the total fixed payment-to-income ratio to fall to an acceptable 39.912%.

386.   Subtracting the non-existent income from the calculations, the actual mortgage payment-to-income ratio was an unacceptable 69%. Similarly, the total fixed payment-to-income ratio became an unacceptable 78%.

387.   LEND AMERICA Loan Officer Marc Fessler fraudulently stated, on the URLA for Borrowers 15A and 15B that he had conducted a face-to-face interview with Borrowers 15A and 15B in order to confirm the details of their financial situation included in the URLA submitted to HUD. In fact, Borrowers 15A and 15B never met with any LEND AMERICA representatives.

388.   LEND AMERICA failed to comply with Credit Analysis Handbook, ¶2-10 requiring that they document the source of the borrowers' funds paid toward the purchase. LEND AMERICA did not submit the required Verification of Deposit form signed by a bank employee to HUD. Further, LEND AMERICA submitted no documentation of the source of $1,000 paid from the attorney's escrow account. LEND AMERICA did submit documentation to HUD that a cashier's check for $3,910 presented at closing was drawn from Borrowers 15A and 15B's bank account. However, LEND AMERICA failed to explain the source of a $3,900 cash deposit made to the borrowers' account just four days earlier. Except for that four-day period, Borrowers 15A and 15B's bank account balance for each day of the two month period

prior to closing was consistently below $800.

389.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

sufficiency of the loan application and all of its components.

390.    Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA,

fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in

underwriting the mortgage and reviewing all documents associated with the application for FHA

mortgage insurance.

391.    Further, in the HUD/VA Addendum to the URLA, Underwriter Burns, on behalf

of LEND AMERICA, fraudulently certified that the information contained in the mortgage

insurance application was received directly from Borrowers 15A and 15B.  Borrowers 15A and

15B gave all of the documentation for the application to their realtor, who then submitted it to

LEND AMERICA employees.

392.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

15A and 15B's employment and income, LEND AMERICA falsely certified to HUD that

Borrowers 15A and 15B met all requirements for FHA mortgage insurance, as set forth in the

Direct Endorsement Handbook.

393.    After borrowers made only eight payments from the loan's origination, the loan

defaulted.  Borrowers 15A and 15B are now in negotiations with the bank holding the mortgage

to refinance.

### Borrower 16: Grand Boulevard, Brentwood

394.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for

$368,231 to Borrower 16, for property on Grand Boulevard, Brentwood, New York on July 25, 2007. Pursuant to the terms of the mortgage, the borrower's monthly payment was $3,221.71.

395.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 16, 2007. LEND AMERICA also electronically transmitted information to HUD in support of the application on June 28, 2007, and July 19, 2007. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 16's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 16, 2008.

396.    At the time of closing, Borrower 16 was receiving unemployment benefits, and working on a part-time basis for a jewelry company. Borrower 16 worked for the jewelry company for only one year, making approximately $25,000.

397.    LEND AMERICA submitted a fraudulent VOE and pay stubs which purported to show that at the time of the mortgage closing, Borrower 16 worked for a company called MAC Jewelry and earned $116,500 in annual salary, or almost five times her actual salary.

398.    Borrower 16 never worked for MAC Jewelry. The salary reported on the VOE represents an inflation of Borrower 16's actual annual income at the time of closing by approximately $91,500.

399.    LEND AMERICA obliterated the fax legend on the VOE it submitted to HUD, to conceal the fact that the VOE was not received directly from the employer, but rather was faxed from an undocumented source. Further, in the HUD 1003 Addendum, Direct Endorsement Underwriter Tarene Keegan, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

400.    LEND AMERICA executed a fraudulent MCAW.  LEND AMERICA falsely inflated Borrower 16's monthly income by $7,792.

401.    LEND AMERICA also gave false, low figures for Borrower 16's Qualifying Ratios on the MCAW.

402.    In reality, Borrower 16's mortgage payment-to-income ratio was 154%.  LEND AMERICA fraudulently concealed this from HUD by providing HUD a false figure of 32.625%.

403.    Borrower 16's total fixed payment-to-income ratio was 205%.  LEND AMERICA fraudulently concealed this from HUD by providing a false figure of 43.308%.

404.    Even the false Qualifying Ratios exceeded permissible HUD limits.  To support the false ratios LEND AMERICA submitted in the mortgage insurance application, LEND AMERICA submitted to HUD inaccurate and insufficient Compensating Factors.

405.    LEND AMERICA fraudulently stated to HUD that Borrower 16 had "good income earning potential" while concealing her actual salary and radically inflating her earnings. Moreover, LEND AMERICA fraudulently concealed from HUD that Borrower 16 was receiving unemployment benefits at the time of closing.

