underwriting the mortgage and reviewing all documents associated with the application for FHA

mortgage insurance.

535.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

24A and 24B's income, LEND AMERICA falsely certified to HUD that Borrowers 24A and

24B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement

Handbook.

536.    The borrowers made only four payments on the mortgage before defaulting on the

mortgage.  The property was tendered to HUD in exchange for a payment to the mortgage holder

on an FHA insurance claim.

537.    The fraudulently obtained mortgage insurance resulted in a loss to HUD of

$62,711.66.

### Borrowers 25A and 25B: York Avenue, Staten Island

538.    LEND AMERICA originated and underwrote a mortgage to Borrowers 25A and

25B for $471,276 for property on York Avenue, Staten Island, New York on May 5, 2008.

Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was

$3,479.26.

539.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on June 9, 2008.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on April 11, 2008, April 30, 2008,

and December 12, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA

insurance for Borrowers 25A and 25B's mortgage to HUD, via United States mail or commercial

interstate carrier, on or about December 15, 2008.

540.    LEND AMERICA Loan Officer Fessler  told Borrower 25A during the loan

application process that her income was insufficient to qualify for the loan independently and that she would need to get someone to "co-sign" the loan.

541.    Borrower 25A informed Fessler and another LEND AMERICA employee that Borrower 25B was available to co-sign the loan.  Borrower 25A also told Fessler that Borrower 25B would not live in the property or contribute to the mortgage payments.  Borrower 25A was told by LEND AMERICA employees that this was not a problem, and that Borrower 25A could refinance in a year with better terms.

542.    LEND AMERICA executed a fraudulent URLA, which stated that Borrower 25B's income was used to qualify for the mortgage.  The URLA further fraudulently and falsely stated Borrower 25B's income as being available to pay toward the mortgage.

543.    LEND AMERICA executed a fraudulent URLA, which falsely stated that both borrowers would make the property their primary residence.

544.    LEND AMERICA submitted a fraudulent VOE to HUD for Borrower 25B.  The VOE falsely stated that in 2006 Borrower 25B earned $67,950 from his employer.  He actually earned $28,837.  The VOE falsely stated that Borrower 25B earned $61,350 in 2007.  He actually earned $16,972.  The VOE falsely stated that Borrower 25B earned $16,240 as of April 30, 2008.  Borrower 25B earned only $22,640 for the entire year of 2008.

545.    LEND AMERICA executed a fraudulent MCAW.  LEND AMERICA fraudulently included Borrower 25B's monthly income in the gross monthly income calculations and Qualifying Ratios on the MCAW.  Further, the monthly income of $5,026.67 used for Borrower 25B was inflated.  As a result of this inflated income, LEND AMERICA concealed from HUD that Borrower 25A's mortgage payment-to-income and total fixed payment-to-income ratios, which already exceeded HUD's limits even with the improper inclusion of

103

Borrower 25B's income, were an impossible 84% and 97% respectively.

546. LEND AMERICA obtained a fundamentally deficient and misleading appraisal. The appraisal overstated the size of the subject property by more than 780 square feet. LEND AMERICA's appraisal further failed to accurately record and consider the desirability of the neighborhood where the property was located. LEND AMERICA's appraisal substantially overestimated the available market rate for rent per room, and described market conditions of the neighborhood as good, when in fact property values were declining, with an oversupply of properties for sale and limited demand.

547. The analysis of comparable properties in LEND AMERICA's appraisal was based on significantly incorrect data concerning physical characteristics, value ranges, and prior sales history of the property. The appraisal failed to disclose that two of the comparable properties had earlier sales less than one year prior to the reported sales used for the comparison. The appraisal further reported sales prices for two of the comparables that are likely inflated and false, and are either concealing large sales concessions or are the result of false sales contracts. Further LEND AMERICA's appraisal also failed to accurately record the building materials, physical setting, and appearance of some comparables.

548. As a result, LEND AMERICA's appraisal fraudulently inflated the appraisal by approximately $40,000.

549. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

550. Further, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA,

104

fraudulently certified that, pursuant to Direct Endorsement Handbook, she had personally reviewed the appraisal, and had used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

551.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 25A and 25B's income, LEND AMERICA falsely certified to HUD that Borrowers 25A and 25B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

552.   LEND AMERICA fraudulently concealed Borrower 25A's inability to pay her mortgage by insuring her payment performance for up to five months through the Rainy Day Foundation.  By making Borrower 25A's mortgage payments through the Rainy Day Foundation, LEND AMERICA fraudulently delayed the appearance of Borrower 25A's mortgage on HUD's Neighborhood Watch list of delinquent loans.

553.   After a single payment towards the mortgage from the Rainy Day Foundation, no further payments were made, and the loan defaulted.  Foreclosure against the property was instituted by the mortgage holder.

### Borrower 26: Temple Court, Staten Island

554.   LEND AMERICA originated and underwrote a mortgage for $315,108 to Borrower 26 for property on Temple Court, Staten Island, New York on May 12, 2006.  Pursuant to the terms of the mortgage, the borrower's monthly mortgage payment was $2,516.03.

555.   LEND AMERICA sent the application for FHA mortgage insurance to HUD via United States mail or commercial interstate carrier on or about May 23, 2006.  LEND AMERICA also electronically transmitted information to HUD in support of the application on April 13, 2006, May 1, 2006, May 22, 2006, and May 25, 2006.

105

556.    LEND AMERICA Loan Officer Vince Bertin informed Borrower 26 and her husband that she had insufficient income and that she would need to show additional income in order to obtain the loan.  Borrower 26's husband could not act as a co-borrower because of his uncertain immigration status.

557.    Bertin asked Borrower 26 and her husband if there was someone who could answer the phone and give a false verbal verification that Borrower 26 had a second job from which she earned additional income.  Bertin informed Borrower 26 and her husband that all that was needed for the verification was someone who could "say yes to a few questions."  Borrower 26 had previously unsuccessfully applied for a job with a home healthcare company. Borrower 26's husband informed Bertin that he had a friend who worked at the home healthcare company who would be willing to falsely confirm that Borrower 26 was employed at the company.  The husband gave Bertin his friend's name and cell phone number.  Bertin then stated that someone besides himself would be calling the friend, and the friend only had to say "yes" to verify the employment.

558.    Bertin, on behalf of LEND AMERICA, told Borrower 26's husband that he would find false pay stubs from the home healthcare company and a VOE form in his mailbox.  On information and belief, Bertin dropped off the VOE form and false pay stubs with Borrower 26's husband.  Then Bertin instructed Borrower 26's husband what amounts to fill in on the VOE form and how to sign it.  Bertin told Borrower 26's husband to fax the fraudulent VOE and paycheck stubs to LEND AMERICA, because it was necessary for it to appear that the documents came from the employer's fax machine.  Bertin instructed Borrower 26's husband to destroy the pay stubs after he completed the fax.

559.    LEND AMERICA submitted the fraudulent VOE and forged paystubs to HUD.

560.    LEND AMERICA submitted a fraudulent letter to HUD purportedly from Borrower 26 in which she confirmed her employment and income at the home healthcare company.

561.    LEND AMERICA submitted a fraudulent URLA and MCAW to HUD.  The URLA and MCAW falsely included $4,550 in monthly income from Borrower 26's fictitious work at the home healthcare company.

562.    Without the nonexistent income from the home healthcare company, Borrower 26's mortgage payment-to-income and total fixed payment-to-income ratios exceeded HUD guidelines, at 64% and 79%, respectively.

563.    On the MCAW submitted to HUD, LEND AMERICA fraudulently certified the adequacy and stability of Borrower 26's income as acceptable for the purposes of making mortgage payments, on the MCAW.

564.    On the VOE submitted to HUD, LEND AMERICA's Loan Processor falsely certified that they had sent the form directly to the employer and that it had not passed through the hands of any interested third-parties.

565.    LEND AMERICA submitted a fraudulent VOR to HUD.  To further conceal Borrower 26's true financial status and to present her as more capable than she actually was to meet the expenses involved in home ownership, LEND AMERICA fraudulently inflated the $1,100 of rent Borrower 26 had been paying for her apartment to $1,800 per month.  Bertin provided the VOR form to Borrower 26's husband and, over the telephone, told him what to write on the form, and to forge the landlord's signature.

566.    LEND AMERICA submitted a credit report to HUD containing false rental information for Borrower 26.

107

567.    LEND AMERICA fraudulently stated to HUD on the Tenancy (Rental)

Verification form, and the URLA, that Borrower 26 was paying $1,800 in monthly rent.

568.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

sufficiency of the loan application and all of its components.

569.    Further, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA,

fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in

underwriting the mortgage and reviewing all documents associated with the application for FHA

mortgage insurance.

570.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower

26's income, LEND AMERICA falsely certified to HUD that Borrower 26 met all requirements

for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

571.    Borrower 26 made only seven payments, before the loan defaulted.  A Pre-

foreclosure Sale of the house was completed in March 2009.  HUD suffered a loss of $127,267

on a claim filed against the FHA mortgage insurance by the mortgage holder.