406.    Further, LEND AMERICA improperly excluded Borrower 16's husband's information from the URLA, despite the fact that he held title to the property jointly with Borrower 16.  The URLA requires that "Co-borrower information must also be provided when the income or assets of a person other than the borrower (including the borrower's spouse) will be used as a basis for loan qualification."  LEND AMERICA failed to include Borrower 16's husband because he had poor credit, in part due to a Chapter 7 bankruptcy that was terminated in April 2000.

407.    LEND AMERICA failed to analyze Borrower 16's derogatory credit history.

78

Borrower 16 made late payments on a prior FHA-insured mortgage. Further, there were several late payment and bad check charges in the last year of the mortgage that was being refinanced. Despite this history, LEND AMERICA provided a cash-out refinance mortgage to Borrower 16 of $368,231, with a monthly payment that was higher than her previous mortgage.

408.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Keegan, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

409.   Further, Underwriter Keegan, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

410.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 16's employment and income, LEND AMERICA falsely certified to HUD that Borrower 16 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

411.   Borrowers defaulted on the loan after making eight payments. The mortgage holder has agreed to forebear on foreclosure at time of writing.

### Borrower 17: Tiber Avenue, Deer Park

412.   LEND AMERICA originated a mortgage for $368,140 to Borrower 17 for property on Tiber Avenue, Deer Park, New York, on January 17, 2007. Pursuant to the terms of the mortgage, the borrowers' monthly payment was $3,224.78.

413.   LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on February 1, 2007. LEND AMERICA also electronically

transmitted information to HUD in support of the application on September 29, 2006, and December 11, 2006. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 17's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

414.    LEND AMERICA submitted a fraudulent VOE to HUD. The VOE submitted for Borrower 17 falsely overstated both the consistency and amount of his salary. It presented his income as a steady salary, even though it varied greatly. Further, it overstated his compensation for 2004, 2005, and 2006.

415.    The VOE submitted by LEND AMERICA purported to be signed by Borrower 17's employer. The business was actually owned by Borrower 17 and his wife. For self-employed borrowers, Credit Analysis Handbook requires two years' worth of personal and business tax returns, a profit and loss statement and a balance sheet to be provided with the mortgage insurance application. LEND AMERICA provided no such documentation.

416.    Although the VOE submitted by LEND AMERICA purported to be signed by the "owner" of the business, it was in fact signed by Borrower 17's mother-in-law, who neither owns the business nor was in a position to verify Borrower 17's salary.

417.    LEND AMERICA further submitted a fraudulent employment letter to HUD. The letter stated a false annual salary for Borrower 17, a false breakdown of Borrower 17's weekly payroll withholdings and a false net pay. As with similarly fraudulent letters submitted by LEND AMERICA to HUD, concerning borrower employment income, this letter contains the false statement that "no computerized pay studs [sic] with year to date earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in

fact verifiable.

418.    LEND AMERICA Loan Officer Bernard instructed Borrower 17 to obtain a signed check from the business for $839.98.  This amount equalled the weekly net pay in the fraudulent employer letter, but was not the borrower's regular weekly net pay.  Bernard further instructed Borrower 17 to deposit the check in Borrower 17's bank account and to give Bernard the deposit slip.  LEND AMERICA submitted these fraudulent documents to HUD to establish this amount as Borrower 17's standard weekly net pay.

419.    LEND AMERICA submitted a fraudulent MCAW to HUD, in support of  LEND AMERICA's endorsement of the mortgage for FHA mortgage insurance.  The MCAW falsely stated that Borrower 17's mortgage payment-to-income ratio was 42.912%. In reality, it was 135%.  The MCAW falsely stated that Borrower 17's total fixed payment-to-income ratio was 43.178%.  In reality, it was 197%.

420.    LEND AMERICA submitted bank statements documenting deposits totaling $15,400 into Borrower 17's bank account, for the purpose of demonstrating his ability to provide funds at the mortgage's closing.  Per HUD regulations, the lender is required to document the source of the borrower's funds, to ensure they are not coming from the seller or the lender.  To conceal the source of the funds, LEND AMERICA submitted fraudulent documentation purporting to show that Borrower 17 had been enrolled in two different susus, and that Borrower 17 had received $15,400 in payments from these susus.  In fact, Borrower 17 had never belonged to these clubs, and had never received a payment from either club.  LEND AMERICA failed to document the actual source of the funds.