**Borrowers 27A and 27B: Cumberbach Street, Wyandanch**

572.    LEND AMERICA originated and underwrote a mortgage for $312,530 to

Borrowers 27A and 27B for property on Cumberbach Street, Wyandanch, New York on

December 28, 2006.  Pursuant to the terms of the mortgage, the borrowers' monthly mortgage

payment was $2,727.40.

573.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on January 5, 2007. LEND AMERICA also electronically

transmitted information to HUD in support of the application on November 9, 2006, and December 22, 2006.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 27A and 27B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 22, 2008.

574.    While applying for a loan, Borrower 27A was informed by LEND AMERICA Loan Officer Bernard that he would be unable to independently qualify for the loan due to insufficient income.  Bernard told Borrower 27A to find someone willing to act as a co-borrower to help him qualify for the loan.

575.    Borrower 27A arranged for Borrower 27B to act as the co-borrower on the loan. Borrower 27A told Bernard that Borrower 27B would neither live in the property nor contribute to the monthly mortgage payments.

576.    LEND AMERICA executed fraudulent URLAs.  The URLAs falsely included Borrower 27B's purported income as income that was available to pay the mortgage.

577.    LEND AMERICA executed a fraudulent URLA that falsely stated that both Borrowers 27A and 27B intended to make the property their primary residence.

578.    LEND AMERICA submitted a fraudulent VOE, concerning Borrower 27B.  The VOE falsely stated that Borrower 27B worked at Lucky Convenient Store Inc. ("Lucky") as a store manager, at a weekly salary of $903.85.  Bernard requested Lucky's owner, a personal acquaintance of Bernard's, to sign the VOE.  Bernard used Lucky's owner to sign at least one other fraudulent VOE, for another borrower.

579.    On the VOE, LEND AMERICA Loan Processor Chandra Williams, on behalf of LEND AMERICA, falsely certified that she sent the form directly to the employer and that it had not passed through the hands of any interested third-parties.

580.    LEND AMERICA submitted a fraudulent letter from Lucky's owner to HUD. LEND AMERICA devised and provided the format and substance of the letter, including the false title, annual salary, the breakdown of the weekly payroll withholdings and erroneous calculation of net pay, and the statement, "No computerized pay studs [sic] with year to date earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters, to conceal the fact that a borrower's salary information is not in fact verifiable.

581.    Borrower 27B never worked for Lucky Convenient Store Inc. and was not receiving the salary stated at the time the mortgage insurance application was submitted to HUD.

582.    LEND AMERICA executed a fraudulent MCAW. The MCAW falsely stated Borrower 27B's non-existent income from Lucky, as money available to pay the mortgage. Further, LEND AMERICA fraudulently included the salary from Lucky in the calculation of Qualifying Ratios on the MCAW. By using the non-existent salary, LEND AMERICA made it seem that Borrowers 27A and 27B's mortgage payment-to-income ratio only slightly exceeded HUD's guidelines, at 33.715%. Further, including the false income allowed LEND AMERICA to falsely state that the total fixed payment-to-income ratio was an acceptable 35.186%.

583.    Without the Lucky income, however, the actual mortgage payment-to-income ratio was an impossible 116%. Similarly, the total fixed payment-to-income ratio became an impossible 121%.

584.    LEND AMERICA submitted a fraudulent gift letter regarding Borrower 27A's down payment. The gift letter falsely stated that Borrower 27A had received $3,800 as a gift from a cousin, Eline L., to be applied against the purchase of the house. Borrower 27A does not have a cousin named Eline L., and he never received a gift in that amount.

110

585.   LEND AMERICA further fraudulently included this non-existent gift in the cash reserves it stated on the MCAW LEND AMERICA submitted to HUD.

586.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

587.   Further, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

588.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 27A and 27B's income, LEND AMERICA falsely certified to HUD that Borrowers 27A and 27B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

589.   The borrowers made only one payment from the origination of the mortgage.  The loan is now in default, and foreclosure proceedings have started.

### Borrower 28: S. 25th Street, Wyandanch

590.   LEND AMERICA originated and underwrote a mortgage for $347,057 to Borrower 28, for purchase of a property on S. 25th Street, Wyandanch, New York on February 6, 2007.  Pursuant to the terms of the mortgage, the borrower's monthly mortgage payment was $3,233.50.

591.   LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on February 14, 2007.  LEND AMERICA also electronically

111

transmitted information to HUD in support of the application on or about January 11, 2007, January 25, 2007, and March 5, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrower 28's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 9, 2009.

592.    At the time LEND AMERICA originated her mortgage, Borrower 28 worked at only one job, as a bus driver, earning  between $20,000 and $30,000 a year.  Borrower 28 provided documentation that this was her sole income to LEND AMERICA, including Loan Officer Bernard.

593.    LEND AMERICA submitted a fraudulent VOE.  The VOE falsely stated that Borrower 28 was employed as Assistant Director at "Focus of Haiti."  Borrower 28 never worked at Focus of Haiti.  The VOE further falsely stated that Borrower 28 made an annual salary of $96,576 per year, triple her actual salary from the bus company.

594.    On the VOE, LEND AMERICA Loan Processor Williams falsely certified that she sent the form directly to the employer and that it had not passed through the hands of any interested third-parties.

595.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

596.    LEND AMERICA submitted to HUD a fraudulent employment letter purportedly from Focus of Haiti.  The letter falsely stated that Borrower 28 had been employed as an Assistant Managing Director for almost three years, and made a gross annual salary of $96,576 per year/$1,857.23 per week.  The letter further stated that Borrower 28 was always paid in cash.

112

The letter concluded: "Sorry there weren't ant computized [sic] pay stubs available." On information and belief, LEND AMERICA arranged for statements similar to this to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

597.    LEND AMERICA submitted a false letter from Borrower 28, setting out her purported work hours. The letter falsely stated that Borrower 28 works both as a part-time bus driver and as an Assistant Director at Focus of Haiti.

598.    LEND AMERICA executed a fraudulent URLA to HUD. The URLA falsely included the nonexistent employment income from Focus of Haiti.

599.    LEND AMERICA executed a fraudulent MCAW. LEND AMERICA falsely stated the income from Focus of Haiti on the MCAW. LEND AMERICA further fraudulently used the false income to calculate and produce an artificially low mortgage payment-to-income ratio and an artificially low total fixed payment-to-income ratio. Borrower's purported mortgage payment-to-income was listed as 34.950%. The actual figure was 268%. This means that borrower would need more than two times her actual monthly earnings to pay just her mortgage.

600.    On the fraudulent MCAW, Borrower 28's purported total fixed payment-to-income ratio was listed as 44.526%, whereas, the actual ratio was 342%. This means Borrower 28 would have to pay almost four times her actual earnings to pay her recurring monthly debts, including the LEND AMERICA-originated mortgage.

601.    LEND AMERICA submitted a credit report to HUD containing false employment information for Borrower 28.

602.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

113

Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

603.    Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

604.    From origination, borrower made a total of six mortgage payments, before the loan defaulted.  Foreclosure proceedings have been started by the mortgage holder.

**Borrowers 29A and 29B: 153rd Street, Jamaica**

605.    LEND AMERICA originated and underwrote a mortgage $362,138 to Borrowers 29A and 29B, for property on 153rd Street, Jamaica, New York on March 23, 2007.  Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was $2,806.98.

606.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on March 30, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on or about March 15, 2007, and March 23, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 29A and 29B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about December 16, 2008.

607.    Borrower 29A was told that her credit was not good enough to qualify for a mortgage loan, and that she would need a co-signer to qualify.  Borrower 29A was told that Borrower 29B would be willing to co-sign the loan, as a co-borrower.  Borrower 29A had never met Borrower 29B before.

608.    Borrower 29A repeatedly informed LEND AMERICA that Borrower 29B was not

114

going to live in, nor contribute to the mortgage payments on the property. LEND AMERICA employees assured her that it would be "legal" for her to have Borrower 29B sign onto the mortgage under these circumstances. Borrowers 29A and 29B were also told that Borrower 29A could refinance in a year, and remove Borrower 29B from the mortgage.

609.    LEND AMERICA required both borrowers to sign a URLA, which  fraudulently stated Borrower 29B's income was  available to pay the mortgage. The URLA also falsely states that Borrower 29A "had not been declared bankrupt within the past seven years." Borrower 29A, however, had a Chapter 7 bankruptcy filing less than seven years prior to the March 23, 2007 loan origination. The bankruptcy discharge date was January 30, 2001. LEND AMERICA submitted this URLA to HUD.

610.    LEND AMERICA also submitted to HUD a fraudulent Borrower Certification on the HUD/VA Addendum to the URLA, a Co-Mortgagor Statement, and an undated "to whom it may concern" letter.  All these documents falsely stated that both borrowers intended to occupy the property as their primary residence.  The Co-Mortgagor Statement further included the false statement that borrowers would share the monthly expenses.  LEND AMERICA executed a fraudulent MCAW, which falsely stated Borrower 29B's monthly income was available to pay the monthly mortgage payments.