421.    The susu documentation was similar in form and substance to that seen in other fraudulent mortgage applications submitted by LEND AMERICA to HUD.  As elsewhere, the

borrower was scheduled to be the last member of each ten week susu to receive a disbursement (in this case $6,400 and $9,000), and the timing coincided within a month of the closing date of his home purchase.

422.   LEND AMERICA failed to analyze Borrower 17's derogatory credit history, in particular four bankruptcies, one terminated less than two years prior to closing.  In addition, Borrower 17's credit history showed a foreclosure action, and collection accounts that were settled for less than the full amount by payoffs at the closing.  Credit Analysis Handbook, ¶2-3E requires that after a bankruptcy, a borrower also must have demonstrated a documented ability to responsibly manage his or her financial affairs, and a lender must document that the borrower's current situation indicates that the events that led to the bankruptcy are not likely to recur. LEND AMERICA failed to meet this requirement, and simply requested and submitted borrower's tautological written explanation for the bankruptcy and debt.

423.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Linda Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

424.   Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

425.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 17's employment and income, LEND AMERICA falsely certified to HUD that Borrower 17 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

426.    After Borrower 17 made only eight payments on the mortgage the borrower

defaulted on the mortgage.  The mortgage holder has instituted foreclosure proceedings against

the property.

### Borrowers 18A and 18B: 148th Street, Jamaica

427.    LEND AMERICA originated and underwrote a mortgage for $333,385 to

Borrowers 18A and 18B for property at 148th Street, Jamaica, New York on December 18, 2007.

Pursuant to the terms of the mortgage, the borrowers' monthly payment was $2,627.48.

428.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on January 28, 2008.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on August 2, 2007, October 4,

2007, October 22, 2007, and February 25, 2008.  LEND AMERICA sent the file supporting its

endorsement of FHA insurance for Borrowers 18A and 18B's mortgage to HUD, via United

States mail or commercial interstate carrier, on or about March 6, 2009.

429.    Borrower 18A sought to purchase a house and was introduced to Carlos Aponte.

Borrower 18A understood Aponte to be working for LEND AMERICA.  In reality, Aponte acted

as a mortgage broker through Innovative Processing Solutions Inc.  Neither Aponte nor

Innovative Processing Solutions Inc. was an FHA-approved mortgage broker.  Borrower 18A

dealt only with Aponte and never spoke with any other LEND AMERICA employee.  Innovative

Processing Solutions Inc. was paid at the closing as a mortgage broker.

430.    LEND AMERICA, through its employee, Direct Endorsement Underwriter

Jonathan Schubert, falsely certified that the lender "has not paid any kickbacks, fee or

consideration of any type, directly or indirectly, to any party in connection with this transaction

except as permitted under HUD regulations and administrative instructions."

431.    Aponte told Borrower 18A that her credit was not good and that she needed a co-signer to qualify for a loan.  Borrower 18A requested Borrower 18B, a friend and co-worker to co-sign the loan.  Borrower 18A told Aponte that Borrower 18B would not be residing at the property or paying money towards the mortgage payments.  Aponte assured Borrower 18A that "nothing would come out of" Borrower 18B's pocket.  Aponte further stated replied that within one year Borrower 18A could refinance and take Borrower 18B's name off the loan and the property.

432.    Aponte instructed Borrower 18B to fill out a VOR and claim that she was paying rent for where she lived.  In reality, she lived with her mother, and paid no rent.

433.    Aponte faxed the VOR to LEND AMERICA.  LEND AMERICA fraudulently submitted this VOR to HUD.

434.    Aponte also faxed a VOE concerning Borrower 18A to LEND AMERICA.

435.    LEND AMERICA employee Patrick Kuhl falsely certified that neither the VOR nor the VOEs passed through the hands of the applicant or any interested third party.  LEND AMERICA Underwriter Schubert further falsely certified that the VOEs were requested and received by the lender or its duly authorized agent without passing through the hands of any third persons.

436.    LEND AMERICA fraudulently submitted a URLA.  The URLA falsely stated that Borrower 18B would be a joint tenant in the house.  The URLA further falsely stated that Borrower 18B's income was available to pay the mortgage.

437.    LEND AMERICA executed a fraudulent MCAW.  The MCAW falsely included Borrower 18B's monthly income of $4,387 as money available to pay the mortgage.  Borrower 18B was not going to contribute towards the mortgage payments.

84

438.    LEND AMERICA fraudulently omitted certain debts in collection status from Borrower 18A's monthly installment payments without explanation.