611.    On the MCAW LEND AMERICA fraudulently calculated the Qualifying Ratios using Borrower 29B's monthly income.  Under LEND AMERICA's false calculations, the borrowers' mortgage payment-to-income ratio was 25.722%.  Their total fixed payment-to-income ratio was 45.927%. LEND AMERICA fraudulently achieved these ratios, effectively doubling Borrower 29A's income, by falsely including Borrower 29B's income as being available to her.  Without Borrower 29B's income, the ratios were 49% and 62%, significantly

higher than the HUD guidelines.

612.    LEND AMERICA obtained a fundamentally flawed and misleading appraisal to support its endorsement of the mortgage for insurance. The appraisal noted that the property had been sold to the previous owners for $206,000 in December 2006, fifteen months prior to the sale to Borrowers 29A and 29B, for $365,000, (a seventy-eight percent increase). The appraisal, however, falsely stated that the after the December 2006 purchase, the property had been renovated, and that there was new flooring, including tile, wood and carpet, new wall finishes, new bathroom fixtures, new windows, a new electrical box and new windows installed. Besides a single new window and new door however, none of these renovations were actually made.

613.    The comparable sales in the appraisal were not researched as required by HUD regulations in Appraisal Handbook, for information on whether the sales were arm's length, distressed sales, or involved seller or financing concessions. Contrary to valuation protocol described in Appraisal Handbook, the appraiser listed only MLS and similar sales data sources as verification sources and, despite acknowledging that "concessions are common within the subject market area," reported sale or financing concessions as "Unknown." Further, the neighborhood of the subject property was incorrectly identified, and therefore the high end of the value range of the market area was overstated by nearly $200,000. The gross living area of four of the comparables was understated, resulting in inaccurate adjustments. Two of the comparable sales used in the appraisal were flip sales and, per HUD guidelines, were not reliable indicators of market value.

614.    LEND AMERICA's fraudulent appraisal inflated the appraised value of the property by at least $20,000.

615.    LEND AMERICA fraudulently submitted documentation to HUD which falsely

stated that $30,900 in renovations were made to the property. The letter, from "Triple A Construction" falsely states that new floors, carpet, doors and locks, windows, and bathroom fixtures were installed, the electrical system and box upgraded, and painting done to the interior and exterior. Virtually none of these repairs actually occurred.

616. LEND AMERICA failed to analyze the significant recent derogatory items on both borrowers' credit reports, including late payments, collection accounts, and settlements for less than the full amount due.

617. In the HUD 1003 Addendum, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that she personally reviewed the appraisal report, had used due diligence, and found the mortgage eligible for FHA mortgage insurance.

618. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

619. Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

620. Borrower 29A was immediately delinquent on her first mortgage payment, in May 2007. The loan is currently in default. On information and belief, foreclosing proceedings will be instituted shortly by the mortgage holder.

**Borrowers 30A and 30B: Freemont Street, Peekskill**

621. LEND AMERICA originated and underwrote a mortgage for $297,549 to

117

Borrowers 30A and 30B for property on Freemont Street, Peekskill, New York on May 15, 2007. Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was $2,380.80.

622.   LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on May 23, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on or about May 21, 2007, and May 22, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 30A and 30B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

623.   LEND AMERICA told Borrower 30A that she did not have sufficient income for a mortgage.  LEND AMERICA employees told her to find someone who made at least $10,000 and who would be willing to co-sign the mortgage.

624.   Borrower 30A told LEND AMERICA that her brother, Borrower 30B, could co-sign the loan, but that he would be neither living in the property nor contributing toward the mortgage payments.  The LEND AMERICA employee assured her that this was no problem.

625.   LEND AMERICA submitted fraudulent URLAs that falsely increased the amount of income available for monthly payment by fifty percent, by including Borrower 30B's income.

626.   LEND AMERICA fraudulently executed a MCAW, containing false statements as to the monies available for payment of the mortgage, and false numbers for the Qualifying Ratios.  LEND AMERICA falsely stated that Borrower 30B's income would be available to pay the monthly mortgage.  LEND AMERICA further, fraudulently used this income to calculate the borrowers' Qualifying Ratios.

627.   LEND AMERICA fraudulently stated on the MCAW that the mortgage payment-

118

to-income ratio was 35.929%. In reality, without Borrower 30B's income, it was 54%. Similarly, LEND AMERICA fraudulently stated that the total fixed payment-to-income ratio was 45.844%. In reality, without Borrower 30B's income, it was 69%. The actual ratios exceed HUD guidelines.

628.    LEND AMERICA submitted a fraudulent Borrower's Certification on the HUD/VA Addendum to the URLA, which falsely stated that both borrowers intended to occupy the property as their primary residence.

629.    LEND AMERICA submitted a fraudulent Disclosure Notices form, which falsely stated that both borrowers intended to occupy the property as their primary residence.

630.    LEND AMERICA submitted a fraudulent a Co-Mortgagor Statement, which falsely stated that borrowers were cousins and intended to occupy the property as their primary residence. Co-Mortgagor Statement further included the false statement that borrowers "will contribute equally to the monthly expenses."

631.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

632.    Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

633.    After the borrowers made only two payments on the mortgage, the loan defaulted. The mortgage holder has instituted foreclosure proceedings.

**Borrower 31: 43rd Street, Lindenhurst**

634.    LEND AMERICA originated and underwrote a mortgage for $359,360 to

Borrower 31 for property on 43rd Street, Lindenhurst, New York, on August 30, 2006.  Pursuant

to the terms of the mortgage, the borrower's monthly mortgage payment was $3,411.34.

635.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on September 7, 2006.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on June 20, 2006, June 22, 2006,

and August 7, 2006.  LEND AMERICA sent the file supporting its endorsement of FHA

insurance for Borrower 31's mortgage to HUD, via United States mail or commercial interstate

carrier, on or about January 12, 2009.

636.    The "purchase" by Borrower 31, was in fact, a sham transaction concocted by

LEND AMERICA and the prior owner of the house, Borrower 31's mother, to strip equity from

the house to pay the mother's debts, while leaving her in place as the resident of the home, along

with her son.  LEND AMERICA instructed the mother to conceal that the buyer was her son.

637.    LEND AMERICA submitted a fraudulent VOE to HUD.  The VOE falsely stated

that Borrower 31 was employed at Strong Island Graphics, in the Bronx, New York, at an annual

salary of $109,999.92 or $9,166.66 per month.  Borrower 31 never worked for Strong Island

Graphics and was not receiving such a monthly salary at the time.

638.    LEND AMERICA further submitted a fraudulent employment letter to HUD,

falsely stating Borrower 31's employment and income.  This letter was similar in format to other

letters submitted by LEND AMERICA in support of fictitious employment for mortgage

insurance applications of unqualified borrowers.  The letter was printed on fabricated letterhead

and included an annual salary, weekly gross pay, tax withholdings, net pay, and the statement,

"No computerized pay stubs with year to date earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

639.     LEND AMERICA submitted no pay stubs, check copies, W-2 forms, tax returns or other documentation to confirm or document Borrower 31's income. LEND AMERICA failed to obtain this basic documentation to corroborate a job with a 6-figure income.

640.     LEND AMERICA executed a fraudulent MCAW. LEND AMERICA falsely stated Borrower 31's monthly income on the MCAW. LEND AMERICA further fraudulently used this inflated income to calculate Borrower 31's ratios of mortgage payment-to-income of 37.215% and total fixed payment-to-income of 47.284%. LEND AMERICA falsely stated on the MCAW that Borrower 31 paid $900. in rent and had a "[g]ood rental payment history." Neither statement was true.

641.     LEND AMERICA submitted a fraudulent Tenancy (Rental) Verification form to HUD. The Rental Verification form falsely stated that Borrower 31 rented an apartment on Newark Street prior to the purchase, at a rent of $900 per month. Borrower 31 never lived at the Newark Street address. Borrower 31 actually lived with his mother at the house he purportedly "purchased" on 43rd Street, and paid no such rent.

642.     LEND AMERICA executed a fraudulent URLA. The URLA falsely stated that Borrower 31 lived at the Newark Street Address, and paid $900 rent. The URLA also falsely stated that Borrower 31 was employed by Strong Island Graphics, and further provided an inflated salary for him.

643.     LEND AMERICA knew that Borrower 31 had been living at the 43rd Street property, rather than on Newark Street. LEND AMERICA found, in a search of a fraud

prevention database, that Borrower 31's name and social security number were reported with the 43rd Street address for five years prior to this purchase transaction.  Furthermore, LEND AMERICA found no genuine, independent record of the borrower at the Newark Street address where LEND AMERICA stated that he paid rent for the past three years.

644.    Direct Endorsement Program Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

645.    In the HUD 1003 Addendum LEND AMERICA submitted to HUD, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

646.    In the HUD 1003 Addendum LEND AMERICA submitted to HUD, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

647.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 31's employment and income, LEND AMERICA falsely certified to HUD that Borrower 31 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

648.    Borrower 31 made only five payments on the mortgage, before defaulting. Foreclosure proceedings were instituted in July 2007.