439.    LEND AMERICA fraudulently double-counted Borrower 18A's available assets on the MCAW by reporting an amount from Borrower 18A's recent bank statement plus an updated amount on the same account purportedly confirmed by fax.  The latter amount was falsely entered on Borrower 18B's URLA.

440.    LEND AMERICA falsely reported "assets available" of $7,220.61 when the actual amount was $4,201.68.

441.    LEND AMERICA further fraudulently stated that the mortgage payment-to-income ratio was 31.589%.  In reality, it was 79%, well in excess of HUD guidelines.

442.    LEND AMERICA further fraudulently stated on the MCAW that the total fixed payment–to-income ratio was 44.895%.  In reality, it was 99%, well in excess of HUD guidelines.

443.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Schubert, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

444.    Direct Endorsement Underwriter Schubert, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, he used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

445.    From the origination, Borrowers 18A and 18B made only two months of payments.  After initially moving to foreclose on the property, the mortgage holder and Borrower

85

18A have entered into a forbearance agreement.

### Borrowers 19A and 19B: 141st Street, Jamaica

446.     LEND AMERICA originated and underwrote a mortgage for $336,472 to

Borrowers 19A and 19B for property on 141st Street, Jamaica, New York on April 25, 2008.

Pursuant to the terms of the mortgage, the borrowers' monthly payment was $2,649.80.

447.     LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on April 30, 2008.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on January 23, 2008, February 25,

2008, and January 7, 2009.  LEND AMERICA sent the file supporting its endorsement of FHA

insurance for Borrowers 19A and 19B's mortgage to HUD, via United States mail or commercial

interstate carrier, on or about January 13, 2009.

448.     Borrower 19A and his fiancée were desperate for housing because their rental

home was foreclosed and they were forced out.  In the weeks prior to closing, they had to live

out of their car, store their belongings in a truck, and send their children to relatives.  The couple

agreed to purchase the property on 141st Street without ever being shown the interior.

449.     On information and belief ,Willie Colbert, who was identified in LEND

AMERICA's file as a Loan Officer, showed Borrower 19A and his fiancée the house from the

outside, said he was from a realtor, but that another realtor outside the area had the key.  Colbert

then took the couple directly to a LEND AMERICA office where the mortgage application

process began.  On information and belief,  Colbert deliberately prevented the borrowers from

seeing the interior of the property, until after the closing, knowing its disastrous condition.

450.     The appraisal obtained on the property by LEND AMERICA was materially

deficient and misleading.  The appraisal falsely stated that the property was in "average

condition" and required no repairs that would affect the property's value or marketability. Further, according to the appraisal, there were neither physical deficiencies nor adverse conditions that would affect the livability of the property. On the day of closing, however, when borrowers were able to see the house's interior for the first time, they discovered that the basement was flooded. In addition, there were holes in the kitchen ceiling and bedroom wall. There were holes in the basement walls, which permitted infestation by vermin. The main waste line in the basement was also broken and required immediate repair. In addition, there were major problems with the electrical system.

451.   The appraisal obtained by LEND AMERICA further stated that home sales and prices were stable in the neighborhood. In reality, they were in a steep decline. The LEND AMERICA appraisal claimed that the supply and demand for homes in the area was "in balance." In fact, it was significantly out of balance, with available homes greatly exceeding the demand for them.

452.   The comparable sales in the appraisal were not researched as required by HUD regulations in Appraisal Handbook for information on whether the sales were arm's length, distressed sales, or involved seller or financing concessions. Contrary to valuation protocol described in Appraisal Handbook, the appraiser listed only MLS and similar sales data sources as verification sources and reported sale or financing concessions as "None Known." Thus, the appraisal did not report that the prior sale of the subject and at least one of the comparable sales were foreclosures, and that the recent sale of that comparable was from a lender and therefore not arm's length.

453.   Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA, nonetheless certified the truth and accuracy of the appraisal, and further certified that it had been

conducted following appropriate appraisal standards.

454.    LEND AMERICA submitted a fraudulent VOR to HUD, to conceal the state of Borrower 19B's finances and exaggerate his ability to make regular housing payments at the time the mortgage was originated. The VOR falsely certified that Borrower 19B was making monthly rental payments of $900 prior to closing. In fact, Borrower 19B was living at his mother's house and paying his mother $500 a month.

455.    LEND AMERICA fraudulently arranged for Borrower 19B's false rent payments to be placed on Borrower 19B's credit report. LEND AMERICA then fraudulently submitted the false credit report to HUD to further support Borrower 19B's false rent payments.