**Borrower 32: Maple Street, Brooklyn**

649.    LEND AMERICA originated and underwrote a mortgage for $462,744 to
Borrower 32 for property on Maple Street, Brooklyn, New York on August 4, 2006.  Pursuant to
the terms of the mortgage, the borrower's monthly mortgage payment was $3,886.55.

650.    LEND AMERICA endorsed the mortgage for FHA insurance through an
electronic transmission to HUD on August 15, 2006.  LEND AMERICA also electronically
transmitted information to HUD in support of the application on July 20, 2006, July 25, 2006,
and August 19, 2006.  LEND AMERICA sent the file supporting its endorsement of FHA
insurance for Borrower 32's mortgage to HUD, via United States mail or commercial interstate
carrier, on or about December 17, 2008.

651.    LEND AMERICA submitted a fraudulent VOE to HUD.  The VOE falsely stated
that Borrower 32 was an attorney employed full-time and earning a bi-weekly salary of
$2,586.67.  The VOE further stated that Borrower 32 had earned $62,080 in 2005, and had
earned $33,626.11 as of July 2006.

652.    Borrower 32 only worked occasionally at this position, and had earned no more
than $2,500 total from that job for the entire two years prior to July 2006.

653.    The VOE was signed in blank and returned to LEND AMERICA by the
employer. LEND AMERICA completed the information on the VOE and submitted it to HUD.
LEND AMERICA falsely certified that the employer had completed the VOE.

654.    LEND AMERICA submitted a fraudulent employment letter.  The letter falsely
stated that Borrower 32 earned $2,586.67 bi-weekly.  The letter further falsely states federal and
state withholdings for Borrower 32's purported salary.  Borrower 32 was actually paid cash, off
the books, with no tax withheld.  LEND AMERICA provided the form and substance of the

123

letter, which was similar to letters used to document fictitious employment in other loan files. The letter further stated that "[o]ur company do [sic] not issue any computerized pay stubs." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

655.    LEND AMERICA submitted a second fraudulent VOE to HUD. The VOE falsely stated that Borrower 32 was President and CEO of the Caribbean Guyana Institute for Democracy ("CGID"), earned a bi-weekly salary of $3,023, and had earned a salary of $74,100 in 2004, and $77,090 in 2005. Borrower 32 actually only earned approximately $30,000 during each of these years from CGID.

656.    LEND AMERICA submitted a fraudulent employment letter to HUD from the CGID. The letter falsely stated Borrower 32's purported annual salary, bi-weekly gross salary, tax withholdings, and net pay. Borrower 32 was actually paid cash, off the books, at about half the rate stated. LEND AMERICA Loan Officer Bernard provided the form and substance of this letter,  including the statement "[t]his office does not generate computerized pay stubs."

657.    LEND AMERICA submitted a fraudulent VOR to HUD for Borrower 32. The VOR falsely stated that Borrower 32 paid $1,500 per month in rent. Borrower 32 actually paid only $800 per month. Further, Borrower 32 was a renter at this location for only six months, not the three years stated.

658.    LEND AMERICA submitted a credit report to HUD containing false employment information, as well as false information concerning a "satisfactory rental history".

659.    LEND AMERICA executed a fraudulent MCAW. The MCAW falsely stated inflated income for Borrower 32. LEND AMERICA further used this false income to

124

fraudulently calculate Borrower 32's Qualifying Ratios. LEND AMERICA stated that Borrower 32's mortgage payment-to-income and total fixed payment-to-income ratios were 29.693%, and within HUD's guidelines. In reality, the ratios were well over 70%. LEND AMERICA further fraudulently stated on the MCAW that Borrower 32 had good Qualifying Ratios, a good rental payment history, and adequate income for the loan, even though every one of those figures was fabricated by LEND AMERICA.

660.    Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

661.    In the HUD 1003 Addendum LEND AMERICA submitted to HUD, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

662.    In the HUD 1003 Addendum LEND AMERICA submitted to HUD, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

663.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 32's employment and income, LEND AMERICA falsely certified to HUD that Borrower 32 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

664.    After the mortgage was originated, Borrower 32 made only two payments on the

125

mortgage, before defaulting.  The mortgage holder has instituted foreclosure proceedings against
the property.

### Borrowers 33A and 33B: Washington Avenue, Amityville

665.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for
$298,917 to Borrowers 33A and 33B for property on Washington Avenue, Amityville, New
York, on May 10, 2006.  Pursuant to the terms of the mortgage, the borrowers' monthly
mortgage payment was $3,665.62.

666.    LEND AMERICA sent the application for FHA mortgage insurance to HUD via
United States mail or commercial interstate carrier on or about May 24, 2006.  LEND
AMERICA also electronically transmitted information to HUD in support of the application on
or about April 23, 2006, April 26, 2006, and May 26, 2006.

667.    Borrower 33A sought a mortgage from LEND AMERICA, through a friend who
was employed there.  After reviewing her finances, the LEND AMERICA employee told
Borrower 33A that her credit scores were too low for her to qualify for the mortgage on her own,
and that she would need a co-borrower in order for her loan to be approved.  Borrower 33A gave
LEND AMERICA the name of her ex-husband, from whom she had been divorced for several
years, and with whom she did not live, as co-borrower.  The LEND AMERICA employee knew
that Borrowers 33A and 33B were divorced and did not live together.

668.    LEND AMERICA submitted a fraudulent Disclosure Notices form, and Statement
of Occupancy signed by both borrowers, falsely stating that both borrowers intended to occupy
the property as their primary residence.

669.    LEND AMERICA submitted a fraudulent VOE to HUD for Borrower 33A's
employment income as part of the documentation supporting its endorsement of the loan for

FHA mortgage insurance. The VOE falsely stated that Borrower 33A earned a salary of $65,000 per year. This was more than twice her actual salary of approximately $29,000 per year.

670. LEND AMERICA had received a VOE with Borrower 33A's actual salary on it from Borrower 33A's employer. LEND AMERICA, however, fraudulently altered the VOE, and sent it to HUD with the vastly inflated salary on it.

671. LEND AMERICA also submitted a fraudulent VOE to HUD for Borrower 33B for a second job at a business that had been closed for several years. This VOE falsely stated that Borrower 33B earned a salary of $38,000 over and above his earnings from his primary employment.

672. In the HUD 1003 Addendum, Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

673. LEND AMERICA submitted a forged employment letter to HUD as part of the documentation supporting its endorsement of the loan for FHA mortgage insurance. The letter falsely stated that Borrower 33A earned the inflated $65,000 salary. Like the false salary certifications for other borrowers, this letter included the annual salary, weekly gross salary, tax deductions withheld, the net amount paid, and the statement, "No computerized paystubs with year to date earnings are issued." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that a borrower's salary information is not in fact verifiable.

674. LEND AMERICA also submitted a forged letter to HUD from Borrower 33B's purported second job employer. The letter falsely stated that Borrower 33B earned the $38,000

salary. Like the false salary certifications for other borrowers, this letter included the annual

salary, weekly gross salary, tax deductions withheld, the net amount paid, and the statement, "No

computerized paystubs with year to date earnings are issued."

675.     LEND AMERICA submitted a fraudulent URLA to HUD. On the URLA, LEND

AMERICA falsely stated Borrower 33A's inflated salary and Borrower 33B's false second job

salary.

676.     As part of the FHA mortgage insurance application, LEND AMERICA submitted

a fraudulent MCAW to HUD. LEND AMERICA stated Borrowers 33A and 33B's inflated

income on the MCAW. The MCAW inflated the monthly income purportedly available to the

borrowers by more than 40%. The inflated income was then used to calculate the Qualifying

Ratios. The result was that the ratios appeared to be within HUD guidelines, but they actually

were not. LEND AMERICA stated to HUD that the mortgage payment-to-income ratio was

27.316%. In reality, it was 38%, exceeding HUD's guidelines. LEND AMERICA further

falsely stated to HUD that the total fixed payment-to-income ratio was 42.041%. In reality, it

was 69%. This also greatly exceeded HUD's guidelines. Further, it meant the borrowers would

have to be devoting over two thirds of their income to servicing their debts and obligations each

month.

677.     Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA,

fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in

underwriting the mortgage and reviewing all documents associated with the application for FHA

mortgage insurance.

678.     In the HUD 1003 Addendum LEND AMERICA submitted to HUD, including the

HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA

128

Insured Mortgage, Direct Endorsement Underwriter O'Halloran, on behalf of LEND AMERICA,

falsely certified the truth, accuracy and sufficiency of the loan application and all of its

components.

679.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

33A and 33B's employment and income, LEND AMERICA falsely certified to HUD that

Borrowers 33A and 33B met all requirements for FHA mortgage insurance, as set forth in the

Direct Endorsement Handbook.