456.    LEND AMERICA enrolled Borrowers 19A and 19B in the Rainy Day Foundation program. The purpose of the Rainy Day Foundation was and is to conceal borrowers' inability to keep up with mortgage payments during the first two years of the loan, the period of time that HUD monitors its Direct Endorsers' delinquency and default rates. Rainy Day purports to be a financial counseling program but on information and belief it is a mortgage lender-funded slush fund that provides payments on mortgages on an ad hoc basis when borrowers cannot make loan payments.

457.    LEND AMERICA fraudulently submitted to HUD a Certificate of Completion of a Rainy Day Foundation Homeownership Education Course, issued by a purported counselor. Borrowers 19A and 19B received no such education or counseling.

458.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

459.    Further, Underwriter O'Halloran, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

460.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 19A and 19B's financial status, LEND AMERICA falsely certified to HUD that Borrowers 19A and 19B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

461.    Borrowers 19A and 19B were unable to make a single payment and defaulted on the loan one month after closing.  Foreclosure proceedings against the home have been instituted by the bank holding the mortgage.

### Borrowers 20A and 20B: 152nd Street, Jamaica

462.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for $356,772 to Borrowers 20A and 20B for property on 152nd Street, Jamaica, New York on August 2, 2006. Pursuant to the terms of the mortgage, the borrowers were required to make a monthly mortgage payment of $2532.81.

463.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 15, 2006.  LEND AMERICA also electronically transmitted information to HUD in support of the application on July 31, 2006, and August 22, 2006. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 20A and 20B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about August 23, 2007.

464.    Borrower 20B had purchased the property, ostensibly with her mother, in June,

2005. The purchase money mortgage was obtained from LEND AMERICA.  Borrower 20B informed LEND AMERICA at that time, that her mother would be neither living in the property nor contributing towards the mortgage.

465.    When Borrower 20B sought to refinance her mortgage, just over a year after the purchase, LEND AMERICA employee Fred Norris urged Borrower 20B to use her mother, Borrower 20A, as the primary borrower on the refinanced mortgage.  Borrower 20B would be the co-borrower on the loan.

466.    Borrower 20B again informed LEND AMERICA that Borrower 20A would not be living in the property or contributing to the monthly mortgage payments.  This was confirmed by the fact that Borrower 20A's most recent pay stubs and her retirement account statement in the LEND AMERICA file bore her actual home's address in Brooklyn.

467.    Nonetheless, at the closing, LEND AMERICA directed the borrowers to sign a "Co-mortgagor Statement" stating that Borrowers 20A and 20B "will occupy the premises together... [and] will contribute equally to the monthly expenses."

468.    LEND AMERICA also required the borrowers to sign a Disclosure Notices form and a "Statement of Occupancy" that stated that both borrowers intended to occupy the property as their primary residence.  LEND AMERICA submitted these false documents to HUD.

469.    LEND AMERICA executed a fraudulent MCAW.  On the MCAW, LEND AMERICA fraudulently inflated Borrower 20B's income by including her mother's monthly income of $2,555.71 as part of the income available towards payment of the mortgage in the FHA mortgage insurance application.

470.    LEND AMERICA fraudulently submitted a URLA.  On the URLA, LEND AMERICA fraudulently inflated Borrower 20B's income by including her mother's monthly

income of $2,555.71 as part of the income available towards payment of the mortgage in the
FHA mortgage insurance application.

471.    LEND AMERICA further inflated Borrower 20B's income by fraudulently
exaggerating the amount Borrower 20B earned at her part time job.  Borrower 20B's employer
initially told LEND AMERICA directly that Borrower 20B could only expect to earn
approximately $6,000 in the course of a year of part time work.  However, LEND AMERICA
pressured the employer to adjust that figure substantially upwards by coming up with a
theoretical "maximum" salary that Borrower 20B might be able to make.  LEND AMERICA
informed the employer that if she was unable to come up with such a "maximum" figure
Borrower 20B would be unable to qualify for the refinancing.

472.    In response, Borrower 20B's employer provided an inflated figure of $11,700 per
year.  LEND AMERICA included this inflated salary figure in the URLA and MCAW.

473.    LEND AMERICA provided the format and substance of an employment  letter,
including a false title, annual salary, the breakdown of the weekly payroll withholdings and net
pay, and the statement, "No computerized pay-sub [sic] with year-to-date earnings issued."

474.    By including an inflated income, LEND AMERICA made it appear that
Borrowers 20A and 20B's mortgage payment-to-income ratio was only slightly above FHA's
guidelines, while their total fixed payment-to-income ratio fell within FHA's limits.  In fact,
Borrower 20B's Qualifying Ratios were 77% and 80%, respectively, exceeding FHA guidelines,
and higher than any Compensating Factors could justify.