680.    After the mortgage was originated, the borrowers made only one payment, before

defaulting on the loan.  Borrower 33A has now filed for Chapter 7 bankruptcy.

### Borrowers 34A and 34B: Oxhead Road, Centereach

681.    LEND AMERICA originated and underwrote a mortgage for $322,452 to

Borrowers 34A and 34B for property on Oxhead Road, Centereach, New York, on November 2,

2007.  Pursuant to the terms of the mortgage, Borrowers 34A and 34B were required to make a

monthly mortgage payment of $2,782.90.

682.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on December 26, 2007.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on August 8, 2007, and October 23,

2007.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for

Borrower 34A and 34B's mortgage to HUD, via United States mail or commercial interstate

carrier, on or about March 20, 2008.

683.    Borrower 34A was informed by LEND AMERICA employee Michael Parker that

he had insufficient income for the mortgage and that he would have to "inflate" his income.

Parker further stated that Borrower 34A would have to state that his employer did not issue

129

paystubs. Borrower 34A responded that his employer did issue him paystubs.

684.   When Borrower 34A's employer refused to sign a VOE with the inflated income for Borrower 34A, LEND AMERICA loan officer Kristen Parker told Borrower 34A that they would "find a way around that" and that the VOE would still get done. LEND AMERICA forged a VOE stating that Borrower 34A made $98,800 in 2006. In reality, Borrower 34A earned $56,160.

685.   LEND AMERICA submitted the forged VOE to HUD. The VOE falsely stated that Borrower 34A made $93,000 in 1995, $98,800 in 2006, and as of October 2007 had made $72,200.

686.   LEND AMERICA submitted a fraudulent URLA to HUD. The URLA falsely stated that Borrower 34A's monthly salary was $8,233.33. This amount was nearly double Borrower 34A's actual monthly salary of $4,680.

687.   LEND AMERICA executed a fraudulent MCAW. LEND AMERICA stated the inflated monthly income on the MCAW, along with Qualifying Ratios premised on this figure. LEND AMERICA falsely stated that Borrowers 34A and 34B's mortgage payment-to-income ratio was 33.800 %, and their fixed payment-to-income ratio was 39.655%. In reality, the figures are 59% and 69% respectively. These figures significantly exceed HUD guidelines.

688.   HUD regulations require that the lender submit the borrower's most recent paycheck stub with year-to-date earnings. Despite the fact that Borrower 34A's actual paycheck stubs stating his salary, withholdings and year-to-date earnings were available, LEND AMERICA failed to submit them to HUD.

689.   Instead of the required paycheck stub, LEND AMERICA submitted, a forged employment letter. The letter falsely stated Borrower 34A's salary was $1,900 per week and

$98,800 per year. Both figures were false. Further, the signature was not that of Borrower

34A's supervisor.

690.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

Underwriter O'Halloran, on behalf of LEND AMERICA, falsely certified the truth, accuracy and

sufficiency of the loan application and all of its components. LEND AMERICA specifically

certified that the VOE had not passed through the hands of any interested parties, and was true to

the best of LEND AMERICA's knowledge and belief.

691.    Further, Underwriter O'Halloran, on behalf of LEND AMERICA, fraudulently

certified, pursuant to Direct Endorsement Handbook, to the integrity of the data supplied by the

lender used to determine the quality of the loan.

692.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

34A and 34B's employment and income, LEND AMERICA falsely certified to HUD that

Borrowers 34A and 34B met all requirements for FHA mortgage insurance, as set forth in the

Direct Endorsement Handbook.

693.    LEND AMERICA fraudulently concealed Borrowers 34A and 34B's inability to

pay their mortgage by having several months of their mortgage payments made through the

Rainy Day Foundation. By doing so, LEND AMERICA fraudulently delayed the appearance of

Borrowers 34A and 34B's mortgage on HUD's Neighborhood Watch list of delinquent loans,

thereby making LEND AMERICA's default rates on the loans it originated look better than they

were, and preventing HUD from enacting its routine controls.

694.    After only six months of payments, including at least four payments from LEND

AMERICA's proxy and agent, the Rainy Day Foundation, the payments ceased, and the loan

131

defaulted. The loan is expected to go into foreclosure shortly.

### Borrower 35: East 98th Street, Brooklyn

695.    LEND AMERICA originated and underwrote a mortgage for $367,100 to

Borrower 35 for property on East 98th Street, Brooklyn, New York, on August 28, 2006.

Pursuant to the terms of the mortgage, Borrower 35 was required to make a monthly mortgage

payment of $2,862.57.

696.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on September 6, 2006. LEND AMERICA also electronically

transmitted information to HUD in support of the application on August 3, 2006, and August 4,

2006. LEND AMERICA sent the file supporting its endorsement of FHA insurance for

Borrower 35's mortgage to HUD, via United States mail or commercial interstate carrier, on or

about December 16, 2008.

697.    When she applied for a mortgage from LEND AMERICA, Borrower 35 told

LEND AMERICA employees that she had been laid off from her employment at Wachovia

Bank, and was supporting herself by selling Mary Kay cosmetics and doing independent

consulting work. She was informed by LEND AMERICA that she had insufficient income for

the mortgage. LEND AMERICA employees asked Borrower 35 if she knew anyone with a

business who would agree to state that she worked there, so as to artificially inflate her income

and allow her to qualify for the mortgage.

698.    LEND AMERICA submitted a forged VOE to HUD. The VOE falsely stated that

Borrower 35 earned $1,644.22 per week at the time the mortgage was originated. Borrower 35

actually earned a total of $1,280 for the occasional times she performed work for the named

employer before and up to 2006, prior to the date of closing.

699.    The VOE submitted to HUD further falsely stated that Borrower 35 earned

$80,299.46 in 2006, and $46,088.16 as of mid-June 2007.  In reality, Borrower 35 earned

$27,458 total for all of the multiple jobs she worked in 2006, and $10,579 for 2007.

700.    On the VOE LEND AMERICA submitted to HUD, Loan Processor Marisol

Coradin, on behalf of LEND AMERICA, falsely certified that she sent the form directly to the

employer and that it had not passed through the hands of any interested third-parties.

701.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Jarrett, on behalf

of LEND AMERICA, fraudulently certified that the VOE was requested and received by the

lender without passing through the hands of any third persons and is true to the best of the

lender's knowledge and belief.

702.    LEND AMERICA executed a fraudulent MCAW stating that Borrower 35 made

$7,124.99 per month.  This amount was more than three times her 2006 monthly income of about

$2,288.  LEND AMERICA further falsely stated on the MCAW that Borrower 35's Qualifying

Ratios were both 40.176%.  In reality, Borrower 35's Qualifying Ratios were 125%, meaning

that all of her monthly income was not enough to cover her monthly mortgage payment.

703.    On the MCAW and the HUD 1003 Addendum, LEND AMERICA falsely and

fraudulently certified to HUD that Borrower 35 had sufficient assets and income to pay the

mortgage.

704.    LEND AMERICA executed a fraudulent URLA, which fraudulently stated that

Borrower made $7,124.99 per month.

705.    LEND AMERICA submitted a forged employment letter purporting to be from

Borrower 35's employer, which stated that borrower made a gross weekly salary of $1,644.22,

and further broke out the withholdings for Borrower 35's salary, leading to a purported net

133

weekly salary of $1280.76. Similar to other fraudulent employment letters submitted to HUD by LEND AMERICA for other borrowers, the letter states "We do not issue computerized checks." On information and belief, LEND AMERICA arranges for this statement to be included on fraudulent employment letters to conceal the fact that the borrower's salary information supplied to HUD by LEND AMERICA is not verifiable.

706.   Per Credit Analysis Handbook, ¶2-3, "The payment history of the borrower's housing obligations holds significant importance in evaluating credit." A borrower with a foreclosure within the three previous years is ineligible unless the borrower has re-established good credit since then. Borrower 35 had a previous FHA-insured mortgage go into and out of foreclosure less than three years earlier, in November 2003. LEND AMERICA nevertheless failed to analyze Borrower 35's derogatory recent credit history. Above and beyond the 2003 foreclosure, Borrower 35's credit report listed several recent derogatory accounts charged off or settled for less than the full amount within months of the closing, and an automobile loan with several late payments that was only recently brought current and purportedly paid off at closing.

707.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Jarrett, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

708.   Further, Underwriter Jarrett, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

709.   Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower

134

35's employment and income, LEND AMERICA falsely certified to HUD that Borrower 35 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

710.    After making thirteen payments, Borrower 35 became delinquent, and then defaulted on the loan.  The mortgage holder has begun foreclosure proceedings.

## Borrowers 36A and 36B: Pine Drive, Bayshore

711.    LEND AMERICA originated and underwrote a mortgage for $332,373 to Borrowers 36A and 36B for property on Pine Drive, in Bay Shore, New York, on July 11, 2007. Pursuant to the terms of the mortgage, the borrowers' monthly mortgage payment was $3,300.70.