475.    LEND AMERICA failed to provide HUD with a complete credit report for
Borrower 20A in violation of FHA mortgage application requirements.  The one page credit
summary indicated several derogatory items, but no detail was provided.  Thus it was impossible

91

for FHA to confirm that outstanding debt was paid off prior to closing.

476.     In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

477.     Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

478.     Despite LEND AMERICA's affirmative misrepresentations as to Borrowers 20A and 20B's financial status, LEND AMERICA falsely certified to HUD that Borrowers 20A and 20B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

479.     Borrowers 20A and 20B were unable to make a single payment and the loan went into default. After investigation and review by HUD, HUD demanded that LEND AMERICA indemnify HUD against any losses caused by this loan.  Only after this demand did LEND AMERICA take steps to indemnify HUD for LEND AMERICA's fraudulent submissions.

### Borrower 21: Easton Drive, Clifton Park

480.     LEND AMERICA originated and underwrote a refinance mortgage for $225,634 to Borrower 21 for property on Easton Drive, Clifton Park, New York on July 25, 2007.  Under the terms of the mortgage, the borrower's monthly mortgage payment was $2,089.

481.     LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on August 6, 2007.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on July 23, 2007, September 13, 2007, and March 19, 2008. LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 21's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

482. LEND AMERICA employee Randall Donadio informed Borrower 21 that he would need an additional $5,000-$8,000 in annual income in order to qualify for the refinanced mortgage. Borrower 21 told LEND AMERICA that he had part time employment at a second job, where he worked a few hours a week.

483. LEND AMERICA subsequently submitted a fraudulent VOE to HUD. The VOE purported to certify that Borrower 21 was as an account representative at the second job working 30 hours a week and making a total of $1,300 in monthly salary.

484. LEND AMERICA also submitted a fraudulent letter, purportedly from Borrower 21, stating that he worked at the second job daily from 5:00PM to 9:00PM. In reality, Borrower 21 worked irregularly, a few hours a week at the second job.

485. Payments from the second job to Borrower 21 were made "off the books" and without any federal or state tax withholdings. LEND AMERICA employee Donadio instructed Borrower 21's employer at the second job on how to fill out a supplemental employment letter submitted to FHA, including what amounts to provide for state and federal taxes on Borrower 21's salary. LEND AMERICA provided the VOE, as well as the format and substance of the supporting letter, including the false annual salary, the breakdown of the bi-weekly payroll withholdings and net pay to the employer at the second job. The employment letter also included the statement "I do not use a payroll services and do not issue computerized pay stubs."

486. LEND AMERICA submitted a credit report to HUD with false employment

information for Borrower 21.

487.    LEND AMERICA fraudulently submitted both a URLA and a MCAW to HUD, containing the inflated income from the second job.  In addition, the inflated income was used to fraudulently reduce the size of the Qualifying Ratios on the MCAW.

488.    Removing the approximately $1,050 per month in inflated salary from the MCAW, results in Qualifying Ratios that exceed HUD's guidelines at 54%.

489.    HUD cautions in Credit Analysis Handbook, ¶1-11B, that "Cash-out" refinances for debt consolidation represent considerable risk, especially if the borrowers have not had an attendant increase in income.  Such transactions must be carefully evaluated.

490.    LEND AMERICA failed to analyze Borrower 21's derogatory credit history, in particular several late payments on an automobile loan, and many late payments on an education loan, several collection accounts, and a $7,293 judgment.  Furthermore, Borrower 21 had already refinanced his mortgage at least five times in the previous five years, increasing the principal each time so that it was now nearly double what it had been five years earlier.

491.    Despite this history, LEND AMERICA provided a cash-out refinance mortgage to Borrower 21 with a monthly payment that was higher than his previous mortgage.  The borrower was still left with other recurring  monthly payments as well.

492.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

493.    Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting

the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

494.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 21's financial status, LEND AMERICA falsely certified to HUD that Borrower 21 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

495.    The loan went into default, after Borrower 21 made only two payments from the origination of the mortgage.  A preforeclosure sale of the property was completed by the bank holding the mortgage.  HUD suffered a loss of $59,512 on a claim filed against the FHA mortgage insurance by the mortgage holder.

### Borrowers 22A and 22B: Okane Street, Central Islip

496.    LEND AMERICA originated and underwrote a mortgage to Borrowers 22A and 22B for $367,040 for property on Okane Street, Central Islip, New York on October 13, 2006. Under the terms of the mortgage, the borrowers' monthly mortgage payment was $3,146.68.