712.    LEND AMERICA endorsed the mortgage for FHA insurance through an electronic transmission to HUD on July 24, 2007.  LEND AMERICA also electronically transmitted information to HUD in support of the application on June 26, 2007, July 6, 2007 and March 17, 2008.  LEND AMERICA sent the file supporting its endorsement of FHA insurance for Borrowers 36A and 36B's mortgage to HUD, via United States mail or commercial interstate carrier, on or about March 18, 2008.

713.    Borrower 36A and her boyfriend sought a mortgage with LEND AMERICA employee Todd Healey.  Borrower 36A was informed by Healey that she needed to find a co-signer other than her boyfriend, due to her boyfriend's poor credit history.  After consulting with her father, Borrower 36A informed Healey that her father would be willing to co-sign the loan. However, Borrower 36A informed Healey that her father would neither be contributing to the mortgage payments nor living in the property.  Healey replied that she just needed the co-signer to qualify for the loan.

714.    Healey subsequently informed Borrower 36A that she needed additional income

to qualify for the loan. Healey decided they would show Borrower 36A's father, Borrower 36B, as receiving rental income on his own home, and moving into Borrower 36A's new home. Borrower 36B never intended to move out of his home, nor intended to have any tenants paying him rental income.

715.   LEND AMERICA submitted a fraudulent "Statement of Occupancy", which falsely stated that Borrowers 36A and 36B would both be living in the house being purchased, as their primary residence, and would be sharing expenses.

716.   LEND AMERICA submitted a fraudulent Disclosure Notices form, which falsely stated that Borrowers 36A and 36B would both be living in the house being purchased, as their primary residence, and would be sharing expenses.

717.   LEND AMERICA submitted a fraudulent handwritten letter purporting to be from the borrowers, which falsely stated that Borrower 36A and Borrower 36B and his wife would all be living in the house being purchased, as their primary residence, and would be sharing expenses.

718.   LEND AMERICA executed a fraudulent MCAW. LEND AMERICA fraudulently doubled the monthly effective income available for the mortgage on the MCAW, by falsely including Borrower 36B's monthly income, as well as the nonexistent rental income from Borrower 36B's house.

719.   LEND AMERICA submitted a forged lease to HUD for a tenant for Borrower 36B's own home. Borrower 36B never entered into such a lease, and never rented his home.

720.   LEND AMERICA fraudulently submitted a URLA to HUD. The URLA falsely stated that Borrowers 36A and 36B would all be living in the house being purchased, as their primary residence.

136

721.   On the URLA, LEND AMERICA fraudulently included a non-existent second job with income of $1,560 per month for Borrower 36A. The URLA stated that the job was with "AFDS, Inc."

722.   LEND AMERICA further submitted a fraudulent VOE to HUD, which purported to come from AFDS, Inc. The VOE falsely stated that Borrower 36A earned $9,360 from AFDS in 2006, and had earned $9,720 from AFDS as of July 10, 2007.

723.   LEND AMERICA also submitted a fraudulent letter from the non-existent employer to HUD. The company was named "AFDS" on all paperwork prepared by LEND AMERICA and submitted to HUD, except for this letter, where the company was identified on its letterhead as "ADFS".

724.   The letter was similar in form and substance to those used to support fictitious employment on other LEND AMERICA loans. The letter was on forged (and misspelled) letterhead, stating Borrower 36A's purported annual salary, weekly gross salary, tax withholdings, net pay, and contained the statement, "No computerized pay stubs with year to date earnings are issued."

725.   On the VOE it submitted to HUD, LEND AMERICA falsely certified that the VOE was sent directly to Borrower 36A's employer and that it did not pass through the hands of any other interested party.

726.   As part of the FHA mortgage insurance application, LEND AMERICA also submitted a letter purporting to be from Borrower 36A, falsely stating how she splits her time between two jobs.

727.   In the HUD 1003 Addendum, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that the VOE was requested and received by the

lender without passing through the hands of any third persons and was true to the best of the lender's knowledge and belief.

728. In total, LEND AMERICA falsely doubled the income available to pay the mortgage on the loan, from the actual figure of $4,248.40 to $8,692.94.

729. LEND AMERICA submitted a fraudulent MCAW to HUD. LEND AMERICA fraudulently stated on the MCAW that the borrowers' mortgage payment-to-income ratio was 37.970%. In reality, it was 77%. LEND AMERICA further fraudulently stated that the borrowers' total fixed payment-to-income ratio was 44.032%. In reality, it was a clearly unsustainable 89%, meaning Borrower 36A would be spending over 89% of her income just to pay her monthly obligations.

730. LEND AMERICA failed to document, as required by HUD regulations, the source of Borrower 36A's approximately $5,000 available for the closing. LEND AMERICA submitted only pages from a bank statement, ending shortly before the closing that showed a $2,000 ATM deposit into Borrower 36A's checking account and a $2,000 transfer from an undocumented savings account.

731. In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Burns, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

732. Further, Underwriter Burns, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

733.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers

36A and 36B's income and employment, LEND AMERICA falsely certified to HUD that

Borrowers 36A and 36B met all requirements for FHA mortgage insurance, as set forth in the

Direct Endorsement Handbook.

734.    Borrowers defaulted on the mortgage after five payments.  Borrowers have

obtained a loan modification of their mortgage, from the mortgage holder.

### Borrower 37: Crescent Street, Brooklyn

735.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for

$471,415 to Borrower 37 for property on Crescent Street, Brooklyn, New York on July 13, 2007.

Pursuant to the terms of the mortgage, Borrower 37 was required to make a monthly mortgage

payment of $3,693.47.

736.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on July 24, 2007.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on or about July 11, 2007, July 13,

2007, and July 20, 2007.  LEND AMERICA sent the file supporting its endorsement of FHA

insurance for Borrower 37's mortgage to HUD, via United States mail or commercial interstate

carrier, on or about August 29, 2008.

737.    LEND AMERICA fraudulently originated this FHA mortgage to Borrower 37

under HUD's 203B program for single-family, owner-occupied homes.  Per Credit Analysis

Handbook, ¶1-1 and ¶1-2, FHA's single-family programs are limited to owner-occupied principal

residences only (except under certain circumstances which do not apply to this borrower).

Because Borrower 37 never lived in this property, Borrower 37's property was ineligible for this

FHA mortgage.

738.     Borrower 37 rented out the apartments in this two-family residence as an investment.  When Borrower 37 wanted to refinance, he consulted his real estate broker Carlos Arias, who worked with his brother Jorge Arias.  Jorge Arias was an "Outside Loan Originator" employed by LEND AMERICA.  Jorge Arias was the loan officer for LEND AMERICA for this mortgage.

739.     LEND AMERICA submitted a fraudulent URLA as documentation for mortgage insurance.  The URLA falsely stated that the property to be refinanced was the primary residence of Borrower 37.

740.     LEND AMERICA electronically submitted to HUD a fraudulent mortgage insurance application that stated that this mortgage was an owner-occupied refinancing.

741.     LEND AMERICA submitted to HUD a fraudulent Statement of Occupancy, and Disclosure Notices form, all falsely stating that Borrower 37 intended to occupy the house as his primary residence.

742.     LEND AMERICA knew the subject property was not Borrower 37's residence. LEND AMERICA employs the "FraudGuard" database to guard against ineligible borrowers among other things.  FraudGuard returned two relevant alert messages to LEND AMERICA, when Borrower 37's data was entered.  The first alert stated that there were other "owner-occupied" loans for this borrower within the last 12 months.

743.     LEND AMERICA's FraudGuard results also stated that the social security number trace indicated a different residence for Borrower 37.  FraudGuard then gave instructions, including requesting multiple sources of physical evidence to support that the borrower lived at the subject property at the time of the loan origination.  LEND AMERICA failed to research Borrower 37's primary residence.

140

744.    LEND AMERICA obtained a materially deficient, fraudulent and inaccurate appraisal, that inflated the value of the property by almost 25%. The appraisal valued the property at $632,000. The property's proper appraised value at that time was approximately $510,000.

745.    All comparables used in the report were flip sales, sold by developers, and not reliable value indicators. The appraisal failed to note the inappropriate choice of comparable sales and failed to substitute more appropriate sales.

746.    The appraisal failed to research the comparable sales, as required by HUD regulations in Appraisal Handbook, for information on whether the sales or prior sales were arm's length, distressed sales, or involved seller or financing concessions. Contrary to valuation protocol described in Appraisal Handbook, the appraiser did not list sources with direct knowledge of the sales and reported sale or financing concessions as "None Known."

747.    The appraisal failed to make appropriate location adjustments where comparables were in considerably more desirable locations than the subject. The subject was located directly under an elevated subway line, while two of the comparables are in much quieter, less commercial locations. For the same reason, the market rental income was also significantly overstated.

748.    In the HUD 1003 Addendum, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that she personally reviewed the appraisal report.

749.    LEND AMERICA executed a fraudulent VOE. The VOE falsely inflated the income that Borrower 37 earned at his job. LEND AMERICA submitted false documentation stating that Borrower 37's employment income was $7,138 per month, when it was at most approximately $3,033 per month.