497.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on October 20, 2006.  LEND AMERICA also electronically transmitted information to HUD in support of the application on September 1, 2006, September 21, 2006, September 22, 2006, October 9, 2006, and December 11, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 22A and 22B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 12, 2008.

498.    During the process of buying a home and applying for a mortgage, Borrower 22A and his girlfriend signed a contract of sale for the above house, but were told by LEND AMERICA employee Bernard that they did not qualify for the mortgage, due to their poor credit

history and insufficient income. Bernard then instructed Borrower 22A to substitute Borrower 22B, the fiancée's father as a co-borrower, instead of his fiancée. LEND AMERICA was told prior to closing that Borrower 22B never intended to live in the property or to contribute to the mortgage payments.

499.    LEND AMERICA submitted a fraudulent URLA. The URLA falsely stated that Borrower 22B intended to occupy the property as his primary residence.

500.    Bernard was also informed that Borrower 22B was unemployed. Bernard stated that he would create a fake job for Borrower 22B, and provide false pay stubs and other documentation of Borrower 22B's employment.

501.    LEND AMERICA submitted a fraudulent VOE to HUD that falsely certified that Borrower 22B as a full-time employee at Benitos' Communication, at a weekly salary of $1,088.50. LEND AMERICA also submitted a fraudulent employment  letter, purportedly from Benitos' Communication, describing Borrower 22B's employment history at the company and income. LEND AMERICA drafted and submitted to HUD the fraudulent VOE as well as the employment letter, which stated a false weekly salary, the breakdown of the weekly payroll withholdings and net pay. Similar to other fraudulent employment letters submitted to HUD by LEND AMERICA, the letter stated, "no computerized pay studs [sic] with year to date earnings are issued."

502.    LEND AMERICA submitted a credit report to HUD containing false employment information on Borrower 22B.

503.    LEND AMERICA submitted a fraudulent MCAW to HUD, in support of  LEND AMERICA's endorsement of the mortgage for FHA mortgage insurance. The MCAW falsely stated that Borrowers 22A and 22B's mortgage payment-to-income ratio was 36.863%. In

reality, it was 114%. The MCAW falsely stated that Borrowers 22A and 22B's total fixed

payment-to-income ratio was 45.228%. In reality, it was 114%.

504. LEND AMERICA submitted a fraudulent VOR to HUD regarding Borrower 22A.

The VOR falsely stated that Borrower 22A was making monthly rental payments of $1,300 prior

to applying for the mortgage. In fact, Borrower 22A was living at his mother's house.

505. LEND AMERICA further submitted a credit report with false information

concerning Borrower 22A's rent payments.

506. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, LEND AMERICA

Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

sufficiency of the loan application and all of its components.

507. LEND AMERICA Underwriter Jarrett fraudulently certified that, pursuant to

Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and

reviewing all documents associated with the application for FHA mortgage insurance.

508. Despite LEND AMERICA's affirmative misrepresentations as to Borrowers 22A

and 22B's income, LEND AMERICA falsely certified to HUD that Borrowers 22A and 22B met

all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

509. Borrowers 22A and 22B made only three payments from the time the mortgage

originated, after which they defaulted on the loan. The property was conveyed by the mortgage

holder to HUD, in exchange for HUD's payment on a claim against the FHA mortgage

insurance.

510. HUD has incurred a loss of $272,480 on this FHA-insured loan.

**Borrowers 23A and 23B: East 214th Street, Bronx**

511.    LEND AMERICA originated and underwrote a refinance mortgage for $470,198
to Borrowers 23A and 23B for property on East 214th Street, Bronx, New York on November 3,
2006.  Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was
$3,537.11.

512.    LEND AMERICA endorsed the mortgage for FHA insurance through an
electronic transmission to HUD on November 13, 2006.  LEND AMERICA also electronically
transmitted information to HUD in support of the application on August 18, 2006, August 23,
2006, October 19, 2006, and December 1, 2008.  LEND AMERICA sent the file supporting its
endorsement of FHA insurance for Borrowers 23A and 23B's mortgage to HUD, via United
States mail or commercial interstate carrier, on or about November 26, 2008.

513.    Borrower 23A received several phone solicitations from LEND AMERICA,
telling her that her mortgage rate was going to adjust upwards, and that LEND AMERICA could
issue her a fixed rate mortgage that would save her money each month.  When she decided to
seek a new mortgage with LEND AMERICA, she was assigned LEND AMERICA Loan Officer
Michael Viviano.

514.    Borrower 23A told Viviano that she rented the second unit of her two unit house,
for $750 per month.  Viviano told Borrower 23A that this was not enough money to qualify for
the loan.