141

750.   LEND AMERICA submitted a fraudulent MCAW to HUD, in support of LEND AMERICA's endorsement of the mortgage for FHA mortgage insurance. The MCAW falsely stated that Borrower 37's mortgage payment-to-income ratio was 39.872%. In reality, it was 46.2%. The MCAW falsely stated that Borrower 37's total fixed payment-to-income ratio was 42.549%. In reality, it was 103%.

751.   LEND AMERICA also fraudulently inflated Borrower 37's assets by listing cars, furniture, and jewelry that he did not own.

752.   In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

753.   Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

754.   The borrower made nine payments before becoming delinquent, then defaulting on the mortgage. The mortgage holder has begun foreclosure on the property.

**Borrower 38: Sterling Street, Brooklyn**

755.   LEND AMERICA originated and underwrote a cash-out refinance mortgage for $368,231 to Borrower 38 for property on Sterling Street, Brooklyn, New York on September 18, 2007. Pursuant to the terms of the mortgage, Borrower 38 was required to make a monthly mortgage payment of $2,979.46.

756.   LEND AMERICA sent the application for FHA mortgage insurance to HUD via

142

United States mail or commercial interstate carrier on or about October 10, 2007.  LEND

AMERICA also electronically transmitted information to HUD in support of the application on

or about September 12, 2007, September 14, 2007, and October 6, 2007.

757.    At the time LEND AMERICA originated the mortgage, Borrower 38 had just

returned to work after having been on disability due to a knee injury.  He planned to have knee

surgery in November 2007, two months after the closing, and did not expect to return to work for

an extended period of time after that.

758.    Borrower 38 obtained his LEND AMERICA mortgage through mortgage broker

Long Island Home Mortgage Corp.  The transaction was in violation of HUD regulations

because Long Island Home Mortgage Corp. was not an FHA-approved mortgage broker at the

time.

759.    Borrower 38 told Denise Nicholson of Long Island Home Mortgage Corp. of his

recent disability and his plan to be out of work for a good deal of time beginning in November

2007.  Borrower 38 interacted only with Nicholson and submitted all of his documentation to

Nicholson.  He was never made aware that LEND AMERICA was a separate entity.

760.    Nicholson was unconcerned about Borrower 38's planned curtailment of income,

and said that if he made his mortgage payments for 12 months she would be able to get him a

reduced interest rate on his mortgage and thereby lower monthly payments.

761.    As part of the FHA mortgage insurance application, LEND AMERICA

fraudulently submitted a URLA to HUD.  The URLA falsely stated that Borrower 38's monthly

employment income was $6,549.41.  Borrower 38, however, had stated while applying for the

mortgage that this salary was about to decrease, because he was taking extended sick leave for a

necessary operation.  LEND AMERICA failed to disclose this on the URLA.

762.    LEND AMERICA concealed Borrower 38's pending salary decrease by deviating from its usual employment documentation procedure.  LEND AMERICA did not use the standard VOE.  Answers to the form's questions regarding future income would have revealed Borrower 38's lower income year-to-date and his planned absence from work.  LEND AMERICA instead submitted deficient income verification, by submitting a paystub documenting less than one full month's earnings.  At the time of the closing, it had been less than one month since Borrower 38 had returned to work after disability.

763.    LEND AMERICA fraudulently concealed Borrower 38's expected decline in income, by submitting a certification from a LEND AMERICA employee that Borrower 38's employer confirmed his current employment by phone.  The certification contains no information on, or confirmation of, Borrower 38's salary or future employment.

764.    As part of the FHA mortgage insurance application, LEND AMERICA submitted a false lease to HUD, to document rental income.  The lease purported to set out a two year term of rental, through December 2008, at $1,700 per month, or $20,400 per year.  LEND AMERICA failed to document, as required by Credit Analysis Handbook, ¶2-7 M that the amount of rental income was stable.  Borrower 38's 2006 and 2005 income tax returns showed gross rental income of only $13,200 and $12,000 respectively.

765.    Borrower 38 had received rental income only sporadically in the past.  The tenants in place at the time of the closing had no lease, moved in July 2007 and left in November 2007, a month and a half after the closing.

766.    As part of the FHA mortgage insurance application, LEND AMERICA submitted a fraudulent MCAW to HUD.  On the MCAW, LEND AMERICA fraudulently stated and used Borrower 38's full salary and rental income to calculate the Qualifying Ratios.  LEND

144

AMERICA further falsely stated on the MCAW that Borrower 38's mortgage payment-to-income ratio was 37.269% when in reality it was 45%. Using the same false figures, LEND AMERICA further stated that Borrower 38's total fixed payment-to-income ratio was 42.260%, just barely within HUD's guidelines was in reality 51%.

767.    When Borrower 38 became delinquent, LEND AMERICA, through the Rainy Day Foundation, and without Borrower 38's knowledge or consent, made a payment towards Borrower 38's mortgage, in order to conceal the delinquent status of Borrower 38's loan from HUD.

768.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Anna Smith, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

769.    Further, Underwriter Smith, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

770.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrower 38's income and financial history, LEND AMERICA falsely certified to HUD that Borrower 38 met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

771.    Borrower and the Rainy Day Foundation made seven payments on the mortgage. Thereafter, the mortgage became delinquent, and then went into default. The borrower has negotiated a modification to the mortgage with the current mortgage holder.

**Borrowers 39A and 39B: East 58th Street, Brooklyn**

772.     LEND AMERICA originated and underwrote a cash-out refinance mortgage for

$471,415 to Borrowers 39A and 39B for property at East 58th Street, Brooklyn, New York on

July 9, 2007.  Pursuant to the terms of the mortgage, Borrowers 39A and 39B were required to

make a monthly mortgage payment of $3,986.34.

773.     LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on August 9, 2007.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on or about May 23, 2007, June 28,

2007, June 29, 2007, July 3, 2007, July 30, 2007, and January 8, 2009.  LEND AMERICA sent

the file supporting its endorsement of FHA insurance for Borrowers 39A and 39B's mortgage to

HUD, via United States mail or commercial interstate carrier, on or about January 12, 2009.

774.     LEND AMERICA submitted a fraudulent lease to HUD stating false names and

rental incomes received by Borrowers 39A and 39B.  The lease overstated the monthly rental

income by $850.

775.     LEND AMERICA submitted a fraudulent MCAW and URLA.  Both the MCAW

and URLA included the fraudulently inflated rental income.

776.     On the fraudulent MCAW, LEND AMERICA provided false information about

Borrower 39's income in order to create an artificially low ratio of mortgage payment-to-income

and artificially low ratio of total fixed payment-to-income.  This made the borrower seem more

qualified for loans with rates that were above and beyond what she could realistically afford.

777.     In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA

and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement

Underwriter Deena Chavez, on behalf of LEND AMERICA, falsely certified the truth, accuracy

146

and sufficiency of the loan application and all of its components.

778.    Direct Endorsement Underwriter Chavez, on behalf of LEND AMERICA,

fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in

underwriting the mortgage and reviewing all documents associated with the application for FHA

mortgage insurance.

779.    Borrowers became delinquent on the loan after six payments.  The borrowers

have now entered into a repayment agreement with the servicing lender.

### Borrowers 40A and 40B: Berkshire Drive, Farmingville

780.    LEND AMERICA originated and underwrote a cash-out refinance mortgage for

$323,023 to Borrowers 40A and 40B for property on Berkshire Drive, Farmingville, New York

on November 21, 2007.  Pursuant to the terms of the mortgage, Borrowers 40A and 40B were

required to make a monthly mortgage payment of $2,657.58.

781.    LEND AMERICA endorsed the mortgage for FHA insurance through an

electronic transmission to HUD on January 25, 2008.  LEND AMERICA also electronically

transmitted information to HUD in support of the application on November 15, 2007, November

16, 2007, and December 2, 2008.  LEND AMERICA sent the file supporting its endorsement of

FHA insurance for Borrowers 40A and 40B's mortgage to HUD, via United States mail or

commercial interstate carrier, on or about November 26, 2008.

782.    LEND AMERICA submitted a fraudulent VOE to HUD, which falsely certified

that Borrower 40B had been employed at L&M Hardwood Flooring for three years and was

currently earning an annual salary of $31,200.

783.    However, at the time of the closing, Borrower 40B was not working at L&M

Hardwood Flooring.  He had worked for this employer for 11 months during 2005, earning

$8,343, and left the job two years prior to the closing.

784.    LEND AMERICA executed a fraudulent MCAW.  On the MCAW, LEND AMERICA falsely stated Borrower 40B's inflated income.  As a result of overstating Borrower 40B's monthly income by $2,600, LEND AMERICA fraudulently concealed that Borrowers 40A and 40B's mortgage payment-to-income and total fixed payment-to-income ratios, exceeded HUD's guidelines at 62% and 74% respectively.