515.    LEND AMERICA Loan Officer Viviano submitted a fraudulent letter to HUD,
stating inflated rental income on the second unit for Borrowers 23A and 23 B.  LEND
AMERICA Loan Officer Viviano prepared this undated letter, which stated that Borrower 23A
"will be" collecting $1,650 in monthly rent on the property.

516.    LEND AMERICA executed a fraudulent URLA.  The URLA stated false rental income for the borrowers.  Viviano fraudulently inflated Borrowers 23A and 23B's income on the URLA by stating that they would have $1,402.50 in net monthly rental income from the rental unit in the property.

517.    LEND AMERICA executed a fraudulent MCAW.  On the MCAW, LEND AMERICA stated false Qualifying Ratios that were based on the inflated rental income.  The stated mortgage payment-to-income ratio was 31.761%.  In reality, it was 34%.  The fixed payment-to-income ratio was stated as 44.350%.  In reality, it was 47%.

518.    As stated on the MCAW LEND AMERICA submitted to HUD, Borrowers 23A and 23B's Qualifying Ratios were still over the limits of HUD's guidelines, and LEND AMERICA was thus required to provide Compensating Factors to justify the mortgage.  LEND AMERICA provided no valid Compensating Factors.

519.    Borrowers 23A and 23B informed LEND AMERICA prior to closing that they could not afford increased payments and that their primary purpose for refinancing was to reduce their the monthly mortgage payments.  Viviano and LEND AMERICA used the prospect of increased payments under the borrowers' existing adjustable rate mortgage to pressure Borrowers 23A and 23B into a new fixed rate mortgage with LEND AMERICA.

520.    Despite assurances made by Viviano, after the closing Borrowers 23A and 23B realized that their mortgage payments had actually increased.

521.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

522.     Further, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA,
fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in
underwriting the mortgage and reviewing all documents associated with the application for FHA
mortgage insurance.

523.     Despite LEND AMERICA's affirmative misrepresentations as to Borrowers 23A
and 23B's income, LEND AMERICA falsely certified to HUD that Borrowers 23A and 23B met
all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

524.     After sixteen payments, Borrowers 23A and 23B defaulted on their mortgage.
The borrowers have been permitted to attempt to make a preforeclosure sale of the property.

**Borrowers 24A and 24B: South 9th Avenue, Mt. Vernon**

525.     LEND AMERICA originated and underwrote a mortgage to for $287,727 to
Borrowers 24A and 24B for property on South 9th Avenue, Mt. Vernon, New York on
November 30, 2004.  Pursuant to the terms of the mortgages, the borrowers' monthly mortgage
payment was $2,056.87.

526.     LEND AMERICA sent the application for FHA mortgage insurance to HUD via
United States mail or commercial interstate carrier on or about December 21, 2004.  LEND
AMERICA also electronically transmitted information to HUD in support of the application on
October 13, 2004, October 14, 2004, December 16, 2004, and December 20, 2004.

527.     LEND AMERICA informed Borrower 24A prior to closing that her income was
insufficient to qualify for the loan independently and that she would need to obtain a co-
borrower.  Borrower 24A provided Borrower 24B as a co-borrower but told LEND AMERICA
prior to closing that Borrower 24B would not live in the subject property and would not
contribute to any expenses related to the property, including mortgage payments.

528.    LEND AMERICA submitted to HUD a fraudulent URLA, a "Statement of Occupancy," and a "Co-Mortgagor Statement" that falsely stated that both borrowers would be occupying the premises as a primary residence.

529.    The Co-Mortgagor Statement further falsely stated that Borrowers 24A and 24B were cousins and that they would "contribute equally to the monthly expenses." In fact, Borrowers 24A and 24B were not related. Further, LEND AMERICA was aware prior to closing that Borrower 24B never intended to live in the property or pay any portion of the mortgage.

530.    LEND AMERICA improperly and fraudulently included Borrower 24B's income in the gross monthly income calculations and Qualifying Ratios on the MCAW and URLA.

531.    By including Borrower 24B's income in the calculations LEND AMERICA made it appear that the mortgage payment-to-income ratio was a slightly excessive 31.93% and the total fixed payment-to-income ratio was an acceptable 40.56%. Subtracting Borrower 24B's income from the calculations, the actual ratios exceeded HUD guidelines at 47% and 60% respectively.

532.    LEND AMERICA failed to provide Compensating Factors in the application for mortgage insurance that would have justified underwriting the loan.

533.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Christine Price, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

534.    Further, Direct Endorsement Underwriter Price, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in