785.    LEND AMERICA told the borrowers that it would negotiate and pay the settlement of a $16,000 judgment against Borrower 40B before the closing.  Credit Analysis Handbook,¶2-3C requires all court-ordered judgments to be paid off before the mortgage loan is eligible for FHA insurance endorsement.  However, the day before the closing, LEND AMERICA informed the borrowers that the judgment would not be paid off before the closing.

786.    The HUD-1 settlement statement showed that a $12,000 payment for the judgment would come out of the proceeds of the refinancing.  However this debt was still not paid when the proceeds were disbursed.

787.    On the Certification Addendum to HUD-1 Settlement Statement, settlement agent Diana Rodriguez falsely certified that "[t]he HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused or will cause the funds to be disbursed in accordance with this statement."

788.    On November 30, 2007, LEND AMERICA received a fax from a law firm confirming a settlement offer of $12,000 for the $16,000 debt.  LEND AMERICA then sent two one-paragraph statements on LEND AMERICA letterhead for each of the borrowers to sign.  The statements required the borrowers to acknowledge that LEND AMERICA reimbursed them for funds related to the debt.  The borrowers signed and faxed these statements back to LEND

148

AMERICA with a note requesting a letter from the creditor agreeing to the settlement.

789.    The borrowers never received the funds from LEND AMERICA.  The judgment was not paid off and remained open into 2009.

790.    In the HUD 1003 Addendum, including the HUD/VA Addendum to the URLA and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, Direct Endorsement Underwriter Etzel, on behalf of LEND AMERICA, falsely certified the truth, accuracy and sufficiency of the loan application and all of its components.

791.    Further, Underwriter Etzel, on behalf of LEND AMERICA, fraudulently certified that, pursuant to Direct Endorsement Handbook, she used due diligence in underwriting the mortgage and reviewing all documents associated with the application for FHA mortgage insurance.

792.    Thus, despite LEND AMERICA's affirmative misrepresentations as to Borrowers 40A and 40B's financial status, LEND AMERICA falsely certified to HUD that Borrowers 40A and 40B met all requirements for FHA mortgage insurance, as set forth in the Direct Endorsement Handbook.

793.    After making only five payments on the mortgage, the borrowers defaulted. Borrowers have negotiated a forbearance agreement with the current mortgage holder.

### K.  Sale of the Loans into the Secondary Market

794.    LEND AMERICA sold the mortgages that it originated for Borrowers 1 through 40 to other mortgage lenders and received remuneration for them.  The loans were "pooled" with other government-insured loans by the new mortgage holders, and provided backing for securities sold to investors whose performance is guaranteed by Ginnie Mae.

149

**FIRST CLAIM FOR RELIEF**

795.    Plaintiff repeats each and every allegation contained in numbered paragraphs 1 through 794 of this Complaint as if fully set forth herein.

796.    By reason of the conduct described herein, the

797.    Defendants and others, knowingly and intentionally devised a continuing scheme and artifice to defraud the United States, through the United States Department of Housing and Urban Development, of money and property, to wit: FHA mortgage insurance and payments made upon default.

798.    For the purpose of executing said scheme and artifice and attempting to do so, the Defendants caused to be sent or delivered by the United States Postal Service or by private or commercial interstate carrier, certain materials, specifically: the applications for FHA mortgage insurance and all corresponding enclosures, as identified and set forth above in paragraphs 156, 182, 195, 210, 222, 234, 248, 268, 278, 291, 316, 334, 351, 366, 382, 395, 413, 428, 447, 463, 481, 497, 512, 526, 539, 555, 573, 591, 606, 622, 635, 650, 666, 682, 696, 712, 734, 756, 773, and 781,  in violation of Title 18 U.S.C. § 1341.  These violations are ongoing.

799.    As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

**SECOND CLAIM FOR RELIEF**

800.    Plaintiff repeats each and every allegation contained in numbered paragraphs 1 through 794 of this Complaint as if fully set forth herein.

801.    By reason of the conduct described herein, the Defendants and others, knowingly and intentionally devised a continuing scheme and artifice to defraud the United States, through the United States Department of Housing and Urban Development, of money and property, to

wit: FHA mortgage insurance and payments made upon default.

802.     For the purpose of executing said scheme and artifice and attempting to do so,

Defendants transmitted and caused to be transmitted in interstate commerce by means of wire

communication, certain signs, signals and sounds, specifically:  the electronic communications

identified and set forth above in paragraphs 156, 182, 195, 210, 222, 234, 248, 268, 278, 291,

316, 334, 351, 366, 382, 395, 413, 428, 447, 463, 481, 497, 512, 526, 539, 555, 573, 591, 606,

622, 635, 650, 666, 682, 696, 712, 734, 756, 773, and 781, in violation of Title 18 U.S.C. § 1343.

These violations are ongoing.

803.     As a result of the foregoing, Defendants' conduct should be enjoined pursuant to

18 U.S.C. § 1345.

WHEREFORE, Plaintiff United States requests:

A.    Entry of a temporary restraining order

    1.    enjoining the Defendants, their agents and employees from:

        a.    using the mails or wire transmissions or causing use of the mails or wire transmissions to fraudulently obtain mortgage insurance from the FHA;

        b.    destroying, moving, altering, disposing of or in any other fashion failing to maintain business, financial, accounting, real estate and legal records;

        c.    originating, underwriting, endorsing for FHA mortgage insurance or submitting to HUD any loans for FHA insurance coverage, except for those loans for which LEND AMERICA has already obtained completed loan applications and for which LEND AMERICA has set mortgage closing dates;

        d.    submitting claims for FHA insurance coverage on loans in default; and

        e.    advertising, marketing to the public, or otherwise soliciting business to originate or otherwise make federally-insured home mortgage loans.

    2.    directing Defendants to post a bond with the Clerk of the Court within three business days equal to the potential loss to the FHA insurance fund arising from the loans set forth herein.

    3.    directing the Defendants to identify within two business days all loans for which LEND AMERICA has already (a) obtained completed loan applications and (b) set mortgage closing dates.

    4.    ordering such other, further and different relief as the Court may deem appropriate.

B.    The United States requests a preliminary injunction:

1.      enjoining the Defendants, or their agents or employees from:

      a.    using the mails or wire transmissions or causing use of the mails or wire transmissions to fraudulently obtain mortgage insurance from the FHA;

      b.    destroying, moving, altering, disposing of or in any other fashion failing to maintain business, financial, accounting, real estate and legal records;

      c.    originating, underwriting, endorsing for FHA mortgage insurance or submitting to HUD any loans for FHA insurance coverage, except for those loans for which LEND AMERICA has already obtained completed loan applications and for which LEND AMERICA has set mortgage closing dates;

      d.    submitting claims for FHA and insurance coverage on loans in default; and

      e.    advertising, marketing to the public, or otherwise soliciting business to originate or otherwise make federally-insured home mortgage loans.

2.      directing the Defendants to post a bond with the Clerk of the Court within three business days equal to the potential loss to the FHA insurance fund arising from the loans set forth herein.

3.      ordering such other, further and different relief as the Court may deem appropriate.

C.    The United States requests a permanent injunction:

1.      enjoining the Defendants, or their agents or employees from:

      a.    using the mails or wire transmissions or causing use of the mails or wire transmissions to fraudulently obtain mortgage insurance from the FHA;

      b.    originating, underwriting, endorsing for FHA insurance or submitting to HUD any loans for FHA insurance coverage;

      c.    submitting claims for FHA insurance coverage on loans in default;

d.   advertising, marketing to the public, or otherwise soliciting business to originate or otherwise make federally related or federally-insured home mortgage loans, including but not limited to, those loans defined in the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602 (1);

e.   participating or in any way being involved in the Direct Endorsement Program in any manner, including but not limited to owning, employing or acting as a Supervised Mortgagee, a Non-Supervised Mortgagee, a Non-Supervised Loan Correspondent, a Supervised Loan Correspondent, or an Investing Mortgagee, Appraiser, Home Equity Conversion Mortgage ("HECM") Servicer, Housing Counselor, Loan Officer, Loan Processor, Property Inspector, Quality Control Officer, Section 203(K) Consultant, or Underwriter;

f.   in addition to the Direct Endorsement Program, participating or on any way being involved in any program concerning federally-related or insured home mortgage loans, including but not limited to programs concerning those loans defined in Real Estate Settlement Procedures Act, 12 U.S.C. § 2602(1); and

g.   such other, further and different relief as the Court may deem appropriate.

154

2.    directing the Defendants to:

    a.    pay to the United States all losses incurred by the FHA insurance fund arising from the loans set forth herein;

    b.    posting with HUD a bond equal to the potential loss to the FHA insurance fund arising from the loans set forth herein; and

    c.    such other, further and different relief as the Court may deem appropriate.

Dated:    Brooklyn, New York
           October 20, 2009

BENTON J. CAMPBELL

United States Attorney
Eastern District of New York

By:    _____

KEVAN CLEARY (KC 6125)
JAMES H. KNAPP (JK 5517)
EDWARD K. NEWMAN (EN 9670)
JOHN VAGELATOS (JV 2063)
Assistant United States Attorneys
(718) 254-7000